**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**
**CASE NO.: 06-243-JMH**

West Hills Farms, LLC,                                                              PLAINTIFFS
Arbor Farms, LLC,
Nelson Breeders, LLC and
MacDonald Stables LLC

v.

ClassicStar, LLC, ClassicStar Farms, LLC,
National Equine Lending Co., LLC, Geostar Corp.,                    DEFENDANTS
Tony Ferguson, David Plummer, and
John Does 1-3.

## AMENDED COMPLAINT

For their Amended Complaint against the defendants, the Plaintiffs West Hills, LLC
("West Hills"), Arbor Farms, LLC ("Arbor"), Nelson Breeders, LLC ("Nelson") and MacDonald
Stables LLC ("MacDonald")(collectively "Plaintiffs"), through counsel, state as follows:

### I.  INTRODUCTION AND NATURE OF THE CASE

1.      Acting together, over the past five years, the defendants have converted a
thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting purchasers of
nearly $500 million.

2.      Operating in a number of states, including Kentucky, defendants aggressively
marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy
individuals interested in participating in the thoroughbred horse industry.

3.      The United States government is currently pursuing a criminal investigation into
the activities of the defendants relating to the Mare Lease Programs, and in February, 2006
acting on federal search warrants, seized the books and records of ClassicStar, LLC.  [*See*

Exhibit A.]  As a result, the participation of Plaintiffs and all others who participated in the Mare Lease Programs have been called into question.

4.      As described by the defendants, the Mare Lease Programs gave purchasers ownership of thoroughbred breeding interests worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding.  Moreover, by virtue of certain tax benefits associated with the Mare Lease Programs, purchasers could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

5.      However, defendants deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by defendants could sustain and contrived to disguise this fact by substituting non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to purchasers.

6.      In 2004 alone, the defendants succeeded, by virtue of their fraudulent practices, in selling more than $160 million dollars of Mare Lease Programs at a time when defendants owned only approximately $40 million of thoroughbred equine bloodstock.  Plaintiffs' direct losses as a result of this scheme exceed $20 million.

7.      Based on the defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, Plaintiffs bring this action against defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et. seq.*, and other federal and state laws.  Defendants engaged in such violations directly and as co-conspirators.  The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## II. PARTIES, JURISDICTION AND VENUE

8.     Plaintiff West Hills is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

9.     Plaintiff Arbor is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

10.     Plaintiff Nelson is a limited liability company organized under the laws of the state of Washington with its principal place of business located in Bellevue, Washington.

11.     Plaintiff MacDonald is a limited liability company organized under the laws of the state of Wisconsin.

12.     Defendant David Plummer ("Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located at Farmington, Utah.

13.     Defendant Tony Ferguson ("Ferguson") is, upon information and belief, a citizen and resident of the State of Florida with a residence or place of business located at Tampa, Florida.

14.     Defendant ClassicStar, LLC ("ClassicStar") is a limited liability company organized and existing under the laws of Utah and authorized to conduct business in Kentucky, with a registered agent located in Lexington, Kentucky.  ClassicStar and/or ClassicStar Farms, LLC operate two horse farms with approximately 600 acres, and have employed approximately 40 individuals in Kentucky.

15.     Defendants ClassicStar Farms, LLC ("ClassicStar Farms") is a limited liability company organized and existing under the laws of Kentucky, with a registered agent located in Lexington, Kentucky.

16.     Defendant National Equine Lending Company, LLC ("NELC") is a Utah limited liability Company with a registered agent located in Salt Lake City, Utah.

17.     Defendant GeoStar Corporation ("GeoStar") is a corporation organized and existing under the laws of Delaware with a registered agent located in Michigan.  Defendant GeoStar is a closely-held corporation that owns, indirectly through subsidiaries, ClassicStar. Three individuals, Ferguson, Thomas Robinson, of Michigan, and John Parrott, of the U.S. Virgin Islands, own the primary interest in GeoStar, with a small percentage of GeoStar currently owned or owned in the past by Plummer's son.  In addition to ClassicStar, GeoStar owns approximately 15% of GasStar, a publicly traded corporation.

18.     Defendants John Does 1-3 are agents of ClassicStar who participated in marketing the Programs and made representations to Plaintiffs regarding same.

19.     At all times relevant to this Complaint, each of the defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

20.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all of part of the claims arise from the defendants' violations the United States Code, including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et. seq.*

21.     This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

22.     This Court has personal jurisdiction over each of the defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) and KRS 454.210 as each regularly transacts

4

business in Kentucky or has minimum contacts with Kentucky, through their involvement with, management of, or receipt of funds from the ClassicStar Mare Lease Programs and the operation of ClassicStar farms in Versailles, Kentucky, such that it is reasonable for this Court to exercise jurisdiction over them.

23.     Venue is proper in this district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 as one or more of the defendants reside, are found, have agents, or transact their affairs within the Lexington jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

### III.  PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX TREATMENT

24.     Mare leases represent one alternative method of participating in the thoroughbred industry.  Rather than investing in a mare directly by way of purchase, the participant leases the rights to the mare for a breeding season and then purchases a stallion nomination to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often the arrangement also includes the price of board for the mare and/or foal and insurance.

25.     Mare leases are a recognized mode of participation in the thoroughbred industry. Prior to the acquisition of control by Plummer and Ferguson, ClassicStar's predecessor conducted a well regarded operation that included boarding and leasing of thoroughbred mares.

26.     Participation in the equine industry has certain tax effects.  A taxpayer that is actively engaged in the horse business may be entitled to deduct as ordinary and necessary business expenses the amounts that he pays in connection with the business during any tax year. Such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare if the taxpayer chose to enter into a leasing program, rather than make an outright purchase.

5

27.     When the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains. Because the cost of producing the foal was deducted as an ordinary expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

28.     When a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the 37% applicable to normal income.

29.     A taxpayer may be entitled to deduct his breeding expenses even if the source of his investment is a loan, provided that the loan is not made by a party with certain connections with the party to whom the breeding expenses are being paid.

## IV.  DEFENDANTS' FRAUDULENT SCHEMES

30.     Since at least 2001, the defendants Ferguson and Plummer, presided over and, in concert with the other defendants, were associated with and conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of  millions of dollars from purchasers of fraudulent Mare Lease Programs.  The defendants' schemes were presented, marketed and sold to purchasers by the defendants using, *inter alia*, the United States mail and/or interstate wire communications.   The defendants' illegal conduct included mail fraud, wire fraud, misrepresentation and misappropriation of purchaser's funds.

31.     Prior to 1998, the thoroughbred mare leasing and boarding operation currently controlled by ClassicStar was run by an unrelated entity known as Classic Breeders, LLC.

32.     Classic Breeders, LLC owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations available for use in connection with the Classic Breeders mares.

33.     Classic Breeders, LLC employed both David Plummer and his son Spencer Plummer.

34.     In 2000, an entity controlled by David Plummer purchased most of the assets of Classic Breeders, LLC and continued its thoroughbred mare operations.

35.     Through its subsidiaries, GeoStar, under Ferguson's control, subsequently acquired ownership of New Classic Breeders and changed its name to ClassicStar, LLC.

36.     ClassicStar continued to operate the thoroughbred boarding and mare leasing business, in conjunction with its wholly-owned subsidiary ClassicStar Farms.

37.     However, subsequent to the acquisition of control by Plummer, GeoStar, and Ferguson, ClassicStar began inflating the value of its Mare Lease Programs and selling far more Programs than the thoroughbred interests owned by ClassicStar could support.

38.     In marketing its Mare Lease Programs, ClassicStar distributed promotional materials both personally through its agents and through the United States mail and other interstate methods of communication.

39.     In mailings addressed to a "Prospective Client, CPA, Attorney or Tax Advisor," David Plummer marketed the ClassicStar Mare Lease Programs as an extremely profitable opportunity, with a historical net cash return on investment of 1133%. *See* attached Exhibit A.

40.     ClassicStar Brochures also touted its ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains." *See* attached Exhibit B.

41.     Once ClassicStar had generated interest in its programs, its agents, including Ferguson and Plummer, would make personal presentations regarding the benefits of purchasing a Mare Lease Program.  Often, Plummer would explain the operations of the Kentucky farms, while Ferguson would address the purported financial benefits of the program.

42.     In marketing the fraudulent scheme, the defendants explained that the Mare Lease Programs they offered for sale included several components.

43.     The primary component involved participation in the breeding of thoroughbred horses.  Participants would receive a list of a ClassicStar thoroughbred mares available for lease and a listing of stallion nominations owned by ClassicStar to be used in connection with the mares.

44.     Once participants indicated their interest in the program, defendants would provide a book detailing the available thoroughbred mares and nominations.  Participants would make selections from the catalog and, in most instances, rely on selections made by agents of ClassicStar or ClassicStar Farms after consultation with participants.

45.     Plummer and other agents of ClassicStar represented that ClassicStar owned the mares and the nominations from which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result.

46.     The defendants, including Plummer and Ferguson, also marketed the Mare Lease Programs as complying with IRS guidelines for generating certain tax benefits.  For example, defendants unequivocally represented that, by following their recommendations regarding participation in the Mare Lease Programs, participants could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their income tax returns.

8

47.     According to the defendants, the purchase price for the Mare Lease Programs would equal the total value of mare leases, stallion services and pre-paid boarding provided in connection with the mare leases, with the price associated with the mare leases being set at 30% of the market value of the mare as given to the participants.

48.     Finally, the defendants represented that the Mare Lease Programs included a feature whereby the participants could defer the profit on the sale of their foals and, by exchanging their interests in the foals or leases for ownership units in one or more limited liability companies or partnerships, obtain capital gains treatment for the income from their participation in the Mare Lease Program.  At various times, defendant GeoStar, acting at the direction of Ferguson, made available both stock and working interests in gas properties which it owned in order to facilitate this aspect of the program and offer further incentive to participants.

49.     Defendants also encouraged participants to purchase more expensive Mare Lease Programs by arranging for defendants to borrow a large portion of the necessary funds from a supposedly independent company, NELC.  Defendants concealed their connections and/or affiliations between ClassicStar or its principals and NELC.  In fact, the connections between defendants and NELC call into question the ability of participants to deduct the loan proceeds that were paid to ClassicStar as ordinary business expenses incurred in their Mare Lease Program.

50.     The defendants also represented that participants in the Mare Lease Program would receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to use ClassicStar's stallion nominations in connection with the leased mares, boarding for the mares and foals, and ownership of the resulting thoroughbred foals.  In addition, the participants would be able to deduct the total cost of participating in the program as an ordinary business

expense and would ultimately receive capital gains treatment of the income resulting from their activities.

51.     The defendants represented that the participants could purchase the Mare Lease Programs with an initial cash outlay amounting to only a fraction of the value of the total mare lease package, because a substantial portion would be funded by NELC.

52.     Defendants marketed the Programs and these features to a number of potential participants, generating more than $500,000,000 in sales between 2000 and 2004.

53.     Representatives of ClassicStar first approached plaintiff Nelson Breeders in February or March of 2004.

54.     At a March 2004 meeting between representatives of ClassicStar and Nelson Breeders, ClassicStar provided Nelson Breeders with an "Illustration" of the Mare Lease Program.

55.     The Illustration, which identified ClassicStar as "a division of the GeoStar Group," represented that, for an up-front investment of approximately $2,900,000, Nelson's participation would generate tax savings of approximately $11,000,000 and net after tax mare lease revenue of approximately $9 million.

56.     Nelson Breeders' Illustration also outlined several options to exchange a portion of the Mare Leases for alternative investments, including ownership of an interest in an entity called First Energy Partners, Inc. and exchange of that interest for stock in GasStar, Ltd., a publicly traded company controlled by GeoStar and Ferguson.  The Illustration also offered the option of using a percentage of the interests for repayment of the NELC loan and, by virtue of a put option associated with the GasStar stock, provided for a projected net after tax return of 326%.

57.     ClassicStar prepared a second illustration for Nelson Breeders in April 2004, which closely resembled the first except that the alternative investments now involved First Equine Partnership and an entity called GeoEquities LLC.

58.     ClassicStar's agents represented to Nelson that the projections contained in the Illustrations rested on verified past results and that transactions described by the Illustrations would not raise any concerns with the IRS because they were structured to comply with IRS rules and regulations.

59.     Moreover, ClassicStar represented that it owned sufficient thoroughbred interests to justify the cost of the Program and that Nelson Breeders would own any foals resulting from its pairings and be free to sell them, train them, or contribute them to one of the alternative investments at its option.

60.     Relying on these representations, Nelson Breeders executed a binding letter agreement (with an effective date of March 26, 2004) committing it to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with ClassicStar regarding the particular thoroughbred pairings.  [*See* Letter Agreement, Exhibit C.]

61.     Shortly thereafter Nelson made a payment of $2,812,000 to ClassicStar and continued to make payments and incur obligations totaling $28 million up until the execution of the mare lease and boarding agreements in December 2004.

62.     ClassicStar presented a similar Illustration to West Hills in or around May 2004, in which it represented that for approximately $800,000 upfront, West Hills' participation would generate $3,100,000 in after tax revenue, based on tax savings of approximately $5,800,000 and utilizing a NELC loan of $6,500,000 (half the amount of the total program).

63.     Again ClassicStar represented that the total cost of the Mare Lease Program, (approximately $13,000,000 in West Hills' illustration) reflected 30% of the fair value of the mares, the fair value of the stallion nominations, and the fair value of the services provided by ClassicStar and/or ClassicStar Farms, that ClassicStar had assured the Mare Lease Program's compliance with all IRS requirements, and that historical performance figures supported the projections.

64.     ClassicStar also represented that West Hills would own any foals resulting from the pairings and that it owned thoroughbred horses sufficient to justify the projections and costs.

65.     Arbor Farms received an almost identical Illustration around early June 2004 and ClassicStar made the same representations about its programs at a meeting on or around June 13, 2004.

66.     In reliance on these representations, Arbor Farms and West Hills, on or around July 30, 2004, forwarded to ClassicStar executed letter agreements committing them to making payment and executing the mare lease and boarding agreements after consultation with ClassicStar regarding the pairings, in essentially the same form as the Nelson agreements.

67.     On September 24, 2004, ClassicStar mailed invoices to West Hills and Arbor Farms for $4,482,494 and $4,491,807, respectively, and included a schedule of additional payments.

68.     Thereafter, from October 2004 through December 2004, West Hills and Arbor Farms each paid, by wire and check, approximately $7,000,000 to ClassicStar.

69.     Plaintiffs also executed notes to NELC, in the principal amount of $25,088,000 for Nelson Breeders and $7,000,000 each for West Hills and Arbor Farms.    ClassicStar

represented to plaintiffs that it had received the proceeds of these loans in letters dated December 23, 2004.

70.     On or around December 23, 2004, each of the plaintiffs executed the mare lease and breeding agreements making up the body of the program. By this time, in accordance with the terms of the letter agreement, plaintiffs had already transferred tens of millions of dollars to ClassicStar. [*See* Sample Agreement, attached as Exhibit D.]

71.     The Leases specifically warranted that ClassicStar owned the mares involved.

72.     The Leases also gave ClassicStar the right to substitute another mare for the thoroughbred mares chosen by defendants, but required that the substitution be of equal value to the original mare.

73.     Based on similar representations, MacDonald purchased Mare Lease Programs in, among other years, 2004 and 2005 valued at $8 million and $3 million respectively.

74.     ClassicStar once again represented that it owned all of the mares being leased to MacDonald and that these mares were being boarded at MacDonald's expense at the ClassicStar Farm in Kentucky.

75.     As part of the Mare Lease Programs, ClassicStar represented that it had traded out MacDonald's 2004 Mare Lease Program interests for other assets. To date, MacDonald has not received the agreed upon consideration for this exchange, in the approximate amount of $8 million which included, *inter alia*, breeding interest in various thoroughbreds.

76.     MacDonald has also not been able to locate the mares represented as involved in the 2005 Mare Lease Programs, and believes that ClassicStar has listed two of these mares, along with their in utero foals, for sale.

13

77.    The defendants misrepresented virtually every material aspect of the Mare Lease Programs.  Specifically, defendants led Plaintiffs to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, that the Mare Lease Programs fairly reflected the value of the horses and services involved, and that ClassicStar had structured the Programs so that the financing arrangement qualified with Internal Revenue Service requirements for the deduction taken by purchasers.

78.    In fact, the costs and sales figures used to calculate the historical return on investment were entirely fictional, and they grossly overstated both the actual costs which would have been involved in the Mare Lease Programs and the value of the horses involved.

79.    Moreover, defendants intentionally oversold the Programs, knowing that ClassicStar and/or ClassicStar Farms did not have ownership of the thoroughbred interests necessary to support the valuations placed on the Programs or the number of Programs sold.

80.    For instance, ClassicStar, in 2004, entered into Mare Lease Programs valued at approximately $160 million, with the majority of the Programs consisting of the mare leases and stallion fees.  However, ClassicStar's ownership in equine bloodstock for this period was no more than approximately $40 million, one fourth of the value sold.

81.    To conceal this intentional policy of overselling the Mare Lease Programs and further their fraudulent scheme, the defendants contrived to substitute, in large part, non-thoroughbred mares (from a roundup horse breed used to herd livestock in the west) for a number of the thoroughbred mares which should have been included in the Lease.  Plaintiffs did not learn of this substitution until after making payment to ClassicStar.

82.    As part of this substitution scheme, ClassicStar farms were set up to support purported embryo implants from quarter horses into surrogate roundup mares.  In theory, the

embryo implants would have produced quarter horses, because artificial breeding is allowed in the quarter horse industry. However, upon information and belief, ClassicStar may have owned embryos resulting from certain quarter horse pairings, but it did not own mares sufficient to support even the quarter horse aspect of the program.

83.    Whether such implants actually occurred or produced foals is unknown. However, Plaintiffs believed, and the defendants led them to believe, that their entire investment was in thoroughbred horses: leasing a thoroughbred mare and paying for the services of a thoroughbred stallion to obtain through the breeding process a thoroughbred foal. The defendants did not disclose the involvement of the quarter horse embryos, surrogate mares or artificial breeding to plaintiffs until Plaintiffs had paid for the Mare Lease Programs.

84.    Moreover, the values placed on the (likely fictional) embryos by defendants greatly exceeded any reasonable value for such interests, a fact known to defendants at the time they requested payment from Plaintiffs and thereafter.

85.    Because participants such as Plaintiffs would not own the expected number of thoroughbred foals at the end of the breeding season, defendants knew that participants could not possibly achieve the rate of return represented.

86.    Even if participants elected one of the "alternative investments" and contributed a portion of their leases to another entity, their ownership interest in that entity would lack the represented value because the entity would not hold the assets needed to fulfill any put obligations associated with those interests. However, the existence of the alternative investments and the availability of Gastar stock helped to disguise the lack of adequate thoroughbred mares to sustain the Programs.

87.     Also to facilitate the policy of deliberate overselling, NELC conspired with the other defendants to create a financing plan for the Mare Lease Programs that both helped to conceal the substitution of non-thoroughbreds and led participants, including Plaintiffs, to claim deductions which resulted in tax savings or refunds passed on to ClassicStar and the other defendants.

88.     Upon information and belief, ClassicStar actually loaned the amounts used to finance the Mare Lease Programs to NELC, a fact not disclosed to Plaintiffs.  Plaintiffs have no knowledge that NELC actually advanced any funds to ClassicStar.

89.     This circular loan structure and the ownership of NELC by Plummer's brother-in-law, a fact also not disclosed to Plaintiffs, together with other irregularities in defendants' transactions have led to a criminal investigation by the Internal Revenue Service, of the programs and practices of ClassicStar and its affiliates, despite the defendants' representations that they had disclosed all facts necessary for Plaintiffs to rely on their assurances regarding the proper tax treatment of the expenses.

90.     NELC knowingly conspired with the other defendants to conceal the nature of its dealings with ClassicStar and the over valuation of the ClassicStar Mare Lease Programs.

91.     Upon information and belief, NELC also accepted a portion of the proceeds of the Mare Lease Programs with knowledge that defendants had obtained same by concealing and misrepresenting certain facts including, *inter alia*, those regarding NELC.

92.     Defendant GeoStar also knowingly accepted the proceeds of the other defendants' fraudulent schemes.  For instance, early in the history of the Programs, ClassicStar advanced approximately $10 million to GeoStar, which advance was booked as a loan but later reduced to zero.

16

93.     This reduction allegedly took place in exchange for GeoStar's agreeing to exchange working gas interests which it owned for participants' equine interests acquired through the Mare Lease Programs.  At various other times, GeoStar, acting at the direction of Ferguson, also made available GasStar stock for exchange and did so with knowledge that the Mare Lease Programs had been substantially overvalued and with the intent of facilitating and concealing the fraudulent schemes.

94.     Upon information and belief, defendants ClassicStar and/or ClassicStar Farms purchased substantial assets, including thoroughbred mares which they allegedly owned prior to payment by Plaintiffs, with funds received by Plaintiffs in exchange for the fictional thoroughbred interests and the Mare Lease Programs.  For instance, in 2004, the year in which all of the Plaintiffs purchased Mare Lease Programs, ClassicStar reportedly spent $9,835,000 for a dozen mares.

95.     Further, defendants used a portion of the fraudulently obtained funds to support the activities of ClassicStar, ClassicStar Farms, GeoStar and/or their affiliates, which accepted the funds with knowledge of the fraud and conspired with the other defendants to conceal the true operation of the Mare Lease Programs.

96.     The use of these funds, in operation of the farms, the activities of GeoStar touted as alternative investments, and the marketing of the Mare Lease Programs facilitated the continuation of the fraudulent scheme and enabled the defendants to defraud Plaintiffs.

97.     Using these fraudulent schemes, the defendants obtained over $500 million from participants, including approximately $30 million from Plaintiffs.

98.     ClassicStar now intends to disperse a substantial portion of its assets, including approximately 90 broodmares, two of which are the subject of MacDonald's 2005 leases and described as pregnant on the sales catalog, in November of this year.

## V.  THE PREDICATE ACTS

99.     The RICO defendants conspired to and did engage in mail and wire fraud in violation of 18 U.S.C. §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses.  Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. §1341 and/or §1343.  A schedule of some of the relevant uses is attached as Exhibit E and incorporated by reference herein.

100.     Defendants used mail and wire communications to collect the proceeds of the fraudulent scheme, to induce Plaintiffs to forward payments to them, to forestall Plaintiffs' inquiry into the scheme, and to induce Plaintiffs' participation.

101.     Defendants misrepresentations using the United States mail and for the purpose of causing the use of the United States mail and interstate wire communications by others were made with the intent to defraud plaintiffs, and plaintiffs in fact reasonably relied upon such misrepresentations, including those relating to the nature of the Mare Lease Programs, to their detriment.

## COUNT I - RICO

102.     The allegations of paragraphs 1 – 96 are incorporated by reference as if fully set forth herein.

103.    At all times relevant to the Complaint, defendants ClassicStar and ClassicStar Farms were each an enterprise as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962.   Each was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this Complaint.

104.    Defendants Ferguson, Plummer, GeoStar, ClassicStar and ClassicStar Farms conspired to and did derive or receive income from a pattern of racketeering activity some part of which was invested and used to operate ClassicStar and/or ClassicStar Farms, enabling plaintiffs to be defrauded as set forth herein.

105.    Each of the defendants was associated with or employed by ClassicStar and/or ClassicStar Farms and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of ClassciStar and/or ClassicStar Farms through engaging in a pattern of racketeering activity.

106.    The actions of defendants, including the conduct of the affairs of ClassicStar and/or ClassicStar Farms through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

107.    Defendants have continuously engaged in criminal activities, including, but not limited to, mail or wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

108.    The defendants' pattern of racketeering activity in the conduct of ClassicStar and/or ClassicStar Farms, including acts of mail and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

109.    Through their conduct of the enterprises, the defendants have made or caused to be made or distributed communications by United States mail which included misrepresentations

of material fact regarding the Mare Lease Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in attached Exhibit E.

110.   By virtue of these and similar communications occurring over at least the past four years, the defendants have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

111.   As a direct and proximate result of defendants' conduct as set forth herein, including defendants' conduct of the affairs of and investment in ClassicStar and/or ClassicStar Farms, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amount of their investment and legal expenses.

112.   Also, at all times relevant to the Complaint, defendant GeoStar was an enterprise as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962. It was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this Complaint.

113.   Defendants Ferguson, Plummer, and ClassicStar and ClassicStar Farms conspired to and did derive or receive income from a pattern of racketeering activity some part of which was invested and used to operate GeoStar, enabling plaintiffs to be defrauded as set forth herein.

114.   Each of the defendants was associated with or employed by GeoStar and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of GeoStar through engaging in a pattern of racketeering activity.

115.    These acts of defendants, including the conduct of the affairs of GeoStar, through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

116.    Defendants have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

117.    The defendants' pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

118.    Through their conduct of the enterprises, the defendants have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations.   Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit E.

119.    By virtue of these and similar communications occurring over at least the past four years, the defendants have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

120.    As a direct and proximate result of defendants' conduct as set forth herein, including defendants conduct of the affairs of and investment in GeoStar, plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

121.   At all times relevant to the Complaint, defendants Ferguson, Plummer, the companies which they formed, caused to be formed, or controlled, including ClassicStar, ClassicStar Farms, GeoStar and NELC, and various agents of those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962 (hereinafter the "ClassicStar Enterprise").   The ClassicStar Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

122.   Each of the defendants was associated with or employed by the ClassicStar Enterprise and each conspired to and did as part of that employment or association  conduct or participate in the conduct of the affairs of the ClassicStar Enterprise through engaging in a pattern of racketeering activity.

123.   Each of the defendants conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the ClassicStar Enterprise, enabling the ClassicStar Enterprise to defraud plaintiffs as set forth herein.

124.   As a whole, Defendants acted in concert, with specific, well-defined roles in the ClassicStar Enterprise, to achieve the common goal of defrauding participants such as the plaintiffs into making payments for the misrepresented Mare Leasing Programs.

125.   These acts of defendants, including the conduct of the affairs of the ClassicStar Enterprise through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

126.   Defendants have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

22

127.    The defendants' pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

128.    Through their conduct of the enterprises, the defendants have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations.   Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit E.

129.    By virtue of these and similar communications occurring over at least the past four years, the defendants have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

130.    As a direct and proximate result of defendants' conduct as set forth herein, including defendants conduct of the affairs of and investment in the ClassicStar Enterprise, plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

131.    Pursuant to 18 U.S.C. §1964(c), plaintiffs are entitled to recover from the defendants, jointly and severally, treble damages, their costs and reasonable attorney fees.

### COUNT II – COMMON LAW FRAUD

132.    The allegations of paragraphs 1 - 126 are incorporated by reference as if fully set forth herein.

133.    In order to induce plaintiffs to purchase the Mare Lease Programs, and with the intent that plaintiffs rely on their representations, defendants made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

134.    As described above, from 2004 on, in promotional materials and in presentations, defendants represented to Plaintiffs that Plaintiffs could claim the deductions described in connection with the Mare Lease Programs and that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, and that the historical figures justified the projected returns referenced in the Illustrations.  Defendants further failed to disclose the lending relationship between ClassicStar and NELC, the ownership of NELC by a relative of Plummers', and the substitution of round-up mares or quarter horse embryos.

135.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which defendants had a duty to disclose.

136.    Defendants knew each representation was false or made same with reckless disregard to the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts.

137.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same. The Plaintiffs would not have agreed to purchase the Programs but for the misrepresentations of the defendants.

138.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of defendants.

139.    The defendants committed this fraud and made said misrepresentations willfully, wantonly, and with malicious disregard of the rights of the plaintiffs.

140.    Plaintiffs are entitled to punitive and compensatory damages and/or rescission of the agreements as a result of defendants' fraud.

## COUNT III – BREACH OF CONTRACT

141.    The allegations of paragraphs 1 - 135 are incorporated by reference as if fully set forth herein.

142.    Defendant ClassicStar entered into various agreements with Plaintiffs, including the letter agreements and the Mare Lease Agreements.

143.    ClassicStar failed to fulfill its obligations under these agreements and breached the provisions of these agreements, including, *inter alia*, its warranty that it owned the mares represented as involved in the Mare Lease Program.

144.    As a direct and proximate result of ClassicStar's breach, Plaintiffs have incurred damages, including the cost of the Mare Lease Programs and lost profits relating to the breeding of the mares.

## COUNT IV- THEFT BY DECEPTION

145.    The allegations of paragraphs 1 - 139 are incorporated by reference as if fully set forth herein.

146.    The defendants conspired to and did commit theft by deception as prohibited by KRS 514.040 by obtaining property from the Plaintiffs by deception with the intent to deprive the Plaintiffs of same.

147.    Specifically, the defendants created a false and misleading impression of the mares and services that they offered in connection with the Mare Lease Programs.

148.    As a direct and proximate result of the deception by defendants, Plaintiffs paid sums in connection with the Mare Lease Programs, including amounts represented to reflect 30% of the value of the mares, and stud fees and board fees.

149.    Pursuant to KRS 446.070, Plaintiffs are entitled to recover damages directly and proximately resulting from such violation.

### COUNT V – UNJUST ENRICHMENT

150.    The allegations of paragraphs 1 - 144 are incorporated by reference as if fully set forth herein.

151.    Plaintiffs made payments to defendants based on defendants' false and misleading descriptions of the Mare Lease Programs, the horses involved in the Mare Lease Programs, and the services that they provided as part of those Mare Lease Programs, and these payments were deposited in accounts controlled by defendants.

152.    Defendants used a portion of these funds in furtherance of their fraudulent scheme and to purchase property currently held by defendants.

153.    In addition, upon information and belief, the defendants transferred a portion of the funds to defendant Geostar, for use in the operation of its business, and specifically to fund gas exploration opportunities which have resulted in profit to Geostar.

154.    Defendants were not entitled to these funds, which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have transferred the funds had the true nature of the transaction been known.

155.     Defendants, including defendant Geostar, were unjustly enriched by obtaining proceeds from Plaintiffs by fraud and in exchange for thoroughbred breeding interests never received by Plaintiffs.

156.     As a result of defendants' unjust receipt of these sums, Plaintiffs have sustained damages, including the amount of their payments.

## COUNT VI - CONSPIRACY

157.     The allegations of paragraphs 1 - 151 are incorporated by reference as if fully set forth herein.

158.     Each of the defendants agreed to and acted in concert with the others in carrying out the fraudulent scheme described above.

159.     Each of the defendants performed acts in furtherance of the common fraudulent scheme.

160.     Plaintiffs have suffered damages as a result of the defendants' concerted activities as described above, for which the defendants are jointly and severally liable.

## COUNT VII – MONEY HAD AND RECEIVED

161.     The allegations of paragraphs 1 - 155 are incorporated by reference as if fully set forth herein.

162.     Defendants, including defendant Geostar, hold funds that in equity and good conscience belong to Plaintiffs, which Plaintiffs are in equity and law entitled to recover.

## COUNT VIII - ACCOUNTING

163.     The allegations of paragraphs 1 - 157 are incorporated by reference as if fully set forth herein.

164.    As part of the programs, ClassicStar agreed to hold, on behalf of Plaintiffs, title to certain property belonging to Plaintiffs, including the foals resulting from the breedings utilizing the mare leases.

165.    ClassicStar holds such property in trust for and as agent for the Plaintiffs.

166.    Plaintiffs are entitled to an accounting from ClassicStar with regard to that property, including the current status of title to the thoroughbred foals ClassicStar represented as belonging to Plaintiffs, the result of the remaining pairings purchased by Plaintiffs and the disposition of any foals resulting from those pairings.

167.    To the extent that ClassicStar intends to dispose of or distribute such property prior to accounting, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

### COUNT IX – CONSTRUCTIVE TRUST

168.    The allegations of paragraphs 1 - 162 are incorporated by reference as if fully set forth herein.

169.    Plaintiffs paid ClassicStar tens of millions of dollars between the middle and end of 2004.

170.    ClassicStar did not own the equine interests that it represented to Plaintiffs at the time of these payments; this included some of the mares involved in Plaintiffs' Mare Lease Programs.  Further, defendants misrepresented the true nature of the Mare Lease Programs.

171.    Upon information and belief, defendants used funds wrongfully acquired from the Plaintiffs to acquire property, including specific thoroughbred mares, currently in their possession.

172.     Having obtained Plaintiffs' funds through the improper and fraudulent means described herein, defendants hold those funds or their proceeds in constructive trust for Plaintiffs and must return or account for same.

173.     To the extent that defendants intend to dispose of or distribute such property, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

### COUNT X – PUNITIVE DAMAGES

174.     The allegations of paragraphs 1 - 168 are incorporated by reference as if fully set forth herein.

175.     The actions of the defendants described above were undertake with fraud, malice and oppression so as to entitle Plaintiffs to punitive damages under applicable law.

WHEREAS, Plaintiffs respectfully demand as follows:

1.     judgment upon their complaint against all defendants;

2.     compensatory damages;

3.     punitive damages;

4.     treble damages and attorney fees where authorized;

5.     injunctive relief;

6.     a constructive trust of defendants ClassicStar and ClassicStar Farms' assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

7.     trial by jury on all issues so triable; and

8.     any and all other relief to which Plaintiffs appear entitled.

Paul E. Sullivan
Barry D. Hunter
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507-1749
Telephone:     (859) 231-0000
Facsimile:     (859) 231-0011

Robert C. Webb
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
Telephone:     (502) 589-5400
Facsimile:     (502) 581-1087
Attorneys for Plaintiffs

LEXLibrary 0108868.0536983  313473v.1