**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
**CASE NO.: 06-243-JMH**

West Hills Farms, LLC,                                                              PLAINTIFFS
Arbor Farms, LLC,
Nelson Breeders, LLC,
MacDonald Stables LLC and
Jaswinder and Monica Grover

v.

ClassicStar, LLC, ClassicStar Farms, LLC,                                          DEFENDANTS
ClassicStar 2004, LLC,
National Equine Lending Co., LLC,
New NEL, LLC, Geostar Corp.,
Geostar Equine Energy, Inc.,
Tony Ferguson, David Plummer,
ClassicStar Thoroughbreds, LLC,
Spencer Plummer,
Karren Hendrix Stagg Allen & Co.,
Thom Robinson, John Parrot,
First Equine Energy Partners, LLC,
Strategic Opportunity Solutions, LLC d/b/a Buffalo Ranch,
ClassicStar 2005 Powerfoal Stables, LLC,
ClassicStar Farms, Inc.,
GeoStar Financial Services Corp.,
Handler, Thayer & Duggan, LLC,
and John Does 1-3.

## THIRD AMENDED COMPLAINT

For their Third Amended Complaint against the defendants, the Plaintiffs West Hills,

LLC ("West Hills"), Arbor Farms, LLC ("Arbor"), Nelson Breeders, LLC ("Nelson"),

MacDonald Stables LLC ("MacDonald"), and Jaswinder and Monica Grover

("Grovers")(collectively "Plaintiffs"), through counsel, state as follows:

## I. INTRODUCTION AND NATURE OF THE CASE

1.     Acting together, over the past five years, the defendants have converted a thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting purchasers of nearly $600 million.

2.     Operating in a number of states, including Kentucky, defendants aggressively marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in participating in the thoroughbred horse industry.

3.     The United States government is currently pursuing a criminal investigation into the activities of the defendants relating to the Mare Lease Programs, and in February, 2006 acting on federal search warrants, seized the books and records of ClassicStar, LLC. As a result, the participation of Plaintiffs and all others who participated in the Mare Lease Programs have been called into question.

4.     As described by the defendants, the Mare Lease Programs gave purchasers ownership of thoroughbred breeding interests worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding. Moreover, by virtue of certain tax benefits associated with the Mare Lease Programs, purchasers could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

5.     However, defendants deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by defendants could sustain. Defendants contrived to disguise this fact by substituting non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to purchasers and by encouraging participants in the Programs to exchange their Mare Lease interests for interests in a variety of related entities.

6. Defendants touted these related entity investments as having features, such as guaranteed puts or buy backs, which ensure that Purchasers could at the least fully recoup their investments. However, at that time Defendants knew that many of the entities could not meet their future obligations because their ability depended on the existence of sufficiently valuable Mare Lease interests or because those entities were overcommitted.

7. By these means, in 2004 alone, the defendants succeeded, by virtue of their fraudulent practices, in selling more than $160 million dollars of Mare Lease Programs at a time when defendants owned only approximately $40 million of thoroughbred equine bloodstock. Plaintiffs' direct losses as a result of this scheme exceed $20 million.

8. Based on the defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, Plaintiffs bring this action against defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et. seq.*, and other federal and state laws. Defendants engaged in such violations directly and as co-conspirators. The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## II. PARTIES, JURISDICTION AND VENUE

9. Plaintiff West Hills is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

10. Plaintiff Arbor is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

11. Plaintiff Nelson is a limited liability company organized under the laws of the state of Washington with its principal place of business located in Bellevue, Washington.

12.     Plaintiff MacDonald is a limited liability company organized under the laws of the state of Wisconsin with its principal place of business located in Wisconsin.

13.     Plaintiffs, Jaswinder and Monica Grover ("Grovers"), are citizens and residents of the State of Nevada.

14.     Defendant David Plummer ("Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located at Farmington, Utah.

15.     Defendant Spencer Plummer ("Spencer Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Utah.

16.     Defendant Tony Ferguson ("Ferguson") is, upon information and belief, a citizen and resident of the State of Florida with a residence or place of business located at Tampa, Florida.

17.     Defendant Karren Hendrix Stagg Allen & Co. ("Karren Hendrix") is, upon information and belief, a citizen and resident of the State of Utah with a place of business located in Salt Lake City, Utah.

18.     Defendant Handler, Thayer & Duggan, LLC ("Handler") is a professional corporation of lawyers and tax consultants with its principal place of business located in Chicago, Illinois.

19.     Defendant Thom Robinson ("Robinson") is, upon information and belief, a citizen and resident of the state of Michigan.

20.     Defendant John Parrot ("Parrot") is, upon information and belief, a citizen of the United States Virgin Islands.

4

21.     Defendant ClassicStar, LLC is a limited liability company organized and existing under the laws of Utah and authorized to conduct business in Kentucky, with a registered agent located in Lexington, Kentucky.  ClassicStar and/or ClassicStar Farms, LLC operate two horse farms with approximately 600 acres and have employed approximately 40 individuals in Kentucky.

22.     Defendant ClassicStar Farms, LLC ("ClassicStar Farms") is a limited liability company organized and existing under the laws of Kentucky, with a registered agent located in Lexington, Kentucky.

23.     Defendant ClassicStar Farms, Inc. ("CFI") is a Delaware corporation with its principal place of business in Michigan.

24.     Defendant ClassicStar Thoroughbreds of Kentucky, LLC ("ClassicStar Thoroughbreds") is a limited liability company organized and existing under the laws of Delaware, with a place of business located in Versailles, Kentucky.

25.     Defendant ClassicStar 2004, LLC ("ClassicStar 2004") is or was a limited liability company organized under the laws of Utah, doing business from ClassicStar's offices.

26.     Defendant National Equine Lending Company, LLC ("NELC") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah.

27.     Defendant New NEL, LLC ("New NEL") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah.   Upon information and belief, New NEL is the successor-in-interest to NELC.

28.     Defendant GeoStar Corporation ("GeoStar") is a corporation organized and existing under the laws of Delaware with a registered agent located in Michigan.  Defendant GeoStar is a closely-held corporation that owns, indirectly through subsidiaries, ClassicStar.

Three individuals, Ferguson, Robinson and Parrott, own the primary interest in GeoStar, with a small percentage of GeoStar currently owned or owned in the past by Spencer Plummer.  In addition to ClassicStar, GeoStar owns approximately 15% of Gastar Exploration Ltd. ("Gastar"), a publicly traded corporation.

29.     Defendant First Equine Energy Partners LLC ("FEEP") is a limited liability company organized and existing under the laws of Nevada with a place of business located in Tampa, Florida.

30.     Defendant GeoStar Equine Energy, Inc. ("GEEI") is a corporation which is, upon information and belief, organized under the laws of either Delaware or Texas, with its principal place of business in Michigan.  Defendants Parrot, Robinson and Ferguson serve as officers and/or directors of GEEI.  GEEI is the managing member of FEEP.

31.     Defendant Strategic Opportunity Solutions LLC, d/b/a Buffalo Ranch ("SOS") is a limited liability company organized and existing under the laws of Utah with a place of business located in Utah.

32.     Defendant, GeoStar Financial Services Corp. ("GFS") is, upon information and belief, a corporation organized and incorporated in the State of Delaware, with its principal place of business in Michigan.

33.     Defendant, ClassicStar 2005 Powerfoal Stables, LLC is, upon information and belief, a limited liability company organized and existing under the laws of Delaware, doing business from ClassicStar's offices.

34.     Defendants John Does 1-3 are entities affiliated with GeoStar, SOS or ClassicStar or who participated in or had knowledge of the scheme described herein, and who received the

proceeds of the Mare Lease Programs under circumstances making their retention of the benefits of those proceeds improper as against Plaintiffs.

35.     At all times relevant to this Complaint, each of the defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

36.     Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all of part of the claims arise from the defendants' violations the United States Code, including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et. seq.* It appears that this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37.     This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

38.     This Court has personal jurisdiction over each of the defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) and KRS 454.210, as each regularly transacts business in Kentucky or has minimum contacts with Kentucky, through their involvement with, management of, or receipt of funds from the ClassicStar Mare Lease Programs and the operation of ClassicStar farms in Versailles, Kentucky, such that it is reasonable for this Court to exercise jurisdiction over them.

39.     Venue is proper in this district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 as one or more of the defendants reside, are found, have agents, or transact their affairs within

the Lexington jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

### III.  PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX TREATMENT

40.     Mare leases represent one alternative method of participating in the thoroughbred industry.  Rather than investing in a mare directly by way of purchase, the participant leases the rights to the mare for a breeding season and then purchases a stallion nomination to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often the arrangement also includes the price of board for the mare and/or foal insurance.

41.     Mare leases are a recognized mode of participation in the thoroughbred industry. Prior to the acquisition of control by Plummer and Ferguson, ClassicStar's predecessor conducted a well regarded operation that included boarding and leasing of thoroughbred mares.

42.     Participation in the equine industry has certain tax effects.  A taxpayer that is actively engaged in the horse business may be entitled to deduct as ordinary and necessary farm business expenses the amounts that he pays in connection with the business during any tax year. Such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare if the taxpayer chose to enter into a leasing program, rather than make an outright purchase.

43.     When the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains.  Because the cost of producing the foal was deducted as an ordinary expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

44.     When a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, however, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the 37% applicable to ordinary income.

45.     A taxpayer may be entitled to deduct his breeding expenses even if the source of his investment is a loan, provided that the requirements of various regulations relating to the loan are met.

## IV.  DEFENDANTS' FRAUDULENT SCHEMES

46.     Since at least 2001, the individual defendants presided over and, in concert with the defendants identified in Count I, *infra*, were associated with and conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of  millions of dollars from purchasers of fraudulent Mare Lease Programs.   These defendants' schemes were presented, marketed and sold to purchasers by these defendants using, *inter alia*, the United States mail and/or interstate wire communications.   The illegal conduct of these defendants included mail fraud, wire fraud, misrepresentation and misappropriation of purchaser's funds.

47.     Prior to 1998, the thoroughbred mare leasing and boarding operation currently controlled by ClassicStar was run by an unrelated entity known as Classic Breeders, LLC ("Classic Breeders").

48.     Classic Breeders owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations available for use in connection with the Classic Breeders mares.

49.     Classic Breeders employed both David Plummer and his son Spencer Plummer.

50.    In 2000, an entity controlled by David Plummer purchased most of the assets of Classic Breeders and continued its thoroughbred mare operations.

51.    Through its subsidiaries, GeoStar, under Ferguson's control, subsequently acquired ownership of the entity formerly known as Classic Breeders and changed its name to ClassicStar, LLC.

52.    ClassicStar, LLC continued to operate the thoroughbred boarding and mare leasing business, in conjunction with its wholly-owned subsidiary ClassicStar Farms.

53.    ClassicStar also operated its Mare Lease Program sales through other wholly owned and controlled subsidiaries which had no function or existence separate from ClassicStar. For instance, ClassicStar 2004 was formed to facilitate sales from 2004 forward, but at all times functioned as nothing more than another name under which ClassicStar operated its Mare Lease business.  Further, ClassicStar's affairs were also conducted through its parent and/or subsidiary companies such as CFI, which contracted with Spencer Plummer for Plummer to act on behalf of ClassicStar, without regard to the separate existence of those companies.   Accordingly, all allegations of the Complaint against or referring to "ClassicStar" include both ClassicStar, LLC, ClassicStar 2004, LLC and CFI.

54.    However, subsequent to the acquisition of control by Plummer, GeoStar, and Ferguson, ClassicStar began inflating the value of its Mare Lease Programs and selling far more Programs than the thoroughbred interests owned by ClassicStar could support.

55.    In marketing its Mare Lease Programs, ClassicStar distributed promotional materials both personally through its agents and through the United States mail and other interstate methods of communication.

56.     For instance, in mailings addressed to a "Prospective Client, CPA, Attorney or Tax Advisor," David Plummer marketed the ClassicStar Mare Lease Programs as an extremely profitable opportunity, with a historical net cash return on investment of 1133%.

57.     ClassicStar Brochures also touted its ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains."

58.     Virtually all of the ClassicStar marketing materials provided to Plaintiffs and others described the Programs as an investment in thoroughbreds.   For instance, the Due Diligence and Mare Lease Information Booklet provided to Plaintiffs discussed how mares were bred to "the very best thoroughbred stallions," and another promotional brochure discussed GeoStar's involvement in the Programs through its ownership of a "thoroughbred horse breeding business."

59.     Once ClassicStar had generated interest in its thoroughbred breeding operations, its agents, including Ferguson and Plummer, would make personal presentations regarding the benefits of purchasing a Mare Lease Program.  Often, Plummer would explain the operations of the Kentucky farms, while Ferguson would address the purported financial benefits of the program.

60.     Ferguson was described on materials provided to Plaintiffs and other participants as ClassicStar's Co-Managing Member.  He also was listed as a member of FEEP's advisory committee in its private placement memoranda, as a contact person and tax partner for FEEP, and as President and CEO of Gastar and GeoStar.

11

61.   Ferguson actively took part in the management of ClassicStar's financial operations and provided direction to Plummer regarding the marketing of the Programs, thus furthering the sale of the Programs and the defendants' scheme.

62.   Parrot and Robinson also took active roles in the management of ClassicStar's sale and promotion of the Mare Lease Programs.

63.   Parrot and Robinson, acting as controlling members of GeoStar and ClassicStar and on behalf of ClassicStar, negotiated with various salespeople to pay the salespeople commissions in return for promoting the ClassicStar Mare Lease Programs.  For instance, Parrot negotiated an arrangement to pay a commission to the law firm representing Plaintiffs Nelson, West Hills and Arbor Farms, for promoting Plaintiffs' involvement in the Programs, and Robinson, acting on behalf of ClassicStar Farms, signed an employment agreement with Plummer which set forth Plummer's obligations with regard to the promotion of the Mare Lease Programs.

64.   Parrot also reviewed and approved of marketing materials used by ClassicStar, including materials illustrating projected returns on investment and the attorney opinion letters offered to participants to reassure them as to the stability of the Programs.

65.   Spencer Plummer was identified on promotional materials and correspondence as ClassicStar's President and often executed documents comprising the Program, such as the Letters of Intent signed by Plaintiffs and Mare Lease agreements.  Spencer Plummer executed MacDonald's initial letter of intent in 2003, which misrepresented the values of the services and equine interests provided in connection with the Programs, signed a similar letter of intent with similar representations with Nelson in 2004, corresponded with Arbor Farms and West Hills regarding how they could achieve the "full tax benefits" of the Programs in August of 2004

12

without disclosing facts material to the tax treatment of the Programs as explained further herein, executed the Mare Leases and other legal documents included in the Plaintiffs' Programs, and executed several agreements in connection with the trade out of MacDonald's equine interests, including MacDonald's FEEP agreement.

66.    Plummer was identified on materials distributed by ClassicStar as ClassicStar's founder.  He also acted as ClassicStar's Director of Marketing and the Director of Marketing for GeoStar, and promoted the sale of the Mare Lease Programs, including to Plaintiffs.  He also executed legal documents provided to Plaintiffs as ClassicStar's CEO.

67.    In marketing the fraudulent scheme, ClassicStar, Plummer and/or the agents retained by ClassicStar, GeoStar and the individual defendants to promote the Programs explained that the Mare Lease Programs they offered for sale included several components.

68.    The primary component involved participation in the breeding of thoroughbred horses.  Participants would receive a list of a ClassicStar thoroughbred mares available for lease and a listing of stallion nominations owned by ClassicStar to be used in connection with the mares.

69.    Once participants indicated their interest in the program, ClassicStar would provide a book detailing the available mares and nominations.  Participants would make selections from the catalog and, in most instances, rely on selections made by agents of ClassicStar or ClassicStar Farms after consultation with participants.

70.    ClassicStar's marketing materials and Plummer, Spencer Plummer and other agents of ClassicStar represented that ClassicStar owned the mares and the nominations from which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result.

13

71.    ClassicStar, through its marketing materials and its agents, including Plummer, Spencer Plummer and Ferguson, also marketed the Mare Lease Programs as complying with IRS guidelines for generating certain tax benefits.   For example, ClassicStar unequivocally represented that, by following its recommendations regarding participation in the Mare Lease Programs, participants could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their income tax returns.

72.    According to ClassicStar and its agents, the purchase price for the Mare Lease Programs would equal the total value of mare leases, stallion services and pre-paid boarding provided in connection with the mare leases, with the price associated with the mare leases being set at 30% of the market value of the mare as given to the participants.   For instance, Plummer specifically discussed this methodology for establishing the lease fee with Plaintiffs in early meetings regarding their participation.

73.    ClassicStar further represented that the Mare Lease Programs included a feature whereby the participants could defer the profit on the sale of their foals and, by exchanging their interests in the foals or leases for ownership units in one or more limited liability companies or partnerships, obtain capital gains treatment for the income from their participation in the Mare Lease Program (the "alternative investments").

74.    At various times, defendant GeoStar, acting at the direction of Ferguson, Robinson and Parrot, made available both stock and working interests in gas properties which it owned in order to facilitate this aspect of the program and offer further incentive to participants. It did so either by way of direct sales to participants or contributions to alternative investments such as FEEP or similar entities.

14

75.     For instance, participants who chose to subscribe to FEEP units would exchange a portion of their breeding interests for preferred units, which carried with them a "put option" described as providing a guaranteed return.   FEEP's assets purportedly consisted of the contributed breeding rights as well as working interests in a number of gas wells contributed by the owner of the common units, GeoStar Equine Energy, Inc.  In order to make this option more attractive and to reassure participants as to the stability of the investment, GeoStar guaranteed payment on the put.

76.     In addition, Robinson, Ferguson, Plummer and Spencer Plummer served as members of FEEP's Advisory Committee, thus vouching for the legality and stability of the FEEP transaction.

77.     ClassicStar also encouraged participants to purchase more expensive Mare Lease Programs than they otherwise would have by arranging for defendants to borrow a large portion of the necessary funds from a supposedly independent company, NELC.   Thus ClassicStar, through its marketing materials and agents, represented that the participants could purchase the Mare Lease Programs with an initial cash outlay amounting to only a fraction of the value of the total mare lease package, because a substantial portion would be funded by NELC.

78.     As part of this marketing scheme, ClassicStar provided to Plaintiffs and other participants an opinion letter dated September 7, 2001 prepared by Karren Hendrix, essentially vouching for the soundness of the Programs from a tax standpoint.

79.     Terry Green ("Green"), the CPA who prepared this letter, was also identified as ClassicStar's CPA on its marketing materials and served as NELC's accountant as well.

80.     ClassicStar also provided to Plaintiffs and other participants various opinion letters which they obtained from attorneys to whom they paid commissions based on the referral

of participants to ClassicStar, including an opinion letter from Handler which essentially vouched for the soundness of the Programs from a tax standpoint.

81.    Participants were also given information regarding the farms operated by ClassicStar Farms, which helped create the appearance of legitimacy by allowing ClassicStar to represent itself as a successful thoroughbred breeding operation.

82.    Thus, the defendants acting together promoted a Program which represented that participants would receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to use ClassicStar's stallion nominations in connection with the leased mares, boarding for the mares and foals, and ownership of the resulting thoroughbred foals.   In addition, the participants would be able to deduct the total cost of participating in the Program as an ordinary business expense and would ultimately receive capital gains treatment of the income resulting from their activities.

83.    Defendants marketed the Programs and these features to a number of potential participants, generating more than $500,000,000 in sales between 2001 and 2004.

84.    The defendants misrepresented virtually every material aspect of the Mare Lease Programs and/or concealed material information which they had a duty to disclose.  Specifically, defendants led participants, including Plaintiffs, to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, that the Mare Lease Programs fairly reflected the value of the horses and services involved, and that ClassicStar had structured the Programs so that the financing arrangement qualified with Internal Revenue Service requirements for the deduction taken by purchasers.

85.    In fact, the costs and sales figures used to calculate the historical return on investment were entirely fictional, and they grossly overstated both the actual costs which would

have been involved in the Mare Lease Programs and the value of the horses involved.  Thus, ClassicStar did not, as represented as a basis for the attorney opinion letter provided to Plaintiffs, charge a fee which reflected the fair market value of the services and property involved.

86.    Moreover, ClassicStar, in conjunction with and/or at the direction of the other defendants, intentionally oversold the Programs, knowing that ClassicStar and/or ClassicStar Farms did not have ownership of the thoroughbred interests necessary to support the valuations placed on the Programs or the number of Programs sold.

87.    For instance, ClassicStar, in 2004, entered into Mare Lease Programs valued at approximately $160 million, with the majority of the Programs consisting of the mare leases and stallion fees.  However, ClassicStar's ownership in equine bloodstock for this period was no more than approximately $40 million, one fourth of the value sold.

88.    In fact, in May of 2004, in a letter addressed to "valued clients" including MacDonald, and signed by Spencer Plummer, ClassicStar represented that it had $30 million in available inventory for the upcoming (2004) Program year.  It then proceeded to enter into 2004 Programs with the four Plaintiffs alone which had a total cost of $64 million and into 2004 Programs with numerous other purchasers as well.

89.    To conceal this intentional policy of overselling the Mare Lease Programs and further their fraudulent scheme, the defendants contrived to substitute, in large part, non-thoroughbred mares (from a roundup horse breed used to herd livestock in the west) for a number of the thoroughbred mares which should have been included in the Lease.  Plaintiffs did not learn of this substitution until after making payment to ClassicStar.

90.    As part of this substitution scheme, SOS, under the direction of Plummer, and other properties owned by ClassicStar Farms were set up to support purported embryo implants

from quarter horses into surrogate roundup mares.  In theory, the embryo implants would have produced quarter horses, because artificial breeding is allowed in the quarter horse industry. However, upon information and belief, ClassicStar may have owned embryos resulting from certain quarter horse pairings, but it did not own mares sufficient to support even the quarter horse aspect of the program.

91.    Instead, contrary to the representations of Plummer and ClassicStar, Plummer owned the majority of quarter horses included in Plaintiffs' Programs.

92.    Plummer subsequently transferred these quarter horse interests to SOS, which accepted such transfer with knowledge of their lease to Plaintiffs.  Thus, SOS and Plummer, by their involvement, contributed to the concealment of the practice of overselling by ClassicStar.

93.    Whether such implants actually occurred or produced foals is unknown. However, Plaintiffs believed, and the defendants led them to believe, that their entire initial investment was in thoroughbred horses: leasing a thoroughbred mare and paying for the services of a thoroughbred stallion to obtain through the breeding process a thoroughbred foal.  None of the defendants disclosed the involvement of the quarter horse embryos, surrogate mares or artificial breeding to plaintiffs until Plaintiffs had paid for the Mare Lease Programs.

94.    Defendants further sold as part of the Programs multiple quarter horse embryos from individual mares, with the knowledge that it was highly unlikely that a majority of these embryos would successfully produce foals.

95.    Both because of the substantial possibility that a foal would not result and the price at which quarter horse foals, as opposed to thoroughbred foals, typically sold, the values placed on the (likely fictional) embryos by ClassicStar and Plummer greatly exceeded any

reasonable value for such interests, a fact known to ClassicStar, Plummer, and Spencer Plummer at the time they requested payment from Plaintiffs and thereafter.

96.     Plummer or SOS actually owned the quarter horses identified on the schedules of breeding pairings belonging to participants and Plummer prepared these schedules, which included the inflated values and appeared to substantiate the cost of the Program as identified in the Letters of Intent signed by Plummer and/or Spencer Plummer and upon which Plaintiffs based their payments.

97.     Because participants such as Plaintiffs would not own the expected number of thoroughbred foals at the end of the breeding season, defendants knew that participants could not possibly achieve the rate of return represented.

98.     Even if participants elected one of the "alternative investments" offered by ClassicStar, such as FEEP, and contributed a portion of their leases to another entity, their ownership interest in that entity would lack the represented value because the entity would not hold the assets needed to fulfill any put obligations associated with those interests.  However, the existence of the alternative investments and the availability of Gastar stocks helped to disguise the lack of adequate thoroughbred mares to sustain the Programs.

99.     Also to facilitate the policy of deliberate overselling, NELC conspired with the other defendants to create a financing plan for the Mare Lease Programs that both helped to conceal the substitution of non-thoroughbreds and led participants, including Plaintiffs, to claim deductions which resulted in tax savings or refunds. By promoting the tax savings, ClassicStar was able to induce participants to purchase more highly priced Mare Lease Programs than they otherwise would have.

100.    NELC was operated for the purpose of facilitating the sale of the Mare Lease Programs, but ClassicStar actually loaned the amounts used to finance the Mare Lease Programs to NELC, a fact not disclosed to Plaintiffs.

101.    This circular loan structure and the ownership in NELC by Plummer's brother-in-law and ClassicStar's CPA Green, a fact also not disclosed to Plaintiffs, together with other irregularities in defendants' transactions have led to a criminal investigation by the Internal Revenue Service, of the programs and practices of ClassicStar and its affiliates, despite the representations by ClassicStar and its agents, including Plummer and Ferguson, that they had disclosed all facts necessary for Plaintiffs to rely on their assurances regarding the proper tax treatment of the expenses.

102.    NELC knowingly conspired with the other defendants to conceal the nature of its dealings with ClassicStar and the overvaluation of the ClassicStar Mare Lease Programs.

103.    Upon information and belief, NELC also accepted a portion of the proceeds of the Mare Lease Programs with knowledge that defendants had obtained same by concealing and misrepresenting certain facts including, *inter alia*, those regarding NELC.

104.    Green continued in his role with NELC with knowledge of the funding of NELC by ClassicStar and, as ClassicStar's accountant, knew or should have known of the overselling of the Mare Lease Programs and the various devices for concealing that overselling.  Nonetheless, Green continued to advise participants, including Plaintiffs, through seminars, consultations and a prepared opinion, that the Programs met all IRS requirements for the advertised benefits. Green also assisted in the preparation of marketing materials used by ClassicStar to promote the Mare Lease Programs.

105.    Upon information and belief, New NEL is the successor-in-interest to NELC and has continued its operations.

106.    Plummer and/or SOS received substantial payments representing the proceeds of the Mare Lease sales, and other substantial compensation from those sales, with knowledge of the fraudulent nature of the quarter horse embryo program.

107.    Spencer Plummer likewise, with knowledge of the fraud, received commissions and other substantial compensation from the sales.

108.    Defendants GeoStar, Ferguson, Robinson and Parrot also knowingly accepted the proceeds of the other defendants' fraudulent schemes.  For instance, early in the history of the Programs, ClassicStar advanced approximately $100 million to GeoStar.

109.    This advance allegedly took place in exchange for GeoStar's agreeing to exchange working gas interests which it owned for participants' equine interests acquired through the Mare Lease Programs.

110.    At various other times, GeoStar, acting at the direction of Ferguson, also made available Gastar stock for exchange and did so with knowledge that the Mare Lease Programs had been substantially overvalued and with the intent of facilitating and concealing the fraudulent schemes.

111.    However, ClassicStar's financial records reflect a net transfer of approximately $40 million to GeoStar in 2004 alone.

112.    Upon information and belief, defendants ClassicStar and/or ClassicStar Farms purchased substantial assets, including thoroughbred mares which they allegedly owned prior to payment by Plaintiffs, with funds received by Plaintiffs in exchange for the fictional thoroughbred interests and the Mare Lease Programs.  For instance, in 2004, the year in which

21

all of the Plaintiffs purchased Mare Lease Programs, ClassicStar reportedly spent $9,835,000 for a dozen mares.

113.    Further, defendants used a portion of the fraudulently obtained funds to support the activities of ClassicStar, ClassicStar Farms, GeoStar and/or their affiliates, and SOS which accepted the funds with knowledge of the fraud and conspired with the other defendants to conceal the true operation of the Mare Lease Programs.

114.    The use of these funds, in operation of the farms, the activities of GeoStar touted as alternative investments, and the marketing of the Mare Lease Programs facilitated the continuation of the fraudulent scheme and enabled the defendants to defraud Plaintiffs.

115.    Using these fraudulent schemes, the defendants obtained over $500 million from participants.

116.    ClassicStar dispersed a substantial portion of its assets, including approximately 90 broodmares, two of which were the subject of MacDonald's 2005 leases and described as pregnant on the sales catalog, in November 2006.

117.    However, under the direction of Ferguson, ClassicStar appears to be continuing to conduct the Mare Leasing business through ClassicStar Thoroughbreds, which now appears to own some of the thoroughbred mares formerly owned by ClassicStar.

118.    MacDonald was introduced to the Mare Lease Programs in mid-2003, at a teleconference attended by Plummer and Ferguson. Plummer explained the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs. As explained, *supra*, the representations regarding these features were all inaccurate.

119.    At this meeting, the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents.   These representations also lacked any basis in fact.

120.    ClassicStar prepared an "Illustration" for MacDonald, presented by Plummer and Ferguson, dated June 18, 2003.   This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $19 million payment of $6 million, with options to convert equine interests to methane gas working interests which could then convert to Gastar stock.   The projections contained in this Illustration lacked any factual basis.

121.    In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

122.    MacDonald elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

123.    MacDonald consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail and wire, to ClassicStar in the amount of $14 million, consisting of cash and the proceeds of an NELC loan.

124.   Upon receiving its final pairings, after payment, MacDonald objected to the inclusion of many more mares than expected in the Program.

125.   MacDonald subsequently learned from Plummer that ClassicStar lacked available thoroughbreds to fill the Programs it sold and had instead assigned quarter horses to it.

126.   MacDonald objected to this substitution and ClassicStar agreed to exchange its 2003 Program interests for other assets.

127.   It was agreed that the stock would be restricted for one year, after which MacDonald would be free to transfer it.

128.   The stock was not transferred in accordance with the agreement, with the result that MacDonald's ability to transfer the stock was delayed by an additional year during which time the fair market value of the stock declined.

129.   ClassicStar arranged for MacDonald to contribute its remaining 2003 equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

130.   The units had associated with them both a "put" and a "call" feature.  Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit.  However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt.  GeoStar guaranteed the put option.

131.   In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other purchasers for those interests and provided a methodology for repayment of the NELC loan which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

132.   Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by MacDonald cannot have the represented value.

133.   FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

134.   However, upon information and belief, these working interests were not assigned or lacked the value represented.

135.   GEEI was aware of this fact and failed to disclose same to MacDonald.

136.   Accordingly, MacDonald's units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

137.   Based on assurances from Plummer, in conversations in mid-2004, and from other ClassicStar agents, that MacDonald would receive the expected valuable interests in a proposed 2004 lease program, MacDonald made payments to ClassicStar, through interstate mail and wire, totaling $8 million in 2004.

138.   However, MacDonald's final pairings again did not conform to ClassicStar's representations.

139.   As a result of MacDonald's objections, ClassicStar agreed to trade the equine interests for other assets, including additional FEEP units, various specified thoroughbred breeding interests, and shares of an entity called GeoEquities, which had additional mineral interests.

140.   ClassicStar and FEEP have neither performed these agreements nor fully refunded MacDonald's payment.

141.    Upon information and belief, ClassicStar and GeoStar created GeoEquities to function as an alternative investment like FEEP, but contrary to their representations to MacDonald, never funded or operated that entity.

142.    Thus, ClassicStar misrepresented the value of both programs to MacDonald, did not disclose the value of the quarter horse interests, and did not disclose the status of NELC. Plummer and Ferguson made such representations and/or omissions at the meetings described above, and Spencer Plummer executed documents containing the inflated values without disclosing same. Further, neither NELC nor Terry Green disclosed its connection to ClassicStar, despite MacDonald's dealings with NELC as a lender.

143.    Representatives of ClassicStar first approached plaintiff Nelson Breeders in February or March of 2004.

144.    At a March 2004 meeting between representatives of ClassicStar, including Plummer, and Nelson Breeders, ClassicStar provided Nelson Breeders with an "Illustration" of the Mare Lease Program.

145.    The Illustration, which identified ClassicStar as "a division of the GeoStar Group," represented that, for an up-front investment of approximately $2,900,000, Nelson's participation would generate tax savings of approximately $11,000,000 and net after tax mare lease revenue of approximately $9 million.

146.    Nelson Breeders' Illustration also outlined several options to exchange a portion of the Mare Leases for alternative investments, including ownership of an interest in an entity called First Energy Partners, Inc. and exchange of that interest for stock in GasStar, Ltd., a publicly traded company controlled by GeoStar and Ferguson. The Illustration also offered the option of using a percentage of the interests for repayment of the NELC loan and, by virtue of a

put option associated with the GasStar stock, provided for a projected net after tax return of 326%. The projections contained in the Illustration lacked any factual basis.

147.    ClassicStar prepared a second Illustration for Nelson Breeders in April 2004, which closely resembled the first except that the alternative investments now involved First Equine Partnership and an entity called GeoEquities LLC.

148.    Plummer met with Nelson Breeders in April 2004 in Lexington, Kentucky, and discussed the Illustration and various features of the Program.

149.    ClassicStar's agents, including Plummer, represented to Nelson that the projections contained in the Illustrations rested on verified past results and that transactions described by the Illustrations would not raise any concerns with the IRS because they were structured to comply with IRS rules and regulations.  These representations were false.

150.    Moreover, ClassicStar represented that it owned sufficient thoroughbred interests to justify the cost of the Program and that Nelson Breeders would own any foals resulting from its pairings and be free to sell them, train them, or contribute them to one of the alternative investments at its option.  These representations were false.

151.    Nelson Breeders attended additional presentations by Plummer, Ferguson and other representatives of ClassicStar, including Doug Anderson, in May and October of 2004, at which times they explained the Mare Lease Program business model, including the basis for the fees (which was misrepresented), the expected returns (which had no basis in fact), and the tax benefits (which were misrepresented).

152.    Relying on these representations, Nelson Breeders executed a binding letter agreement (with an effective date of April 28, 2004) signed by Spencer Plummer committing it

to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with ClassicStar regarding the particular thoroughbred pairings.

153.    Shortly thereafter Nelson made a payment of $2,812,000 to ClassicStar and continued to make payments and incur obligations (to NELC) totaling $28 million up until the execution of the mare lease and boarding agreements in December 2004.  Nelson made such payments through interstate mail and wire in reliance on the representations of ClassicStar and its agents.

154.    Again, ClassicStar and NELC acting through their agents misrepresented the ownership and value of the mares, concealed material facts regarding same, and failed to disclose the NELC connection with ClassicStar.

155.    West Hills attended a presentation by Plummer and Doug Anderson in March-April 2004, in which Plummer made representations regarding the expected returns on the Programs, the tax benefits of the Programs and the costs associated with the Programs.  Each of these representations was false, in that the Programs were not structured so as to confer the touted tax benefits and the projected returns and the fees both lacked any basis in fact.

156.    ClassicStar presented an Illustration similar to the Nelson Illustration to West Hills in or around May 2004, in which it represented that for approximately $800,000 upfront, West Hills' participation would generate $3,100,000 in after tax revenue, based on tax savings of approximately $5,800,000 and utilizing a NELC loan of $6,500,000 (half the amount of the total program).

157.    Also in May 2004, Plummer and other agents of ClassicStar explained to West Hills the operation of the Mare Lease Programs, including the methodology of setting the fees based on the fair market value of the interests and services provided at a meeting attended by

Plummer.  Plummer also met with West Hills in June 2004 and, in addition to the representations described above, explained GeoStar's affiliation with ClassicStar and GeoStar's connection to Gastar, as the majority owner of a publicly traded company.

158.    Again ClassicStar and its agents, including Plummer, represented that the total cost of the Mare Lease Program, (approximately $13,000,000 in West Hills' illustration) reflected 30% of the fair value of the mares, the fair value of the stallion nominations, and the fair value of the services provided by ClassicStar and/or ClassicStar Farms, that ClassicStar had assured the Mare Lease Program's compliance with all IRS requirements, and that historical performance figures supported the projections.  All these representations were false.

159.    ClassicStar also falsely represented that West Hills would own any foals resulting from the pairings and that it owned thoroughbred horses sufficient to justify the projections and costs.

160.    Arbor Farms met with Plummer in Oregon in early 2004, where Plummer gave a general description of the programs as thoroughbred breeding operations.

161.    Plummer met with Arbor Farms again prior to May 2004 and explained the fee structure, including the establishment of the Mare Lease fee as 30% of the value of the mare, and the tax benefits as outlined above.

162.    At a subsequent meeting in or around October 2004, Plummer specifically explained the potential financing arrangements available to Arbor through NELC, emphasizing the deductibility of the loan.  At no time did Plummer disclose the connection between NELC and ClassicStar.

163.    ClassicStar also provided information, including the Karren Hendrix opinion letter and the attorney opinion letter to Plaintiffs.  Green also mailed the ClassicStar tax returns

prepared by Karren Hendrix, which grossly overstated the expenses of ClassicStar's operations, to Arbor and West Hills' accountant on or around July 29, 2004.

164.     Agents of ClassicStar and GeoStar, including Ferguson, further sought to reassure Arbor regarding the stability of the Programs by discussing with Arbor GeoStar's oversight of the ClassicStar operations.

165.     In reliance on these representations, including the accuracy of the values in the tax returns, Arbor Farms and West Hills, on or around July 30, 2004, forwarded to ClassicStar executed letter agreements from Plummer and Spencer Plummer committing them to making payment and executing the mare lease and boarding agreements after consultation with ClassicStar regarding the pairings, in essentially the same form as the Nelson agreements.

166.     On September 24, 2004, ClassicStar mailed invoices to West Hills and Arbor Farms for $4,482,494 and $4,491,807, respectively, and included a schedule of additional payments.  These amounts were represented to reflect the value of the interests and services to be provided by ClassicStar in connection with the Mare Lease Programs, but were in fact far in excess of the true value of such interests and services.

167.     Thereafter, from October 2004 through December 2004, West Hills and Arbor Farms, in reliance in the invoices and the representations, each paid, by wire and check, approximately $7,000,000 to ClassicStar.

168.     Plaintiffs also executed notes to NELC, in the principal amount of $25,088,000 for Nelson Breeders and $7,000,000 each for West Hills and Arbor Farms.   ClassicStar represented to plaintiffs that it had received the proceeds of these loans in letters dated December 23, 2004.

169.   On or around December 23, 2004, each of the plaintiffs executed and sent to ClassicStar the mare lease and breeding agreements making up the body of the program.  By this time, in accordance with the terms of the letter agreement, Plaintiffs had already transferred tens of millions of dollars to ClassicStar.

170.   The Leases specifically warranted that ClassicStar owned the mares involved.

171.   The Leases also gave ClassicStar the right to substitute another mare for the thoroughbred mares chosen by defendants, but required that the substitution be of equal value to the original mare.

172.   Unknown to Plaintiffs until well after payment for the 2004 Programs, ClassicStar filled the Nelson, West Hills and Arbor Farms 2004 Programs with a small portion of thoroughbred and a majority of quarter horse pairings.

173.   Accordingly, as described above, these Plaintiffs received only a fraction of the promised value.

174.   Moreover, they did not receive interests in mares owned by ClassicStar, but rather, it appears, in mares owned by Plummer or SOS, for which ClassicStar lacked any rights.

175.   Plaintiffs have therefore suffered the loss of the greater portion of their investments.

176.   Defendants Plummer and ClassicStar subsequently attempted to forestall Plaintiffs' inquiry into this loss by continuing to assure Plaintiffs of the viability of the Programs and by offering investment in FEEP and other GeoStar controlled entities as potential alternatives.

177.   Grovers were introduced to the Mare Lease Program in late 2002/early 2003 in several face-to-face meetings with Plummer and thereafter with Ferguson.  Plummer explained

the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs.  As explained, *supra*, the representations regarding these features were all inaccurate.

178.  At these meetings the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents.  These representations also lacked any basis in fact.

179.  ClassicStar prepared an "Illustration" for Grovers, presented by Plummer and Ferguson, dated October 20, 2003.  This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $1.085 million payment of $4.823 million, with options to convert equine interests to methane gas working interests which could then convert to Gastar stock.  The projections contained in this Illustration lacked any factual basis.

180.  In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

181.  ClassicStar also paid Handler to prepare various attorney opinion letters to vouch for the integrity of the Mare Lease Program for use by ClassicStar as a promotional aid in selling

their Program including an attorney opinion letter prepared by Handler for Grovers, which opinion letter was provided directly to Grovers.

182.    Grovers elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

183.    Grover consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail and wire, to ClassicStar in the amount of $8,065,112 million, consisting of cash and the proceeds of an NELC loan.

184.    In early 2004, David Plummer and Tony Ferguson recommended to Grovers that they exchange a substantial portion of their equine interests for alternative available investments in oil and gas, which they were told represented a better and more diversified strategy for generating profits.  During this meeting, Plummer and Ferguson assured Grovers that they could convert tax free into these new oil and gas investment opportunities.

185.    Pursuant to this proposal, ClassicStar arranged for Grovers to contribute approximately 60% of their equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

186.    The units had associated with them both a "put" and a "call" feature.  Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit.  However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt.  GeoStar guaranteed the put option.

187.    In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other

purchasers for those interests and provided a methodology for repayment of the NELC loan which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

188.    Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by Grovers cannot have the represented value.

189.    FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

190.    However, upon information and belief, these working interests were not assigned or lacked the value represented.

191.    GEEI was aware of this fact and failed to disclose same to Grovers.

192.    Accordingly, Grovers' units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

193.    In addition, ClassicStar arranged for Grovers to exchange substantially all of their remaining equine interests for an Installment Note in the amount of $3,796,707, payable by a purported GeoStar entity called GeoStar Financial Services Corporation ("GFSC"). Ferguson signed for GFSC. The full Note amount was due and payable on or before July 15, 2007.

194.    Upon information and belief, GFSC had no assets, and it has failed to make any of the required payments of its Installment Note to Grovers.

195.    Thereafter, in late 2004, based on representations from Plummer and Ferguson and other agents of GeoStar and ClassicStar that the 2003 Mare Lease Program was performing as represented and that their oil and gas investments were generating profits, Grovers purchased an additional $2.2 million of Mare Lease Program interests, the vast majority of which equine interests they exchanged for FEEP units in early 2005.

196.    To date, despite demand, Grovers have received no information about their FEEP investments or their installment note, and they have received no payments or installments or other distributions from FEEP or GFSC.

197.    By this complaint, Grovers are exercising their put option with FEEP, and they are demanding that FEEP and/or GeoStar pay them the put price of $1 per unit, or $7,214,335.

## V.  THE PREDICATE ACTS

198.    The defendants identified in Count I, *infra*, conspired to and did engage in mail and wire fraud in violation of 18 U.S.C. §1341 or §1343 by using, or causing to be used, the United States mail or interstate wire communications in furtherance of and for the purposes of executing schemes to defraud and to obtain and maintain money by false pretenses.  Each use of the mails or interstate wire communications in furtherance of and for the purposes of executing the schemes constitutes a separate and distinct violation of 18 U.S.C. §1341 and/or §1343.  Some of the relevant uses are described in, *inter alia*, paragraphs 59, 116, 131, 146, 147, 160, 161, and 162 and on the Schedule attached as Exhibit A and incorporated by reference herein.

199.    The defendants identified in Count I used mail and wire communications to collect the proceeds of the fraudulent scheme, to induce Plaintiffs to forward payments to them, to forestall Plaintiffs' inquiry into the scheme, and to induce Plaintiffs' participation.

200.    The misrepresentations of the defendants identified in Count I using the United States mail and for the purpose of causing the use of the United States mail and interstate wire communications by others were made with the intent to defraud Plaintiffs, and Plaintiffs in fact reasonably relied upon such misrepresentations, including those relating to the nature of the Mare Lease Programs, to their detriment.

**COUNT I – RICO**
**(by all Plaintiffs against ClassicStar, ClassicStar Farms, ClassicStar 2004, CFI, NELC, New NEL, GeoStar, Ferguson, Plummer and Spencer Plummer, as set forth below)**

201.    The allegations of paragraphs 1 – 200 are incorporated by reference as if fully set forth herein.

<u>Violation of 18 U.S.C. §1962(a), (c) and (d) in connection with ClassicStar, ClassicStar 2004 and ClassicStar Farms</u>

202.    At all times relevant to the Complaint, defendants ClassicStar, ClassicStar 2004 and ClassicStar Farms were each an enterprise as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962.  Each was created and existed as an entity engaged in or affecting interstate commerce apart from the pattern of racketeering activity alleged in this Complaint.

203.    Defendants Ferguson, Plummer, Spencer Plummer, GeoStar, ClassicStar, ClassicStar 2004 and ClassicStar Farms conspired to and did derive or receive income from a pattern of racketeering activity some part of which was invested in and used to operate ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, enabling plaintiffs to be defrauded as set forth herein.  Such conduct constituted a violation of 18 U.S.C. §1962(a) and (d).

204.    Each of the defendants identified in this Count was associated with or employed by ClassicStar, ClassicStar 2004 and/or ClassicStar Farms and conspired to and did, as part of that employment or association, conduct or participate in the conduct of the affairs of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms through engaging in a pattern of racketeering activity.  Such conduct constituted a violation of 18 U.S.C. §1962(c) and (d).

205.    The actions of each of the defendants identified in this Count, including the conduct of the affairs of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

206.    The defendants identified in this Count have continuously engaged in criminal activities, including, but not limited to, mail or wire fraud, as described in the preceding allegations, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

207.    This pattern of racketeering activity in the conduct of ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, including acts of mail and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

208.    Through their conduct of the ClassicStar, ClassicStar 2004 and/or ClassicStar Farms enterprises, the defendants identified in this Count have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Lease Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations.  Examples of such communications and transfers in furtherance of the fraudulent schemes are described in attached A and throughout the preceding allegations, including in Paragraph 164.

209.    By virtue of these and similar communications occurring over at least the past four years, the defendants identified in this Count have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

210.    As a direct and proximate result of the conduct of the defendants identified in this Count as set forth herein, including their conduct of the affairs of and investment in ClassicStar, ClassicStar 2004 and/or ClassicStar Farms, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amount of their investment and legal expenses.

Violations of 18 U.S.C. §1962(a), (c) and (d) in Connection with GeoStar

211.    Also, at all times relevant to the Complaint, defendant GeoStar was an enterprise
as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962.  It was created and
existed as an entity engaged in or affecting interstate commerce apart from the pattern of
racketeering activity alleged in this Complaint.

212.    Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004
and ClassicStar Farms conspired to and did derive or receive income from a pattern of
racketeering activity some part of which was invested in and used to operate GeoStar, enabling
plaintiffs to be defrauded as set forth herein.  Such conduct constituted a violation of 18 U.S.C.
§1962(a) and (d).

213.    Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004,
ClassicStar Farms and NELC each was associated with or employed by GeoStar and conspired to
and did, as part of that employment or association, conduct or participate in the conduct of the
affairs of GeoStar through engaging in a pattern of racketeering activity.   Such conduct
constituted a violation of 18 U.S.C. §1962(c) and (d).

214.    These acts of defendants Ferguson, Plummer, Spencer Plummer, ClassicStar,
ClassicStar 2004, ClassicStar Farms and NELC, including the conduct of the affairs of GeoStar
through a pattern of racketeering activity, took place over a period of at least four years and
included multiple acts of mail and wire fraud.

215.    Defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004,
ClassicStar Farms and NELC have continuously engaged in criminal activities including, but not
limited to, mail and wire fraud, as part of their overall scheme for at least four years and will
continue indefinitely unless prevented.

216.   This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

217.   Through their conduct of the GeoStar enterprise, defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations.  Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit A and throughout the preceding allegations, including at Paragraph 164.

218.   By virtue of these and similar communications occurring over at least the past four years, defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC have engaged in and are continuing to engage in an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

219.   As a direct and proximate result of this conduct, including defendants Ferguson, Plummer, Spencer Plummer, ClassicStar, ClassicStar 2004, ClassicStar Farms and NELC's conduct of the affairs of and investment in GeoStar, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

Violations of 18 U.S.C. §1962(a), (c) and (d) in Connection with the ClassicStar Enterprise

220.   At all times relevant to the Complaint, defendants Ferguson, Plummer, Spencer Plummer, the companies which they formed, caused to be formed, or controlled, including ClassicStar, ClassicStar 2004, ClassicStar Farms, GeoStar and NELC, and various agents of

those companies constituted an association in fact and therefore are an "enterprise" as that term is defined in 18 U.S.C. §1961(4) and used in 18 U.S.C. §1962 (hereinafter the "ClassicStar Enterprise"). The ClassicStar Enterprise was created and has existed as an ongoing association engaged in or affecting interstate commerce, apart from the pattern of racketeering activity alleged in this Complaint.

221. Each of the defendants identified in this Count was associated with or employed by the ClassicStar Enterprise and each conspired to and did as part of that employment or association conduct or participate in the conduct of the affairs of the ClassicStar Enterprise through engaging in a pattern of racketeering activity. Such conduct constituted a violation of 18 U.S.C. §1962(c) and (d).

222. Each of the defendants identified in this Count conspired to and did derive or receive income from a pattern of racketeering activity, some part of which was used to operate the ClassicStar Enterprise, enabling the ClassicStar Enterprise to defraud plaintiffs as set forth herein. Such conduct constituted a violation of 18 U.S.C. §1962(a) and (d).

223. As a whole, the defendants identified in this Count acted in concert, with specific, well-defined roles in the ClassicStar Enterprise, as described in the preceding allegations, to achieve the common goal of defrauding participants such as the Plaintiffs into making payments for the misrepresented Mare Leasing Programs.

224. These acts, including the conduct of the affairs of the ClassicStar Enterprise through a pattern of racketeering activity, took place over a period of at least four years and included multiple acts of mail and wire fraud.

225. The defendants identified in this Count have continuously engaged in criminal activities including, but not limited to, mail and wire fraud, as part of their overall scheme for at least four years and will continue indefinitely unless prevented.

226. This pattern of racketeering activity, including acts of mail fraud and wire fraud, have occurred within the relevant time periods outlined in 18 U.S.C. §1961(5).

227. Through their conduct of the ClassicStar Enterprise, the defendants identified in this Count have made or caused to be made or distributed communications by United States mail which included misrepresentations of material fact regarding the Mare Leasing Programs and have made or caused to be made interstate wire transfers as a result of such misrepresentations. Examples of such communications and transfers in furtherance of the fraudulent schemes are described in Exhibit A and throughout the preceding allegations, including at Paragraph 164.

228. By virtue of these and similar communications occurring over at least the past four years, the defendants identified in this Count have engaged in, and are continuing to engage in, an uninterrupted series of predicate acts of mail and wire fraud that were related to one another in furtherance of the fraudulent schemes.

229. As a direct and proximate result of these defendants' conduct as set forth herein, including the conduct of the affairs of and investment in the ClassicStar Enterprise by the defendants identified in this Count, Plaintiffs were injured in their business and property and continue to suffer injuries, including the amounts of their investments and legal expenses.

230. Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from the defendants identified in this Count I, jointly and severally, treble damages, their costs and reasonable attorney fees.

## COUNT II – COMMON LAW FRAUD
### (by all Plaintiffs against Plummer, Ferguson, Spencer Plummer, ClassicStar, GeoStar, ClassicStar Farms, ClassicStar 2004, CFI, NELC, New NEL, SOS, FEEP, GEEI, Thom Robinson and Jon Parrot)

231.    The allegations of paragraphs 1 - 230 are incorporated by reference as if fully set forth herein.

232.    In order to induce plaintiffs to purchase the Mare Lease Programs, and with the intent that plaintiffs rely on their representations, the defendants identified above (the "Count II defendants") made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

233.    As described specifically above, from 2003 on, in promotional materials and in presentations, the Count II defendants either:

(a)      represented to Plaintiffs that Plaintiffs could claim the deductions described in connection with the Mare Lease Programs and that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations; or

(b)      failed to disclose the relationship between ClassicStar and NELC; failed to disclose the ownership of many of the leased mares by Plummer and/or SOS; and failed to disclose that the majority of the breeding interests being sold to them by ClassicStar and financed by its affiliate NELC were completely bogus or at the least grossly overvalued, rendering them subject to challenge by the IRS; or

42

(c)     knowingly received the proceeds of these fraudulent representations and omissions.

234.     Thus, each of the Count II defendants actively participated in and benefited from the fraudulent scheme through which the Plaintiffs were damaged, as follows:

(a)     defendants Plummer, Spencer Plummer, Ferguson, and defendants ClassicStar, GeoStar, NELC, FEEP and GEEI, through these and other of their agents, misrepresented material facts regarding the Mare Lease Programs, including that defendants had structured the programs to fall well within IRS requirements for such the deductions described in connection with the Mare Lease Programs, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations;

(b)     each of these defendants also concealed from Plaintiffs material facts, including the true value of the equine interests involved in the Mare Lease Programs, and the connection between ClassicStar and NELC, while dealing with Plaintiffs under circumstances which created a duty for them to disclose these facts;

(c)     each of these defendants, as well as the defendants ClassicStar Farms, CFI, Robinson, Parrot, SOS and ClassicStar Thoroughbreds, accepted the proceeds of these fraudulent transactions with knowledge of the fraud, thus ratifying the activity and becoming liable therefore.

235.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which the Count II defendants had a duty to disclose.

236.    Each of the Count II defendants knowingly profited from the fraudulent practices complained of in this Count.

237.    The Count II defendants knew each representation was false or made same with reckless disregard to the truth or falsity of the misrepresentation, in that they knew they had no basis for the misrepresentation, or intentionally failed to disclose material facts.

238.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same. The Plaintiffs would not have agreed to purchase the Programs but for the misrepresentations and omissions of the Count II defendants.

239.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of the Count II defendants.

240.    The Count II defendants committed this fraud and made said misrepresentations willfully, wantonly, and with malicious disregard of the rights of the Plaintiffs.

241.    Plaintiffs are entitled to punitive and compensatory damages and/or rescission of the agreements as a result of defendants' fraud.

### COUNT III - NEGLIGENT MISREPRESENTATION
### (by all Plaintiffs against Plummer, Ferguson, Spencer Plummer, ClassicStar, GeoStar, NELC, New NEL, ClassicStar 2004, CFI, GEEI and FEEP)

242.    The allegations of paragraphs 1 - 241 are incorporated by reference as if fully set forth herein.

243.    In order to induce plaintiffs to purchase the Mare Lease Programs, and with the intent that plaintiffs rely on their representations, the defendants named in this Count (the "Count

III defendants") made certain misrepresentations of material fact and omitted to disclose certain material facts which they had a duty to disclose.

244. As described above, from 2004 on, in promotional materials and in presentations, the Count III defendants represented to Plaintiffs that Plaintiffs could claim the deductions described in connection with the Mare Lease Programs and that defendants had structured the programs to fall well within IRS requirements for such deductions, that the actions of the defendants complied with all applicable laws, that the Plaintiffs were provided services of value equal to the amounts attributed to the mare leases, stud fees and boarding costs, and that the horses involved in the programs had corresponding value, that all of the horses involved in the programs were thoroughbreds, that all of the horses in the programs were owned by ClassicStar and that the historical figures justified the projected returns referenced in the Illustrations. The Count III defendants further failed to disclose the lending relationship between ClassicStar and NELC, the ownership of NELC by a relative of Plummers', and the substitution of round-up mares or quarter horse embryos.

245. Each of the foregoing representations was false when it was made and each of the omitted facts was one which the Count III defendants had a duty to disclose.

246. Each of the Count III defendants profited from the misrepresentations and omissions complained of in this Count.

247. The Count III defendants should have known that each representation was false and that they needed to make additional disclosures in order to prevent what they and/or other representatives of ClassicStar had said to Plaintiffs from being materially misleading.

248. Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

The Plaintiffs would not have agreed to purchase the Programs but for the misrepresentations of the Count III defendants.

249.   Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on the misrepresentations of the Count III defendants.

250.   The Count III defendants made the representations complained of in this Count in the course of their own business activities and for the avowed reason of guiding Plaintiffs in their business affairs.

### COUNT IV – BREACH OF CONTRACT
### (by all Plaintiffs against ClassicStar and/or ClassicStar 2004)

251.   The allegations of paragraphs 1 - 250 are incorporated by reference as if fully set forth herein.

252.   Defendant ClassicStar and/or ClassicStar 2004 (collectively "ClassicStar") entered into various agreements with Plaintiffs, including the letter agreements, the Mare Lease Agreements, and the Foal Agreements.

253.   ClassicStar failed to fulfill its obligations under these agreements and breached the provisions of these agreements.   ClassicStar's breaches include, *inter alia*, its false representation that it owned the mares represented as involved in the Mare Lease Program, its failure to breed the pairs identified on Plaintiffs' schedules, its failure to pay stallion fees as promised, its substitution of quarter horses having significantly less value for thoroughbreds, its failure to obtain insurance as promised and its encumbrance of foals resulting from breedings purchased by Plaintiffs.

254.   As a direct and proximate result of ClassicStar's breaches, Plaintiffs have incurred damages, including the cost of the Mare Lease Programs and lost profits relating to the breeding of the mares.

## COUNT V- THEFT BY DECEPTION
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, ClassicStar, GeoStar, NELC, New NEL, ClassicStar Farms, ClassicStar 2004, CFI, Robinson and Parrot)**

255.    The allegations of paragraphs 1 - 254 are incorporated by reference as if fully set forth herein.

256.    The defendants named in this Count (the Count V defendants) conspired to and did commit theft by deception as prohibited by KRS 514.040 by obtaining property from the Plaintiffs by deception with the intent to deprive the Plaintiffs of same.

257.    Specifically, the Count V defendants created a false and misleading impression of the horses and services offered in connection with the Mare Lease Programs, through the misrepresentations and other actions described above.

258.    As a direct and proximate result of the deception by the Count V defendants, Plaintiffs paid sums in connection with the Mare Lease Programs, including amounts represented to reflect 30% of the value of the mares, and stud fees and board fees.

259.    Pursuant to KRS 446.070, Plaintiffs are entitled to recover damages directly and proximately resulting from such violation.

## COUNT VI – UNJUST ENRICHMENT
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, ClassicStar 2004, CFI, ClassicStar Thoroughbreds, NELC, New NEL, GeoStar and SOS)**

260.    The allegations of paragraphs 1 - 259 are incorporated by reference as if fully set forth herein.

261.    Plaintiffs made payments to ClassicStar and/or NELC based on the false and misleading descriptions of the Mare Lease Programs, the horses involved in the Mare Lease Programs, and the services provided as part of those Mare Lease Programs, as described above

47

and these payments were deposited in or transferred to accounts controlled by the defendants identified in this Count (the "Count VI defendants"), or otherwise placed in their control.

262.    The Count VI defendants used a portion of these funds in furtherance of the fraudulent scheme and a portion to purchase property currently held by the Count VI defendants.

263.    Upon information and belief, a portion of the funds transferred to Count VI defendant Geostar was used in the operation of its business, and specifically to fund gas exploration opportunities which have resulted in profit to Geostar.

264.    The Count VI defendants were not entitled to these funds, which were obtained from Plaintiffs through fraud and improper means, and Plaintiffs would not have transferred the funds had the true nature of the transaction been known.

265.    The Count VI defendants, including defendant Geostar, were unjustly enriched by obtaining proceeds from Plaintiffs by fraud and in exchange for thoroughbred breeding interests never received by Plaintiffs.

266.    As a result of the Count VI defendants' unjust receipt of these sums, Plaintiffs have sustained damages, including the amount of their payments.

**COUNT VII – CONSPIRACY**
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, ClassicStar 2004, CFI, GEEI, FEEP, GFS and SOS)**

267.    The allegations of paragraphs 1 – 266 are incorporated by reference as if fully set forth herein.

268.    Each of the defendants identified in this Count (the "Count VII defendants") agreed to and acted in concert with the others in carrying out the fraudulent scheme described above.

269.    Each of the Count VII defendants performed acts in furtherance of the common fraudulent scheme with the intent that their actions further same.

270.    As described more specifically above, Plummer, Spencer Plummer, Ferguson, ClassicStar, NELC, FEEP, GEEI and GeoStar, *inter alia*, either in person or in documents executed by them made representations or omitted certain material facts in their dealings with the Plaintiffs, while Robinson and Parrot also oversaw the operations of the entities and executed various documents and obtained the services of promoters to further the sale of the Mare Lease Programs.   SOS, FEEP, GEEI, ClassicStar Farms, and CFI provided property or services to ClassicStar in furtherance of such sales, and each of these Count VII defendants benefited from the proceeds of the scheme.

271.    Plaintiffs have suffered damages as a result of the Count VII defendants' concerted activities as described above, for which the Count VII defendants are jointly and severally liable.

## COUNT VIII – AIDING AND ABETTING
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, FEEP, ClassicStar 2004, CFI, GFS, GEEI, and SOS)**

272.    The allegations of paragraph 1- 271 are incorporated by reference as if fully set forth herein.

273.    The defendants identified in this Count (the "Count VIII defendants") through the activities described throughout the Amended Complaint, participated in and aided and abetted in commission of the fraudulent scheme by which Plaintiffs were deprived of their property.

274.    The Count VIII defendants undertook such participation and assistance with knowledge of the fraud being committed and with the intent that their actions further same.

49

275.    Plaintiffs have suffered damages as a result of the Count VIII defendants' concerted activities as described above, for which the Count VIII defendants are jointly and severally liable.

**COUNT IX – AGENCY**
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, NELC, New NEL, GeoStar, FEEP, ClassicStar 2004, CFI, GFS, GEEI, and SOS)**

276.    The allegations of paragraph 1- 275 are incorporated by reference as if fully set forth herein.

277.    The defendants identified in this Count (the "Count IX defendants") each acted as the others' agent and within the scope of their authority as such in furthering the promotion and sale of the Mare Lease Programs as described above, and each is responsible, under principles of agency and respondeat superior, for the misrepresentations, acts and omissions of the others made within the scope of that agency.

**COUNT X – MONEY HAD AND RECEIVED**
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar, ClassicStar Farms, ClassicStar Thoroughbreds, NELC, New NEL, GeoStar, ClassicStar 2004, CFI, and SOS)**

278.    The allegations of paragraphs 1 - 277 are incorporated by reference as if fully set forth herein.

279.    The defendants identified in this Count hold funds that in equity and good conscience belong to Plaintiffs, which Plaintiffs are in equity and law entitled to recover.

**COUNT XI – ACCOUNTING**
**(by all Plaintiffs against ClassicStar and/or ClassicStar 2004)**

280.    The allegations of paragraphs 1 - 279 are incorporated by reference as if fully set forth herein.

50

281. As part of the programs, ClassicStar agreed to hold, on behalf of Plaintiffs, title to certain property belonging to Plaintiffs, including the foals resulting from the breedings utilizing the mare leases.

282. ClassicStar holds such property in trust for and as agent for the Plaintiffs.

283. Plaintiffs are entitled to an accounting from ClassicStar with regard to that property, including the current status of title to the thoroughbred foals ClassicStar represented as belonging to Plaintiffs, the result of the remaining pairings purchased by Plaintiffs and the disposition of any foals resulting from those pairings.

284. To the extent that ClassicStar intends to dispose of or distribute such property prior to accounting, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

## COUNT XII – CONSTRUCTIVE TRUST
### (by all Plaintiffs against all defendants)

285. The allegations of paragraphs 1 – 285 are incorporated by reference as if fully set forth herein.

286. Plaintiffs paid ClassicStar tens of millions of dollars between the middle and end of 2004.

287. ClassicStar did not own the equine interests that it represented to Plaintiffs at the time of these payments; this included some of the mares involved in Plaintiffs' Mare Lease Programs. Further, the true nature of the Mare Lease Programs was misrepresented to Plaintiffs as set forth above.

288. Upon information and belief, each of the defendants used funds wrongfully acquired from the Plaintiffs to acquire property, including specific thoroughbred mares, currently in their possession.

289.   Having obtained Plaintiffs' funds through the improper and fraudulent means described herein, defendants hold those funds or their proceeds in constructive trust for Plaintiffs and must return or account for same.

290.   To the extent that defendants intend to dispose of or distribute such property, such disposition will cause irreparable harm to Plaintiffs for which there is no remedy at law.

**COUNT XIII – ALTER EGO/INSTRUMENTALITY**
**(by all Plaintiffs as specified below)**

291.   The allegations of paragraphs 1 – 290 are incorporated by reference as if fully set forth herein.

292.   ClassicStar was and is operated by GeoStar, Ferguson, Robinson and Parrott as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

293.   FEEP was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

294.   GeoStar was and is operated by Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities and as a fraud on creditors of that company.

295.   GEEI was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

296.   GFS was and is operated by GeoStar, Ferguson, Parrott and Robinson as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

297.    ClassicStar 2004 was operated by ClassicStar, GeoStar, Ferguson, Robinson and Parrot as a mere instrumentality, without observing corporate formalities, without sufficient capital to transact the business it transacted and as a fraud on creditors of that company.

298.    The controlling defendants exercised control over these entities in such a way as to defraud or harm Plaintiffs.

299.    Each of the controlling defendants received substantial distributions of funds or assets from the controlled entities.

300.    Refusal to disregard the corporate entities in this instance would subject the Plaintiffs to unjust loss or otherwise sanction a fraud.

301.    As a result of the foregoing ClassicStar, GeoStar, Ferguson, Parrot and Robinson are each jointly and severally liable for all the liabilities of ClassicStar 2004; GeoStar, Ferguson, Parrot and Robinson are each jointly and severally liable for all of the liabilities of ClassicStar, GEEI, GFS, and FEEP; and Ferguson, Parrott and Robinson are each jointly and severally liable for all of the liabilities of GeoStar.

**COUNT XIV – FRAUDULENT TRANSFER**
**(by all Plaintiffs against Plummer, Spencer Plummer, Ferguson, Robinson, Parrot, ClassicStar Farms, ClassicStar Thoroughbreds, ClassicStar 2004, CFI, NELC, New NEL, GFS, GeoStar and SOS)**

302.    The allegations of paragraphs 1 - 301 are incorporated by reference as if fully set forth herein.

303.    ClassicStar made transfers and conveyances of cash and assets, including horses, to, *inter alia*, the defendants identified in this Count with the intent to hinder, delay or defraud its creditors, including Plaintiffs.

304.    The recipients of such transfers had notice of such fraudulent intent at the time of the transfer.

305.    Alternatively, ClassicStar made such transfers at a time when it was insolvent and/or for less than a reasonably equivalent consideration from the transferees.

306.    Such transfers have injured Plaintiffs, and Plaintiffs are entitled to recover the transferred assets from the recipients.

### COUNT XV – NEGLIGENT REPRESENTATION
### (by all Plaintiffs against Karren Hendrix)

307.    The allegations of paragraphs 1 – 306 are incorporated by reference as if fully set forth herein.

308.    In its role as ClassicStar's accounting firm, Karren Hendrix prepared opinion letters for ClassicStar which vouched for the soundness from a tax standpoint of ClassicStar's Mare Lease Programs.  Karren Hendrix prepared these opinion letters for the purpose and with the expectation that they would be provided by ClassicStar to a limited number of prospective Program participants.

309.    In addition, in its role as ClassicStar's accounting firm, Karren Hendrix prepared tax returns which grossly overstated the expenses incurred by ClassicStar in the course of its operations.  As with the tax opinions, Karren Hendrix knew that ClassicStar was sharing the contents of its tax returns with the limited number of participants that ClassicStar was approaching to participate in its Programs.  Karren Hendrix should have known that the tax returns would provide false assurance to prospective participants about the integrity of ClassicStar's programs.

310.    By virtue of its opinion letters and tax returns, Karren Hendrix was representing to prospective ClassicStar program participants that these programs were sound and viable from a tax standpoint.

311.    Based on information learned by Karren Hendrix in the course of performing accounting services for ClassicStar, and based on information known by its agent, Green, through his role with NELC, Karren Hendrix should have known that, in order to avoid making the contents of those documents misleading to prospective participants in the ClassicStar programs who reviewed those documents, including Plaintiffs, Karren Hendrix needed to further disclose, *inter alia,* that the breeding interests being provided to Mare Lease Program Purchasers, including Plaintiffs, were either non-existent and/or grossly overstated in value, that ClassicStar was carrying the expenditures it was claiming to make on its equine interests at grossly inflated values and that the loans being offered to finance Mare Lease Program purchases by participants, including Plaintiffs, were not being made by a bona fide independent lender as ClassicStar had represented – all with the result that the deductions that were being represented as available to Program participants were subject to challenge by the Internal Revenue Service.

312.    Karren Hendrix never made these necessary disclosures to Plaintiffs.

313.    Each of the foregoing representations was false when it was made and each of the omitted facts was one which Karren Hendrix had a duty to disclose.

314.    Karren Hendrix profited from the misrepresentations and omissions complained of in this Count.

315.    Karren Hendrix should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Plaintiffs from being materially misleading.

316.    Plaintiffs reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

317.    Plaintiffs have suffered damages as a direct and proximate result of their reasonable reliance on Karren Hendrix's misrepresentations, for which they are entitled to recover.

318.    Karren Hendrix made the representations complained of in this Count in the course of its business and for the avowed reason of guiding Plaintiffs in their business affairs.

319.    The opinions provided by Karren Hendrix provided legitimacy for the overall ClassicStar Scheme.  Without the overlay of Karren Hendrix and other professionals adding legitimacy to the Programs, Defendants would have been unable to induce Plaintiffs and others to participate in the Programs.  The role of Karren Hendrix and these other professionals in the marketing gave the impression of viability and lawfulness of the Programs and substantially furthered and assisted ClassicStar's efforts in promoting and marketing the Programs; moreover, the participation, opinions and presentations of Karren Hendrix were instrumental in the decision of Plaintiffs and others to participate and continue such participation in the ClassicStar and related exchange Programs.

### COUNT XVI– AIDING AND ABETTING
### (all Plaintiffs against Karren Hendrix)

320.    The allegations of paragraphs 1 - 319 are incorporated by reference as if fully set forth herein.

321.    Karren Hendrix, through the activities described throughout the Amended Complaint, participated in and aided and abetted in the Count II Defendants' commission of the fraud by which Plaintiffs were deprived of their property.

322.    Karren Hendrix undertook such participation and assistance with knowledge of the fraud being committed and with the intent that their actions further same.

323.     Plaintiffs have suffered damages as a result of Karren Hendrix' activities in concert with the Count II Defendants, as described above, for which Karren Hendrix is jointly and severally liable.

## COUNT XVII– BREACH OF CONTRACT – 2003 PROGRAM
### (by MacDonald against ClassicStar)

324.     The allegations of paragraphs 1 - 323 are incorporated by reference as if fully set forth herein.

325.     In 2003, MacDonald entered into various agreements with ClassicStar as part of its 2003 Mare Lease Programs.

326.     When contrary to ClassicStar's representations, ClassicStar substituted quarter horse pairings for all the breeding pairs purchased by MacDonald, MacDonald contacted ClassicStar to express his dissatisfaction.

327.     In order to remedy the situation, ClassicStar agreed with MacDonald that they would cause ClassicStar to sell to MacDonald 1,680,890 shares of Gastar stock having the approximate value of $5 million in exchange for 1/3 of the interests purchased by MacDonald as part of the Mare Lease Programs, with the remaining interests to be traded out for units in a securities offering discussed more fully hereinbelow.

328.     ClassicStar agreed with MacDonald that the stock would be restricted for a period of one year, but that MacDonald could freely transfer the stock after this period.   Instead, because of, *inter alia*, ClassicStar's failure to transfer the stock at the time promised the stock remained restricted for two years, thereby preventing MacDonald from transferring the stock.

329.     As a result, MacDonald has suffered damages, including the loss resulting from his inability to sell the stock at prices prevailing at the expiration of the promised one (1) year term restriction.

## COUNT XVIII – BREACH OF CONTRACT – 2004 PROGRAM
### (by MacDonald against ClassicStar)

330.    The allegations of paragraphs 1 - 329 are incorporated by reference as if fully set forth herein.

331.    In 2004, MacDonald invested $8 million in the ClassicStar Mare Lease Program.

332.    Because ClassicStar had once again assigned to MacDonald pairings consisting entirely of substituted quarter horses, ClassicStar again committed to exchange MacDonald's equine interests for other assets, including, *inter alia*, units in a securities offering discussed hereinbelow, thoroughbred equine interests and units valued at $2 million in an entity known as GeoEquities.

333.    ClassicStar failed to provide MacDonald the promised interests in GeoEquities or any reasonably equivalent alternative thereto

334.    Accordingly, MacDonald has suffered damages, including the loss of $2 million dollars of his payments to ClassicStar in 2004 for which he was promised valuable interests in an entity known as GeoEquities.

## COUNT XIX – DECLARATORY JUDGMENT/ANTICIPATORY BREACH
### (by MacDonald against FEEP and GeoStar)

335.    The allegations of paragraphs 1 - 334 are incorporated by reference as if fully set forth herein.

336.    The FEEP agreement gives MacDonald the right to put his units to FEEP, which is required to, at MacDonald's election, purchase the FEEP units for $1 per unit.

337.    According to the agreement, GeoStar guarantees this purchase.

338.    MacDonald has exercised his put option; neither FEEP nor GeoStar has responded thereto, and based on the prior conduct of defendants in ignoring their obligations to

MacDonald and based on the fraudulent conduct by defendants in their operation of FEEP, FEEP cannot meet its obligations to purchase back MacDonald's units and GeoStar will not meet its obligations.

339.    MacDonald, therefore, is entitled to judgment against FEEP and/or GeoStar in the amount of $14,004,828, or $1 per each unit owned by MacDonald.

### COUNT XX – STATE SECURITIES FRAUD
### (by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson, Ferguson, Plummer, Spencer Plummer, and ClassicStar)

340.    The allegations of paragraphs 1 – 339 are incorporated by reference as if fully set forth herein.

341.    In addition to the transfer of Gastar stock and other purported consideration, and in order to compensate MacDonald for the unauthorized substitution of quarter horses into his 2003 and 2004 Programs, ClassicStar arranged for the exchange of MacDonald's remaining equine interests for 14,004,828 units in FEEP.  Moreover, ClassicStar arranged for the exchange of substantial portions of Grovers' equine interests from their 2003 and 2004 Programs for 7,214,335 units in FEEP.

342.    The FEEP units are securities within the meaning of the relevant state statutes.

343.    The FEEP units were sold in violation of the anti-fraud provisions of the relevant state securities statutes because, *inter alia*: (1) the FEEP Prospectuses and other offering documents delivered to MacDonald and Grovers stated that FEEP owned valuable oil and gas interests contributed to it by a GeoStar affiliate (which interests FEEP did not own and was never intended to own); (2) the FEEP Prospectuses and other offering documents delivered to MacDonald and Grovers stated that FEEP owned valuable equine interests (which interests FEEP did not own and was never intended to own): (3) the FEEP Prospectuses and other offering

documents delivered to MacDonald and Grovers stated that FEEP was a real operating entity (when, in fact, it had no actual operations or assets and was never intended to have any operations or assets).

344.    Moreover, in order to avoid making the representations as to the integrity of the FEEP operations materially misleading, the offerees, including MacDonald and Grovers, needed to be told that FEEP was formed and operated for a criminal purpose of furthering a tax fraud on the United States Government by masking the fact that, unknown to the participants, including MacDonald and Grovers, the quarter horse breeding interests that were being sold to them by ClassicStar and financed for them by ClassicStar's affiliate, NELC, were completely bogus and, as such, their claimed deductions on these interests were subject to challenge.

345.    FEEP is liable to MacDonald and Grovers as the seller of the FEEP units.

346.    The additional defendants identified in this Count (the "Count XX defendants") are each jointly and severally liable to MacDonald and Grovers because they controlled FEEP in connection with the acts complained of, they were privy to and participated in the creation and development of FEEP's records, budgets and reports, they enjoyed significant contact with the other defendants in connection with FEEP and they had access to all company information and were aware of the dissemination of information to MacDonald and Grovers and other investors of information which they could reasonably have determined was false.

347.    The Count XX defendants each knew or reasonably should and could have known in the exercise of reasonable diligence, of the existence of the facts upon which their liability is based.

348.    MacDonald and Grovers did not know and they could not reasonably have known of the true facts complained of herein until after the date that they filed their initial complaint in this action.

349.    As a result, MacDonald and Grovers are entitled to compensatory and/or recessionary damages.

**COUNT XXI – FEDERAL SECURITIES FRAUD**
**(by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson, Ferguson, Plummer, Spencer Plummer, and ClassicStar)**

350.    The allegations of the preceding paragraphs 1 - 349 are incorporated as if fully set forth herein.

351.    The FEEP units are securities within the meaning of the federal securities laws.

352.    The defendants identified in this Count (the "Count XXI defendants") are each responsible, under the group publication doctrine, for the contents, misstatements and omissions contained in the FEEP Prospectuses and other FEEP documents.

353.    By virtue of the representations in the FEEP Prospectuses and other offering documents, the Count XXI defendants falsely represented that FEEP owned valuable equine and oil and gas interests and had legitimate operations.  Moreover, FEEP, and the other Count XXII defendants are each responsible for having made the material omission regarding the illegal purposes behind FEEP and the lack of any substantive legitimate purpose and operations of FEEP.  Finally, each of the Count XXI defendants is liable as a controlling  person of FEEP.

354.    Each of FEEP and the Count XXI defendants made the misrepresentations and omissions complained of in this Count with scienter, that is, with actual knowledge of their falsity or with conscious disregard thereof.

355.    Relying on the representations of the Count XXI defendants contained in the FEEP Prospectuses and other offering documents MacDonald and Grovers exchanged their equine interests for shares of FEEP and suffered damage thereby.

356.    At the time of the misrepresentations and omissions, MacDonald and Grovers did not and could not reasonably have known of their falsity, and they could not reasonably have known of their falsity thereafter until after they filed their original complaint in this action.

357.    As a result, MacDonald and Grovers are entitled to compensatory and/or recessionary damages.

**COUNT XXII – FAILURE TO REGISTER**
**(by MacDonald and Grovers against FEEP, GeoStar, GEEI, Robinson,**
**Ferguson, Plummer, Spencer Plummer, and ClassicStar))**

358.    The allegations of paragraphs 1 – 357 are incorporated by reference as if fully set forth herein.

359.    The units of FEEP exchanged with MacDonald and Grovers represent securities subject to registration under federal and state securities law.

360.    Upon information and belief, no exemption from registration applies.

361.    The FEEP units were not registered under either federal or Kentucky or Wisconsin law or Nevada law.

362.    Accordingly, MacDonald and Grovers are entitled to recover from the Count XXII defendants the amounts that they invested in the FEEP shares.

**COUNT XXIII - ACCOUNTING**
**(by Grovers against ClassicStar 2005 Powerfoal Stables, LLC)**

363.    The allegations of paragraphs 1 - 362 are incorporated by reference as if fully set forth herein.

364.    After exchanging the majority of their 2003 Program equine interests for other oil and gas related interests as set forth above, Grovers retained interests in three (3) thoroughbred breeding pairings valued by ClassicStar, at the time of their purchase, at over $800,000.

365.    Three thoroughbred foals were produced from these pairings in early 2005.

366.    On April 6, 2005, based on representations by ClassicStar that they could achieve more reliable returns by exchanging their foals to for units in a partnership controlled by ClassicStar consisting of numerous other foals generated from the 2003 Mare Lease Program, Grovers agreed to contribute their 3 thoroughbred foals to ClassicStar 2005 Powerfoal Stables, LLC in exchange for what was represented to be an interest in the Partnership commensurate with the value of their foals.

367.    As represented by ClassicStar 2005 Powerfoal Stables, LLC, the foals owned by the Partnership would be sold as yearlings in 2006, and Grovers would received their prorata distributions at that time.

368.    To date Grovers have received only approximately $365,000 from ClassicStar 2005 Powerfoal Stables, LLC, despite the fact that their foals were valued at far in excess of this sum, and their requests for information as to the status of their interests in the Partnership have gone unheeded.

369.    As partners, Grovers are entitled to an accounting from ClassicStar 2005 Powerfoal Stables, LLC as to the total assets contributed to the Partnership, the current Partnership assets, the Partnership revenues and the Partnership expenses.

## COUNT XXIV - BREACH OF CONTRACT
### (by Grovers against GFS)

370.    The allegations of paragraphs 1 - 369 are incorporated by reference as if fully set forth herein.

371.    In December 2004 Grover entered into an agreement with GFS whereby GFS agreed to pay Grover the sum of $3,796,707 by on or before July 15, 2007.

372.    Despite demand, GFS has failed and refused to pay any of such sums to Grovers.

373.    Accordingly, Grover has suffered damages, including the loss of $3,796,707 of their payments to ClassicStar in 2003 and the costs, including a reasonable attorneys fee, of bringing this action.

### COUNT XXV – DECLARATORY JUDGMENT/ANTICIPATORY BREACH
### (by Grovers against FEEP and GeoStar)

374.    The allegations of paragraphs 1 – 373 are incorporated by reference as if fully set forth herein.

375.    The FEEP agreement gives Grovers the right to put their units to FEEP, which is required to, at Grover's election, purchase the FEEP units for $1 per unit.

376.    According to the agreement, GeoStar guarantees this purchase.

377.    In April or May 2006, Grovers exercised their put option for their 2004 FEEP units.

378.    Moreover, Grovers hereby exercise their put options for their 2005 FEEP units.

379.    Based on the prior conduct of Defendants in ignoring their obligations to Grovers and to other FEEP unit holders exercising their pus options and based on the fraudulent conduct by Defendants in their operation of FEEP, FEEP cannot meet its obligations to purchase back Grover's units and GeoStar will not meet its obligations.

380.    Grovers, therefore, are entitled to judgment against FEEP and/or GeoStar in the amount of $7,214,335, or $1 per each unit owned by Grovers.

## COUNT XXVI – BREACH OF CONTRACT – 2004 FEEP AGREEMENT
### (by Grovers against FEEP and GeoStar)

381.    The allegations of paragraphs 1 - 380 are incorporated by reference as if fully set forth herein.

382.    The FEEP agreement gives Grovers the right to put their units to FEEP, which is required to, at Grover's election, purchase the FEEP units for $1  per unit.

383.    According to the agreement, GeoStar guarantees this purchase.

384.    In April or May 2006, Grovers exercised their put option for their 2004 FEEP units.

385.    Neither FEEP nor GeoStar has met its obligations under the FEEP agreement.

386.    Grovers, therefore, are entitled to judgment against FEEP and/or GeoStar in the amount of $1 per each of the 2004 FEEP units.

## COUNT XXVII – NEGLIGENT MISREPRESENTATION
### (by Grovers against Handler)

387.    The allegations of paragraphs 1 - 386 are incorporated by reference as if fully set forth herein.

388.    In their role as ClassicStar's attorneys, Handler prepared opinion letters for ClassicStar which vouched for the soundness from a tax standpoint of ClassicStar's Mare Lease Programs.  Handler prepared these opinion letters for the purpose and with the expectation that they would be provided by ClassicStar to a limited number of prospective Program participants.

389.    By virtue of its opinion letters Handler was representing to prospective ClassicStar program participants that these programs were sound and viable from a tax standpoint.

390.   Based on information learned by Handler in the course of performing legal services for ClassicStar, Handler should have known that, in order to avoid making the contents of those documents misleading to prospective participants in the ClassicStar programs who reviewed those documents, including Grovers, Handler needed to further disclose, *inter alia,* that the breeding interests being provided to Mare Lease Program Purchasers, including Grovers, were either non-existent and/or grossly overstated in value, that ClassicStar was carrying the expenditures it was claiming to make on its equine interests at grossly inflated values and that the loans being offered to finance Mare Lease Program purchases by participants, including Grovers, were not being made by a bona fide independent lender as ClassicStar had represented – all with the result that the deductions that were being represented as available to Program participants were subject to challenge by the Internal Revenue Service.

391.   Handler never made these necessary disclosures to Grovers.

392.   Each of the foregoing representations was false when it was made and each of the omitted facts was one which Handler had a duty to disclose.

393.   Handler profited from the misrepresentations and omissions complained of in this Count.

394.   Handler should have known that each representation was false and that it needed to make additional disclosures in order to prevent what it had represented to Grovers from being materially misleading.

395.   Grovers reasonably and justifiably relied on the representations to their detriment by, *inter alia*, their agreement to purchase Mare Lease Programs and their payment for same.

396.   Grovers have suffered damages as a direct and proximate result of their reasonable reliance on Handler's misrepresentations, for which they are entitled to recover.

397.    Handler made the representations complained of in this Count in the course of its business and for the avowed reason of guiding Grovers in their business affairs.

398.    The opinions provided by Handler provided legitimacy for the overall ClassicStar Scheme.  Without the overlay of Handler and other professionals adding legitimacy to the Programs, Defendants would have been unable to induce Grovers and others to participate in the Programs.  The role of Handler and other professionals in the marketing gave the impression of viability and lawfulness of the Programs and substantially furthered and assisted ClassicStar's efforts in promoting and marketing the Programs; moreover, the participation, opinions and presentations of Handler were instrumental in the decision of Grovers and others to participate and continue such participation in the ClassicStar and related exchange Programs.

## COUNT XXVIII – AIDING AND ABETTING
### (by Grovers against Handler)

399.    The allegations of paragraphs 1 - 398 are incorporated by reference as if fully set forth herein.

400.    Handler, through the activities described throughout the Amended Complaint, participated in and aided and abetted in commission of the fraudulent scheme by which Grovers were deprived of their property.

401.    Handler undertook such participation and assistance with knowledge of the fraud being committed and with the intent that their actions further same.

402.    Grovers have suffered damages as a result of Handler's activities in concert with the Count II Defendants, as described above, for which Handler is jointly and severally liable.

### COUNT XXIX – CONVERSION BREACH OF CONTRACT OR UNJUST ENRICHMENT
#### (by West Hills against ClassicStar and Ferguson)

403.    The allegations of paragraphs 1 - 402 are incorporated by reference as if fully set forth herein.

404.    West Hills purchased, as part of its 2004 Program, the breeding rights to a foal out of Turko's Turn by Gone West.

405.    ClassicStar agreed to and did obtain insurance on the Turko's Turn 06 foal for the benefit of West Hills in the amount of $694,000.

406.    The Turko's Turn foal has died.

407.    ClassicStar has received the $694,000 insurance proceeds due to West Hills as a result of the death of the foal, yet it has refused to pay over the proceeds to West Hills and it has converted those proceeds to its own benefit and use.

408.    Such refusal constitutes conversion by ClassicStar, a breach of ClassicStar's agreement with West Hills, or, in the alternative, ClassicStar is unjustly enriched by retaining money which in equity and good conscience belongs to West Hills.

409.    West Hills has been damaged by ClassicStar's actions and is entitled to a constructive trust over the proceeds of the policy and/or damages resulting from ClassicStar's actions as described above.

410.    By his conduct in directing that ClassicStar retain the proceeds due and owing to West Hills, Ferguson is liable for participating in the conversion by ClassicStar.

### COUNT XXX - PUNITIVE DAMAGES

411.    The allegations of paragraphs 1 – 410 are incorporated by reference as if fully set forth herein.

412.    The actions of the defendants described above were undertake with fraud, malice and oppression so as to entitle Plaintiffs to punitive damages under applicable law.

WHEREAS, Plaintiffs respectfully demand as follows:

1.      judgment upon their complaint against all defendants;

2.      compensatory damages;

3.      punitive damages;

4.      treble damages and attorney fees where authorized;

5.      injunctive relief;

6.      a constructive trust of assets traceable to payment by Plaintiffs for benefit of Plaintiffs;

7.      trial by jury on all issues so triable; and

8.      any and all other relief to which Plaintiffs appear entitled.


/s/ Barry D. Hunter
Paul E. Sullivan
Barry D. Hunter
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507-1749
Telephone:    (859) 231-0000
Facsimile:    (859) 231-0011

Robert C. Webb
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202-3363
Telephone:    (502) 589-5400
Facsimile:    (502) 581-1087

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the Third Amended Complaint has been

electronically filed on December 27, 2007, with the Clerk of the Court by using the CM/ECF

system, which will send a notice of electronic filing to the following:

Robert M. Anderson
randerson@vancott.com

Charles R. Brown
crb@clydesnow.com

Neal D. Colton
ncolton@cozen.com

Bethany V. Crawley
bcrawley@fowlerwhite.com

Thomas C. Dearing
tdearing@fowlerwhite.com

T. Parker Douglas
pdouglas@hjdlaw.com

Barbara B. Edelman
Edelman@dinslaw.com,
Stephanie.ross@dinslaw.com

Ronald L. Green
rgreen@bsglex.com

George Edward Henry, II
geh@hwgsg.com


John G. Irvin, Jr.
jirvin@ksattorneys.com

Amanda Brockmann
abrockmann@bsglex.com

Judy A. Clausen
jclausen@murphyandersonlaw.com

Emily H. Cowles
ehc@morganandpottinger.com

Jason W. Crowell
jwcrowell@stoel.com, jalorton@stoel.com,
sea_docket@stoel.com

Nicholas Deenis
ndeenis@stradley.com

Sherryll M. Dunaj
dunajs@stephenslynn.com

Eric D. Freed
efreed@cozen.com, ncolton@cozen.com,
mmerola@cozen.com

David W. Henry
dhenry@addmg.com, abruno@addmg.com

Richard J. Idell
Richard.idell@idellseitel.com,
courts@idellseitel.com,
Elizabeth.rest@idellseitel.com

Brian M. Johnson
bmj@gdm.com, ejk@gdm.com,
ckw@gdm.com

Robert Michael Klein
kleinr@stephenslynn.com

James S. Lowrie
jslowrie@joneswaldo.com

Romaine C. Marshall
rcmarshall@hollandhart.com,
lcpaul@hollandhart.com

Graham N. Morgan
gmorgan@dinslaw.com

David Andrew Owen
dao@gdm.com, ckw@gdm.com

Catherine L. Sakach
csakach@wolfblock.com

J. Ronald Sim
jrsim@stoel.com, jalorton@stoel.com,
sea_docket@stoel.com

Rodney G. Snow
rgs@clydesnow.com, dhales@clydesnow.com

Mary Jane E. Wagg
mwagg@vancott.com,
docketing@vancott.com,
kkatzdorn@vancott.com

T. Scott White
tsw@morganandpottinger.com

Janet Knauss Larsen
larja@fosterpdx.com, erwil@fosterpdx.com,
voldp@fosterpdx.com, reynw@fosterpdx.com,
beldt@fosterpdx.com

Kara Read Marino
kmarino@hwgsg.com

Whitney Howard Mendiondo
Whitney.howard@dinslaw.com,
debra.king@dinslaw.com

Niels P. Murphy
nmurphy@murphyandersonlaw.com,
bblair@murphyandersonlaw.com,
scassidy@murphyandersonlaw.com,
jclausen@murphyandersonlaw.com

Walter A. Romney, Jr.
war@clydesnow.com

Jeffrey Weston Shields
jshields@joneswaldo.com

Christopher B. Snow
cbs@clydesnow.com

Matthew A. Stinnett
mas2@gdm.com, ckw@gdm.com

Scott H. White
shw@morganandpottinger.com

Tracey N. Wise
wisebk@wisedel.com, plickert@wisedel.com

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants on December 27, 2007:

First Equine Energy
37 North Buffalo Road
Farmington, UT  84025

Brian P. Flaherty
Wolf, Block, Schorr & Solis-Cohen
1650 Arch Street
22nd Floor
Philadelphia, PA  19103-2097

Lindsey R. Trowell
Fowler White Boggs & Banker, PA
50 N. Laura Street
Suite 2200
Jacksonville, FL  32202

/s/ Barry D. Hunter
Counsel for West Hills Farms, LLC,
Arbor Farms, LLC,
Nelson Breeders, LLC,
MacDonald Stables LLC
and Jaswinder and Monica Grover