**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

**ELECTRONICALLY FILED**

| | |
|---|---|
| **IN RE CLASSICSTAR MARE LEASE**<br>**LITIGATION** | )   **MDL No. 1877** |
| | ) |
| | )   **Master File:** |
| | )   **Civil Action No.: 5:07-cv-353-JMH** |
| | ) |
| AND | ) |
| | ) |
| WEST HILLS FARMS, LLC, ET AL. | ) |
| | ) |
|         **PLAINTIFFS** | ) |
| V. | )   **CASE NO.: 06-243-JMH** |
| | ) |
| ClassicStar, LLC, ClassicStar Farms, LLC,<br>ClassicStar 2004, LLC, | ) |
| National Equine Lending Co., LLC, | ) |
| New NEL, LLC, Geostar Corp., | ) |
| Geostar Equine Energy, Inc., | ) |
| Tony Ferguson, David Plummer, | ) |
| ClassicStar Thoroughbreds, LLC, | ) |
| Spencer Plummer, | ) |
| Karren Hendrix Stagg Allen & Co., | ) |
| Thom Robinson, John Parrot, | ) |
| First Equine Energy Partners, LLC, | ) |
| Strategic Opportunity Solutions, LLC d/b/a | ) |
| Buffalo Ranch, ClassicStar 2005 Powerfoal | ) |
| Stables, LLC, ClassicStar Farms, Inc., | ) |
| GeoStar Financial Services Corp., Gastar | ) |
| Exploration, Ltd. and John Does 1-3. | ) |
| | ) |
|         DEFENDANTS. | ) |

**FOURTH AMENDED COMPLAINT**

For their Fourth Amended Complaint against the defendants, the Plaintiffs West Hills,

LLC ("West Hills"), Arbor Farms, LLC ("Arbor"), Nelson Breeders, LLC ("Nelson"),

MacDonald   Stables   LLC   ("MacDonald"),   and   Jaswinder   and   Monica   Grover ("Grovers")(collectively "Plaintiffs"), through counsel, state as follows:

## I. INTRODUCTION AND NATURE OF THE CASE

1.      Acting together, over at least the past six years, the defendants have converted a thoroughbred horse breeding operation into a vehicle used to defraud unsuspecting purchasers of nearly $600 million.

2.      Operating in a number of states, including Kentucky, defendants aggressively marketed and sold thoroughbred Mare Lease Programs (the "Mare Lease Programs") to wealthy individuals interested in participating in the thoroughbred horse industry.

3.      The United States government is currently pursuing a criminal investigation into the activities of the defendants relating to the Mare Lease Programs, and in February, 2006 acting on federal search warrants, seized the books and records of ClassicStar, LLC.  As a result, the participation of Plaintiffs and all others who participated in the Mare Lease Programs have been called into question.

4.      As described by the defendants, the Mare Lease Programs gave purchasers ownership of thoroughbred breeding interests worth millions of dollars with the potential to own extremely valuable thoroughbred foals as a result of the breeding.  Moreover, by virtue of certain tax benefits associated with the Mare Lease Programs, purchasers could fund their participation with an out-of-pocket outlay of only a fraction of the Mare Lease Program's value.

5.      However, defendants deliberately sold Mare Lease Programs with a total value of tens of millions of dollars greater than the thoroughbred interests owned by defendants could sustain.  Defendants contrived to disguise this fact by substituting non-thoroughbred horse pairings for the thoroughbred interests promoted and promised to purchasers and by encouraging

participants in the Programs to exchange their Mare Lease interests for interests in a variety of related entities.

6.      Defendants touted these related entity investments as having features, such as guaranteed puts or buy backs, which ensure that Purchasers could at the least fully recoup their investments.  However, at that time Defendants knew that many of the entities could not meet their future obligations because their ability depended on the existence of sufficiently valuable Mare Lease interests or because those entities were overcommitted in other ways.

7.      By these means, in 2004 alone, the defendants succeeded, by virtue of their fraudulent practices, in selling more than $160 million dollars of Mare Lease Programs at a time when defendants owned only approximately $40 million of thoroughbred equine bloodstock. Plaintiffs' direct losses as a result of this scheme exceed $20 million.

8.      Based on the defendants' fraudulent misrepresentations and other illegal actions in connection with the Mare Lease Programs, Plaintiffs bring this action against defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et. seq.*, and other federal and state laws.  Defendants engaged in such violations directly and as co-conspirators.  The state law claims arise out of the same transaction or occurrence or series of transactions or occurrences that form the basis of the RICO cause of action.

## II.  PARTIES, JURISDICTION AND VENUE

9.      Plaintiff West Hills is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

10.     Plaintiff Arbor is a limited liability company organized and existing under the laws of the state of Oregon with its principal place of business located in Portland, Oregon.

11.    Plaintiff Nelson is a limited liability company organized under the laws of the state of Washington with its principal place of business located in Bellevue, Washington.

12.    Plaintiff MacDonald is a limited liability company organized under the laws of the state of Wisconsin with its principal place of business located in Wisconsin.

13.    Plaintiffs, Jaswinder and Monica Grover ("Grovers"), are citizens and residents of the State of Nevada.

14.    Defendant David Plummer ("Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located at Farmington, Utah.

15.    Defendant Spencer Plummer ("Spencer Plummer") is, upon information and belief, a citizen and resident of the State of Utah with a residence or place of business located in Farmington, Utah.

16.    Defendant Tony Ferguson ("Ferguson") is, upon information and belief, a citizen and resident of the State of Florida with a residence or place of business located at Tampa, Florida.

17.    Defendant Karren Hendrix Stagg Allen & Co. ("Karren Hendrix") is, upon information and belief, a citizen and resident of the State of Utah with a place of business located in Salt Lake City, Utah.

18.    Defendant Thom Robinson ("Robinson") is, upon information and belief, a citizen and resident of the state of Michigan.

19.    Defendant John Parrot ("Parrot") is, upon information and belief, a citizen of the United States Virgin Islands.

4

20.     Defendant ClassicStar, LLC is a limited liability company organized and existing under the laws of Utah and authorized to conduct business in Kentucky, with a registered agent located in Lexington, Kentucky.  Prior to ClassicStar's bankruptcy, ClassicStar and/or ClassicStar Farms, LLC operated two horse farms with approximately 600 acres and have employed approximately 40 individuals in Kentucky.

21.     Defendant ClassicStar Farms, LLC ("ClassicStar Farms") is a limited liability company organized and existing under the laws of Kentucky, with a registered agent located in Lexington, Kentucky.

22.     Defendant ClassicStar Farms, Inc. ("CFI") is a Delaware corporation with its principal place of business in Michigan.

23.     Defendant ClassicStar Thoroughbreds of Kentucky, LLC ("ClassicStar Thoroughbreds") is a limited liability company organized and existing under the laws of Delaware, with a place of business located in Versailles, Kentucky.

24.     Defendant ClassicStar 2004, LLC ("ClassicStar 2004") is or was a limited liability company organized under the laws of Utah, doing business from ClassicStar's offices.

25.     Defendant National Equine Lending Company, LLC ("NELC") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah.

26.     Defendant New NEL, LLC ("New NEL") is a Utah limited liability company with a registered agent located in Salt Lake City, Utah.   Upon information and belief, New NEL is the successor-in-interest to NELC.

27.     Defendant GeoStar Corporation ("GeoStar") is a corporation organized and existing under the laws of Delaware with a registered agent located in Michigan.  Defendant GeoStar is a closely-held corporation that owns, indirectly through subsidiaries, ClassicStar.

Three individuals, Ferguson, Robinson and Parrott, own the primary interest in GeoStar, with a small percentage of GeoStar currently owned or owned in the past by Spencer Plummer.

28.     Defendant Gastar Exploration, Ltd. ("Gastar") is a Canadian corporation with its principal place of business in Houston, Texas.  From 2000 through 2005, GeoStar owned a controlling interest in Gastar and actually controlled Gastar.  During this period, Gastar had no employees, and GeoStar performed all of its managerial and operational functions.   Upon information and belief, GeoStar and its principals still own approximately 15% of Gastar.

29.     Defendant First Equine Energy Partners LLC ("FEEP") is a limited liability company organized and existing under the laws of Nevada with a place of business located in Tampa, Florida.

30.     Defendant GeoStar Equine Energy, Inc. ("GEEI") is a corporation which is, upon information and belief, organized under the laws of either Delaware or Texas, with its principal place of business in Michigan.  Defendants Parrot, Robinson and Ferguson serve as officers and/or directors of GEEI.  GEEI is the managing member of FEEP.

31.     Defendant Strategic Opportunity Solutions LLC, d/b/a Buffalo Ranch ("SOS") is a limited liability company organized and existing under the laws of Utah with a place of business located in Utah.

32.     Defendant, GeoStar Financial Services Corp. ("GFS") is, upon information and belief, a corporation organized and incorporated in the State of Delaware, with its principal place of business in Michigan.

33.     Defendant, ClassicStar 2005 Powerfoal Stables, LLC is, upon information and belief, a limited liability company organized and existing under the laws of Delaware, doing business from ClassicStar's offices.

34.    Defendants John Does 1-3 are entities affiliated with GeoStar, SOS or ClassicStar or who participated in or had knowledge of the scheme described herein, and who received the proceeds of the Mare Lease Programs under circumstances making their retention of the benefits of those proceeds improper as against Plaintiffs.

35.    At all times relevant to this Complaint, each of the defendants was and is a "person" as that term is defined in 18 U.S.C. §1961 and used in 18 U.S.C. §1962.

36.    Pursuant to 28 U.S.C. §1331, this Court has original jurisdiction over the subject matter of this case because all of part of the claims arise from the defendants' violations of the United States Code, including, *inter alia*, the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et. seq.*  It appears that this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as it involves citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

37.    This Court has supplemental jurisdiction over the subject matter of the claims asserted herein that arise under state law pursuant to 28 U.S.C. §1367(a) and the doctrines of pendent and ancillary jurisdiction, because the state law claims arise from a common nucleus of operative fact giving rise to the federal claims alleged this case.

38.    This Court has personal jurisdiction over each of the defendants in this action pursuant to 18 U.S.C. §1965(a), (b) and (d) and KRS 454.210, as each regularly transacts business in Kentucky or has minimum contacts with Kentucky, through their involvement with, management of, or receipt of funds from the ClassicStar Mare Lease Programs and the operation of ClassicStar farms in Versailles, Kentucky, such that it is reasonable for this Court to exercise jurisdiction over them.

39.     Venue is proper in this district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 as one or more of the defendants reside, are found, have agents, or transact their affairs within the Lexington jury division of this Court and conducted their fraudulent scheme, through use of the United States Mail or interstate wire communications in an illegal manner, from this District.

### III.  PARTICIPATION IN THE THOROUGHBRED INDUSTRY AND TAX TREATMENT

40.     Mare leases represent one alternative method of participating in the thoroughbred industry.  Rather than investing in a mare directly by way of purchase, the participant leases the rights to the mare for a breeding season and then purchases a stallion nomination to be used in connection with the leased mare, retaining or selling the foal that results from the breeding. Often the arrangement also includes the price of board for the mare and/or foal insurance.

41.     Mare leases are a recognized mode of participation in the thoroughbred industry. Prior to the acquisition of control by GeoStar, Plummer, Ferguson, Robinson and Parrott, ClassicStar's predecessor conducted a well regarded operation that included boarding and leasing of thoroughbred mares.

42.     Participation in the equine industry has certain tax effects.  A taxpayer that is actively engaged in the horse business may be entitled to deduct as ordinary and necessary farm business expenses the amounts that he pays in connection with the business during any tax year. Such ordinary expenses can include insurance, board fees, stud fees, and either the depreciation of a mare purchased by the taxpayer or the cost of leasing a mare if the taxpayer chose to enter into a leasing program, rather than make an outright purchase.

43.     When the mare, whether leased or purchased, is bred to a stallion and produces a foal that is sold, the net revenue that is received by the taxpayer may be taxed as ordinary income rather than as capital gains.  Because the cost of producing the foal was deducted as an ordinary

expense, the taxpayer has no basis in the foal, making the proceeds, net of selling costs, taxable ordinary income.

44.     When a taxpayer purchases a horse for breeding or racing purposes and retains ownership for two years before selling the horse, however, any gain on the sale receives capital gains treatment and is subject (in the highest tax bracket) only to 15% taxation, as opposed to the 37% applicable to ordinary income.

45.     A taxpayer may be entitled to deduct his breeding expenses even if the source of his investment is a loan, provided that the requirements of various regulations relating to the loan are met.

## IV.  DEFENDANTS' FRAUDULENT SCHEMES

46.     Since at least 2001, the individual defendants presided over and, in concert with the defendants identified in Count I, *infra*, were associated with and conducted the affairs of an enterprise which systematically and wrongfully obtained hundreds of  millions of dollars from purchasers of fraudulent Mare Lease Programs.   These defendants' schemes were presented, marketed and sold to purchasers and the proceeds collected by these defendants using, *inter alia*, the United States mail and/or interstate wire communications.   The illegal conduct of these defendants included mail fraud, wire fraud, money laundering, misrepresentation and misappropriation of purchaser's funds.

47.     Prior to 1998, the thoroughbred mare leasing and boarding operation currently controlled by ClassicStar was run by an unrelated entity known as Classic Breeders, LLC ("Classic Breeders").

48.     Classic Breeders owned over 60 mares valued at approximately $6 million, in addition to a number of stallion nominations available for use in connection with the Classic Breeders mares.

49.     Classic Breeders employed both David Plummer and his son Spencer Plummer.

50.     In 2000, an entity controlled by David Plummer purchased most of the assets of Classic Breeders and continued its thoroughbred mare operations.

51.     Through its subsidiaries, GeoStar, under the control of Ferguson, Robinson and Parrott, subsequently acquired ownership of the entity formerly known as Classic Breeders and changed its name to ClassicStar, LLC.  Throughout the relevant period, GeoStar continued to maintain and exercise control over a portion of ClassicStar's books, records, bank accounts, financial reports and tax returns from its office in Michigan.

52.     ClassicStar, LLC continued to operate the thoroughbred boarding and mare leasing business, in conjunction with its wholly-owned subsidiary ClassicStar Farms.

53.     ClassicStar also operated its Mare Lease Program sales through other wholly owned and controlled subsidiaries which had no function or existence separate from ClassicStar. For instance, ClassicStar 2004 was formed to facilitate sales from 2004 forward, but at all times functioned as nothing more than another name under which ClassicStar operated its Mare Lease business.  Further, ClassicStar's affairs were also conducted through its parent and/or subsidiary companies such as CFI, which contracted with Spencer Plummer for Spencer Plummer to act on behalf of ClassicStar, without regard to the separate existence of those companies.  Accordingly, all allegations of the Complaint against or referring to "ClassicStar" include ClassicStar, LLC, ClassicStar 2004, LLC and CFI.

54.     However, subsequent to the acquisition of control by Plummer, GeoStar, and Ferguson, Robinson and Parrott, ClassicStar began inflating the value of its Mare Lease Programs and selling far more Programs than the thoroughbred interests owned by ClassicStar could support.

55.     In marketing its Mare Lease Programs, ClassicStar distributed promotional materials both personally through its agents and through the United States mail and other interstate methods of communication.

56.     For instance, in mailings addressed to a "Prospective Client, CPA, Attorney or Tax Advisor," David Plummer marketed the ClassicStar Mare Lease Programs as an extremely profitable opportunity, with a historical net cash return on investment of 1133%.

57.     ClassicStar Brochures also touted its ownership of high quality thoroughbred mares and its ability to provide the "Ultimate Tax Solution, which converts ordinary income to long-term capital gains."

58.     Virtually all of the ClassicStar marketing materials provided to Plaintiffs and others described the Programs as an investment in thoroughbreds.  For instance, the Due Diligence and Mare Lease Information Booklet provided to Plaintiffs discussed how mares were bred to "the very best thoroughbred stallions," and another promotional brochure discussed GeoStar's involvement in the Programs through its ownership of a "thoroughbred horse breeding business."

59.     Once ClassicStar had generated interest in its thoroughbred breeding operations, its agents, including Ferguson and Plummer, would make personal presentations regarding the benefits of purchasing a Mare Lease Program.  Often, Plummer would explain the operations of

11

the Kentucky farms, while Ferguson would address the purported financial benefits of the program.

60.     Ferguson was described on materials provided to Plaintiffs and other participants as ClassicStar's Co-Managing Member.  He also was listed as a member of FEEP's advisory committee in its private placement memoranda, as a contact person and tax partner for FEEP, and as either President, executive vice-president and CEO of Gastar and GeoStar or simply as a director of the companies.  In these roles, Ferguson participated in the solicitation of Plaintiffs and other participants in the Mare Lease Programs and arranged for numerous exchanges associated with those Programs.

61.     Ferguson actively took part in the management of ClassicStar's financial operations and provided direction to Plummer regarding the marketing of the Programs, thus furthering the sale of the Programs and the defendants' scheme.

62.     Parrot and Robinson also took active roles in the management of ClassicStar's sale and promotion of the Mare Lease Programs and controlled and directed the operations of GeoStar, and through it ClassicStar.

63.     Parrot and Robinson, acting as controlling members of GeoStar and ClassicStar and on behalf of ClassicStar, negotiated with various salespeople to pay the salespeople commissions in return for promoting the ClassicStar Mare Lease Programs.  Robinson, who has been identified as a director, president and CEO of GeoStar and a director and CEO of Gastar, as well as having a role in ClassicStar's management, approved of numerous operational decisions relating to ClassicStar, and, acting on behalf of ClassicStar Farms, signed an employment agreement with Plummer which set forth Plummer's obligations with regard to the promotion of the Mare Lease Programs.

64.     Parrot, who acted as vice president of GeoStar, a director of Gastar and was identified in some materials as having a role in ClassicStar's management, negotiated an arrangement to pay a commission to the law firm representing Plaintiffs Nelson, West Hills and Arbor Farms, for promoting Plaintiffs' involvement in the Programs.  Parrot also reviewed and approved of marketing materials used by ClassicStar, including materials illustrating projected returns on investment, materials relating to alternative investment programs, and the attorney opinion letters offered to participants to reassure them as to the stability of the Programs.

65.     Spencer Plummer was identified on promotional materials and correspondence as ClassicStar's President or Vice President and often executed documents comprising the Program, such as the Letters of Intent signed by Plaintiffs and Mare Lease agreements.  Spencer Plummer executed MacDonald's initial letter of intent in 2003, which misrepresented the values of the services and equine interests provided in connection with the Programs, signed a similar letter of intent with similar representations with Nelson in 2004, corresponded with Arbor Farms and West Hills regarding how they could achieve the "full tax benefits" of the Programs in August of 2004 without disclosing facts material to the tax treatment of the Programs as explained further herein, executed the Mare Leases and other legal documents included in the Plaintiffs' Programs, and executed several agreements in connection with the trade out of MacDonald's equine interests, including MacDonald's FEEP agreement.   Spencer Plummer has also claimed an ownership interest in GeoStar.

66.     Plummer was identified on materials distributed by ClassicStar as ClassicStar's founder and at times its president.  He also acted as ClassicStar's Director of Marketing and the Director of Marketing for GeoStar, and promoted the sale of the Mare Lease Programs, including

13

to Plaintiffs. He also executed legal documents provided to Plaintiffs as ClassicStar's CEO, and, upon information and belief, owns or claims to own an interest in GeoStar.

67. GeoStar controlled the operations of ClassicStar and the other entity defendants with respect to the Mare Lease Programs, by means of the activities of the individuals acting in the roles described above, and through this control GeoStar gained and benefited from the fraudulently obtained proceeds of the Programs.

68. At some point around the acquisition of the breeding business by GeoStar and Plummer, the defendants conceived of a plan to raise funds for the use of GeoStar and other defendants by overselling the ClassicStar Mare Lease Program in a number of ways. In marketing the fraudulent scheme, ClassicStar, Plummer and/or the agents retained by ClassicStar, GeoStar and the individual defendants to promote the Programs explained that the Mare Lease Programs they offered for sale included several components.

69. The primary component involved participation in the breeding of thoroughbred horses. Participants would receive a list of ClassicStar thoroughbred mares available for lease and a listing of stallion nominations owned by ClassicStar to be used in connection with the mares.

70. Once participants indicated their interest in the program, ClassicStar would provide a book detailing the available mares and nominations. Participants would make selections from the catalog and, in most instances, rely on selections made by agents of ClassicStar or ClassicStar Farms after consultation with participants.

71. ClassicStar's marketing materials and Plummer, Spencer Plummer and other agents of ClassicStar represented that ClassicStar owned the mares and the nominations from

14

which participants would choose their pairings, and that, assuming a successful breeding, the participants would own the thoroughbred foals that would result.

72.     ClassicStar, through its marketing materials and its agents, including Plummer, Spencer Plummer and Ferguson, also marketed the Mare Lease Programs as complying with IRS guidelines for generating certain tax benefits.   For example, ClassicStar unequivocally represented that, by following its recommendations regarding participation in the Mare Lease Programs, participants could properly deduct the value of the Mare Lease Programs as ordinary business expenses on their income tax returns.

73.     According to ClassicStar and its agents, the purchase price for the Mare Lease Programs would equal the total value of mare leases, stallion services and pre-paid boarding provided in connection with the mare leases, with the price associated with the mare leases being set at 30% of the market value of the mare as given to the participants.   For instance, Plummer specifically discussed this methodology for establishing the lease fee with Plaintiffs in early meetings regarding their participation.

74.     ClassicStar further represented that the Mare Lease Programs included a feature whereby the participants could defer the profit on the sale of their foals and, by exchanging their interests in the foals or leases for ownership units in one or more limited liability companies or partnerships, obtain capital gains treatment for the income from their participation in the Mare Lease Program (the "alternative investments").

75.     At various times, defendant GeoStar, acting at the direction of Ferguson, Robinson and Parrot, made available both stock and working interests in gas properties which it owned in order to facilitate this aspect of the program and offer further incentive to participants.

It did so either by way of direct sales to participants or contributions to alternative investments such as FEEP or similar entities.

76.     In the early years of the Program, participants were offered interests in a specified group of gas wells to be drilled in the Powder River Basin area of Wyoming.  The properties on which these wells were to be drilled were represented to be predominantly owned by Gastar and they were purportedly going to be drilled by GeoStar or its affiliates.  After a holding period, participants were encouraged to exchange a portion of their equine interests for working interests in these wells.  These exchanges helped disguise the fact that the defendants had sold more Mare Lease packages than ClassicStar had inventory to fill.

77.     These working interests also included a guaranteed revenue stream, characterized as a payment against future royalties, which would generate income to pay any financing obligations undertaken by participants in connection with the Mare Lease Programs.

78.     However, participants were further encouraged to, at a later time, exchange their working interests for Gastar stock.

79.     The availability of this stock was a material factor in influencing many participants to purchase interests in the Mare Lease Programs and Gastar, while under the control of GeoStar, actively participated in and facilitated the fraudulent scheme by making its stock available and by using the proceeds of the Mare Lease Programs for the benefit of GeoStar.

80.     Gastar was formed by GeoStar's principals in or around 2000.

81.     From May 2000 until late 2005, Gastar had no employees.  Instead, all of its management and operational activities were performed by GeoStar employees, many of which received Gastar stock as compensation.  Thurs, Gastar acted out of the same office and under common control with GeoStar and its principals.

82.     During much of this period, Gastar also operated under a joint operating agreement with GeoStar, whereby GeoStar would acquire oil and gas properties in which Gastar had a right to participate up to 75% of the working interest on an at cost basis.  GeoStar or one of its subsidiaries would operate the properties thus acquired by GeoStar for the mutual benefit of GeoStar and Gastar.

83.     Pursuant to this arrangement, Gastar acquired 75% of GeoStar's interests in properties in the Powder River Basin ("PRB").  The PRB properties were the same properties used by GeoStar to facilitate the Mare Lease Program, through the exchange of working interests for participants' Mare Lease interests.

84.     Between 2000 and 2005, GeoStar provided Gastar million of dollars to fund Gastar's operations.   GeoStar also acquired numerous properties for the benefit of both companies and expended additional sums so as to render the properties marketable.

85.     In 2003, both Gastar and GeoStar transferred one-half of their PRB interests to a third party.  In exchange, Gastar and GeoStar received $6.7 million in cash and a development commitment of $15 million.

86.     Gastar acquired GeoStar's remaining interest in the PRB properties in 2005. Representatives of GeoStar have testified in other litigation that Gastar acquired these wells subject to the interests of the Mare Lease participant working interest owners, some of whom, upon information and belief, remain owners of such interests today.

87.     Throughout the period of GeoStar's control, Gastar issued stock to GeoStar, upon information and belief, with the intent of allowing GeoStar to facilitate the exchange aspect of the marketing of the Mare Lease Programs and to satisfy the obligations of GeoStar and ClassicStar to participants, such as MacDonald, who failed to receive the equine interests that

they had been promised by ClassicStar.  Parties who had exchanged their Mare Lease interests for working interests were offered a further option to convert to Gastar stock, the availability of which helped disguise the overselling of the Mare Lease and working interest programs.

88.   In later years, GeoStar discontinued the working interest exchanges and began offering other alternative programs which worked in much the same way.  One such program, FEEP, involved the contribution of participants' equine interests in exchange for units in the FEEP entity.

89.   Participants who chose to subscribe to FEEP units would exchange a portion of their breeding interests for preferred units, which carried with them a "put option" described as providing a guaranteed return.

90.   FEEP's assets purportedly consisted of the contributed breeding rights as well as working interests in a number of gas wells contributed by the owner of the common units, GeoStar Equine Energy, Inc.

91.   These working interests, along with the contributed breeding rights, would purportedly generate cash sufficient to service debt associated with the purchase of the Mare Lease Programs and FEEP units would be used to collateralize the debt.

92.   In order to make this option more attractive and to reassure participants as to the stability of the investment, GeoStar guaranteed payment on the put.

93.   In fact, many of the wells allegedly contributed to FEEP were the same wells involved in the earlier working interest programs.  However, a large percentage of the PRB properties had been sold to a third party in 2003, with Gastar acquiring the remaining portion of GeoStar's interests in the properties in 2005.   Thus, it appears that GEEI could not have contributed the identified wells or any interests therein to FEEP.

18

94.     In addition, Robinson and Ferguson, who were principals of GeoStar and Gastar and thus familiar with GeoStar's working interest programs and its dealings with Gastar, and Plummer and Spencer Plummer, served as members of FEEP's Advisory Committee, thus vouching for the legality and stability of the FEEP transaction.

95.     ClassicStar also encouraged participants to purchase more expensive Mare Lease Programs than they otherwise would have by arranging for defendants to borrow a large portion of the necessary funds from a supposedly independent company, NELC.  Thus ClassicStar, through its marketing materials and agents, represented that the participants could purchase the Mare Lease Programs with an initial cash outlay amounting to only a fraction of the value of the total mare lease package, because a substantial portion would be funded by NELC.

96.     As part of this marketing scheme, ClassicStar provided to Plaintiffs and other participants an opinion letter dated September 7, 2001 prepared by Karren Hendrix, essentially vouching for the soundness of the Programs from a tax standpoint.

97.     Terry Green ("Green"), the Karren Hendrix CPA who prepared this letter, was also identified as ClassicStar's CPA on its marketing materials and served as NELC's accountant as well.

98.     ClassicStar also provided to Plaintiffs and other participants various opinion letters which they obtained from attorneys to whom they paid commissions based on the referral of participants to ClassicStar, including an opinion letter which essentially vouched for the soundness of the Programs from a tax standpoint.

99.     Participants were also given information regarding the farms operated by ClassicStar Farms, which helped create the appearance of legitimacy by allowing ClassicStar to represent itself as a successful thoroughbred breeding operation.

100.    Thus, the defendants acting together promoted a Program which represented that participants would receive breeding rights (a lease) to a group of thoroughbred mares, along with the right to use ClassicStar's stallion nominations in connection with the leased mares, boarding for the mares and foals, and ownership of the resulting thoroughbred foals.  In addition, the participants would be able to deduct the total cost of participating in the Program as an ordinary business expense and would ultimately receive capital gains treatment of the income resulting from their activities.

101.    Defendants marketed the Programs and these features to a number of potential participants, generating more than $500,000,000 in sales between 2001 and 2004.

102.    The defendants misrepresented virtually every material aspect of the Mare Lease Programs and/or concealed material information which they had a duty to disclose.  Specifically, defendants led participants, including Plaintiffs, to believe that they were receiving millions of dollars of interests in thoroughbred bloodstock, that the Mare Lease Programs fairly reflected the value of the horses and services involved, and that ClassicStar had structured the Programs so that the financing arrangement qualified with Internal Revenue Service requirements for the deduction taken by purchasers.

103.    In fact, the costs and sales figures used to calculate the historical return on investment were entirely fictional, and they grossly overstated both the actual costs which would have been involved in the Mare Lease Programs and the value of the horses involved.  Thus, ClassicStar did not, as represented as a basis for the attorney opinion letter provided to Plaintiffs, charge a fee which reflected the fair market value of the services and property involved.

104.    Moreover, ClassicStar, in conjunction with and/or at the direction of the other defendants, intentionally oversold the Programs, knowing that ClassicStar and/or ClassicStar

20

Farms did not have ownership of the thoroughbred interests necessary to support the valuations placed on the Programs or the number of Programs sold.

105.   For instance, ClassicStar, in 2004, entered into Mare Lease Programs valued at approximately $160 million, with the majority of the Programs consisting of the mare leases and stallion fees.  However, ClassicStar's ownership in equine bloodstock for this period was no more than approximately $40 million, one fourth of the value sold.

106.   To conceal this intentional policy of overselling the Mare Lease Programs and further their fraudulent scheme, GeoStar and ClassicStar and their principals originally relied on the availability of the alternative investments, including the working interests in the properties jointly held by Gastar and GeoStar and the Gastar stock.  These alternatives disguised the fraud by forestalling inquiry by the Plaintiffs and lulling them into contributing additional funds or leaving their funds in the control of the defendants throughout the relevant periods.

107.   The Mare Lease participants were encouraged to transfer a portion of their equine interests, prior to breeding, to GeoStar in exchange for the working interests in various wells which GeoStar represented that it would drill.

108.   These were the same wells which were transferred to Gastar and then to an unrelated third party, but, upon information and belief, GeoStar also oversold this program and purported to transfer to participants more interests than actually existed.

109.   GeoStar and Gastar disguised this aspect of the fraud by encouraging the owners of the working interests to exchange those interests for Gastar stock.

110.   After the working interest programs were discontinued, participants were offered interests in FEEP and other GeoStar entities instead.  However, as described above, FEEP could

21

not have owned many of the wells it purported to own because Gastar had transferred those wells to a third party.

111.    Dissatisfied participants such as MacDonald were also offered Gastar stock to compensate them for ClassicStar's failure to provide the promised value.

112.    Upon information and belief, Gastar made this stock available to GeoStar for such use, by various transactions with GeoStar which resulted in the issuance of additional Gastar stock for this purpose.

113.    In addition to offering the alternative investments, the defendants contrived to substitute, in large part, non-thoroughbred mares (from a roundup horse breed used to herd livestock in the west) for a number of the thoroughbred mares which should have been included in the Lease.

114.    This aspect of the scheme was conducted with the specific approval of GeoStar and its principals.

115.    Plaintiffs did not learn of this substitution until after making payment to ClassicStar and when they did learn of the substitution, were offered or given alternative investments which it was represented would compensate the difference in value.

116.    As part of this substitution scheme, SOS was set up by defendants to support purported embryo implants from quarter horses into surrogate roundup mares.  In theory, the embryo implants would have produced quarter horses, because artificial breeding is allowed in the quarter horse industry.  However, upon information and belief, SOS may have owned embryos resulting from certain quarter horse pairings, but it did not own mares sufficient to support even the quarter horse aspect of the program.

117.    Instead, contrary to the representations of Plummer and ClassicStar, Plummer owned the majority of quarter horses included in Plaintiffs' Programs.

118.    Plummer subsequently transferred these quarter horse interests to SOS, which accepted such transfer with knowledge of their lease to Plaintiffs.  Thus, SOS and Plummer, by their involvement, contributed to the concealment of the practice of overselling by ClassicStar.

119.    Whether such implants actually occurred or produced foals is unknown; however, what is known is that the defendants never had any intention of breeding any quarter horses for the benefit of Plaintiffs or any other ClassicStar participant and they never had any intention of delivering any quarter horse foals resulting from these breedings to Plaintiffs or to any other ClassicStar participants.  Moreover, by virtue of its drafting of the leases and the interaction between, at a minimum, representatives of SOS and Ferguson, GeoStar actively participated in the quarterhorse portion of the Programs.

120.    However, Plaintiffs believed, and the defendants led them to believe, that their entire initial investment was in thoroughbred horses: leasing a thoroughbred mare and paying for the services of a thoroughbred stallion to obtain through the breeding process a thoroughbred foal.  None of the defendants disclosed the involvement of the quarter horse embryos, surrogate mares or artificial breeding to plaintiffs until Plaintiffs had paid for the Mare Lease Programs.

121.    Defendants further sold as part of the Programs multiple quarter horse embryos from individual mares, with the knowledge that it was highly unlikely that a majority of these embryos would successfully produce foals.

122.    Both because of the substantial possibility that a foal would not result and the price at which quarter horse foals, as opposed to thoroughbred foals, typically sold, the values placed on the (likely fictional) embryos by ClassicStar and Plummer greatly exceeded any

23

reasonable value for such interests, a fact known to ClassicStar, Plummer, and Spencer Plummer at the time they requested payment from Plaintiffs and thereafter.

123.    Plummer or SOS actually owned the quarter horses identified on the schedules of breeding pairings belonging to participants and Plummer prepared these schedules, which included the inflated values and appeared to substantiate the cost of the Program as identified in the Letters of Intent signed by Plummer and/or Spencer Plummer and upon which Plaintiffs based their payments.

124.    Because participants such as Plaintiffs would not own the expected number of thoroughbred foals at the end of the breeding season, defendants knew that participants could not possibly achieve the rate of return represented.

125.    Even if participants elected one of the "alternative investments" offered by ClassicStar, such as FEEP, and contributed a portion of their leases to another entity, their ownership interest in that entity would lack the represented value because the entity would not hold the assets needed to fulfill any put obligations associated with those interests.  However, the existence of the alternative investments and the availability of Gastar stocks helped to disguise the lack of adequate thoroughbred mares to sustain the Programs.

126.    Also to facilitate the policy of deliberate overselling, NELC conspired with the other defendants to create a financing plan for the Mare Lease Programs that both helped to conceal the substitution of non-thoroughbreds and led participants, including Plaintiffs, to claim deductions which resulted in tax savings or refunds. By promoting the tax savings, ClassicStar was able to induce participants to purchase more highly priced Mare Lease Programs than they otherwise would have.

127.    NELC was operated for the purpose of facilitating the sale of the Mare Lease Programs, but ClassicStar actually loaned the amounts used to finance the Mare Lease Programs to NELC, a fact not disclosed to Plaintiffs.

128.    This circular loan structure and the ownership in NELC by Plummer's brother-in-law and ClassicStar's CPA Green, a fact also not disclosed to Plaintiffs, together with other irregularities in defendants' transactions have led to a criminal investigation by the Internal Revenue Service, of the programs and practices of ClassicStar and its affiliates, despite the representations by ClassicStar and its agents, including Plummer and Ferguson, that they had disclosed all facts necessary for Plaintiffs to rely on their assurances regarding the proper tax treatment of the expenses.

129.    NELC knowingly conspired with the other defendants to conceal the nature of its dealings with ClassicStar and the overvaluation of the ClassicStar Mare Lease Programs.

130.    Upon information and belief, NELC also accepted a portion of the proceeds of the Mare Lease Programs with knowledge that defendants had obtained same by concealing and misrepresenting certain facts including, *inter alia*, those regarding NELC.

131.    Green continued in his role with NELC with knowledge of the funding of NELC by ClassicStar and, as ClassicStar's accountant, knew or should have known of the overselling of the Mare Lease Programs and the various devices for concealing that overselling.  Nonetheless, Green continued to advise participants, including Plaintiffs, through seminars, consultations and a prepared opinion, that the Programs met all IRS requirements for the advertised benefits. Green also assisted in the preparation of marketing materials used by ClassicStar to promote the Mare Lease Programs.

132.    Upon information and belief, New NEL is the successor-in-interest to NELC and has continued its operations.

133.    Plummer and/or SOS received substantial payments representing the proceeds of the Mare Lease sales, and other substantial compensation from those sales, with knowledge of the fraudulent nature of the quarter horse embryo program.

134.    Spencer Plummer likewise, with knowledge of the fraud, received commissions and other substantial compensation from the sales.

135.    Defendants GeoStar, Ferguson, Robinson and Parrot also knowingly accepted the proceeds of the other defendants' fraudulent schemes.  For instance, early in the history of the Programs, ClassicStar advanced approximately $100 million to GeoStar.

136.    This advance allegedly took place in exchange for GeoStar's agreeing to exchange working gas interests which it owned for participants' equine interests acquired through the Mare Lease Programs.

137.    At various other times, GeoStar, acting at the direction of Ferguson, Robinson and Parrott, also made available Gastar stock for exchange and did so with knowledge that the Mare Lease Programs had been substantially overvalued and with the intent of facilitating and concealing the fraudulent schemes.

138.    ClassicStar's financial records reflect a net transfer of approximately $40 million to GeoStar in 2004 alone.

139.    During the period in which these activities took place, GeoStar funded all the operations of Gastar, including the development of properties sold by Gastar for $6.2 million in cash in 2003 and the development of other jointly owned Gastar/GeoStar properties.

140.    Upon information and belief, Gastar, also with knowledge of the scheme, issued shares of its stock to GeoStar, in order for GeoStar to be able to complete the working interest exchanges and to placate dissatisfied participants who had not received the promised value.

141.    Upon information and belief, Gastar purchased and/or developed substantial oil and gas assets with funds received from Plaintiffs and other ClassicStar participants in exchange for the fictional thoroughbred interests and the Mare Lease Programs, and Gastar accepted funds from GeoStar which were derived from the Mare Lease Program.  Gastar did so with knowledge of the fraud and conspired with the others involved in the scheme to conceal the true operation of the Mare Lease Programs.

142.    Upon information and belief, defendants ClassicStar and/or ClassicStar Farms purchased substantial assets, including thoroughbred mares which they allegedly owned prior to payment by Plaintiffs, with funds received by Plaintiffs in exchange for the fictional thoroughbred interests and the Mare Lease Programs.  For instance, in 2004, the year in which all of the Plaintiffs purchased Mare Lease Programs, ClassicStar reportedly spent $9,835,000 for a dozen mares.

143.    Further, defendants used a portion of the fraudulently obtained funds to support the activities of ClassicStar, ClassicStar Farms, GeoStar, Gastar and/or their affiliates, and SOS which accepted the funds with knowledge of the fraud and conspired with the other defendants to conceal the true operation of the Mare Lease Programs.

144.    The use of these funds, the operation of the farms, the activities of GeoStar and Gastar touted as alternative investments, and the marketing of the Mare Lease Programs facilitated the continuation of the fraudulent scheme and enabled the defendants to defraud Plaintiffs.

145.   Using these fraudulent schemes, the defendants obtained over $500 million from participants.

146.   ClassicStar dispersed a substantial portion of its assets in November 2006.

147.   ClassicStar filed for bankruptcy in September 2007.

148.   However, under the direction of Ferguson, ClassicStar continued to conduct the Mare Leasing business through ClassicStar Thoroughbreds, which now appears to own some of the thoroughbred mares formerly owned by ClassicStar.

149.   MacDonald was introduced to the Mare Lease Programs in mid-2003, at a teleconference attended by Plummer and Ferguson.  Plummer explained the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs.  As explained, *supra*, the representations regarding these features were all inaccurate.

150.   At this meeting, the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents.  These representations also lacked any basis in fact.

151.   ClassicStar with assistance from Green prepared an "Illustration" for MacDonald, presented by Plummer and Ferguson, dated June 18, 2003.  This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $19 million payment of $6 million, with options to convert equine interests to methane gas

28

working interests which could then convert to Gastar stock.  The projections contained in this Illustration lacked any factual basis.

152.    In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

153.    MacDonald elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

154.    On or around August 1, 2003, Spencer Plummer transmitted, through mail or other interstate carrier, to MacDonald, the Letter of Intent that obligated MacDonald to the 2003 Program.   On this same date, ClassicStar sent MacDonald correspondence describing the Program, including a timeline for the business, a summary of material participation guidelines for tax purposes, and sample participation logs.

155.    MacDonald consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail and wire, to ClassicStar in the amount of $14 million, consisting of cash and the proceeds of an NELC loan.

156.    In late December, 2003, MacDonald received, by mail or other interstate carrier, the Mare Lease and breeding agreements making up the body of the Program, as well as the schedule detailing the final pairings.  Shortly thereafter, MacDonald received an e-mail from Gary Thompson, on behalf of NELC, attaching the NELC notes.  Subsequent correspondence

from Thompson and from Karren Hendrix instructed MacDonald to mail interest payments on the notes to NELC in care of Karren Hendrix.

157.    Upon receiving its final pairings, after payment, MacDonald objected to the inclusion of many more mares than expected in the Program.

158.    MacDonald subsequently learned from Plummer that ClassicStar lacked available thoroughbreds to fill the Programs it sold and had instead assigned quarter horses to it.

159.    MacDonald objected to this substitution and ClassicStar agreed to exchange its 2003 Program interests for other assets, including stock issued by Gastar at GeoStar's direction.

160.    It was agreed that the stock would be restricted for one year, after which MacDonald would be free to transfer it.

161.    The stock was not transferred in accordance with the agreement, with the result that MacDonald's ability to transfer the stock was delayed by an additional year during which time the fair market value of the stock declined.

162.    ClassicStar arranged for MacDonald to contribute its remaining 2003 equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

163.    The units had associated with them both a "put" and a "call" feature.  Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit.  However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt.  GeoStar guaranteed the put option.

164.    In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other purchasers for those interests and provided a methodology for repayment of the NELC loan

30

which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

165.   Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by MacDonald cannot have the represented value.

166.   FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

167.   However, upon information and belief, these working interests were not assigned, because they had been assigned or transferred to Gastar, or lacked the value represented.

168.   GeoStar, GEEI and Gastar were aware of this fact and failed to disclose same to MacDonald.

169.   Accordingly, MacDonald's units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

170.   Based on assurances from Plummer, in conversations in mid-2004, and from other ClassicStar agents, that MacDonald would receive the expected valuable interests in a proposed 2004 lease program, MacDonald agreed to participate in the 2004 Program.

171.   Those representations included Illustrations provided to MacDonald via mail or other interstate carrier by the law firm of Handler Thayer & Duggan, which referenced both FEEP and an alternative approaches, in October and December 2004.

172.   In reliance on these assurances, MacDonald made payments to ClassicStar, through interstate mail and wire, totaling $8 million in 2004.

173.   However, MacDonald's final pairings again did not conform to ClassicStar's representations.

174.    As a result of MacDonald's objections, ClassicStar agreed to trade the equine interests for other assets, including additional FEEP units, various specified thoroughbred breeding interests, and shares of an entity called GeoEquities, which had additional mineral interests.

175.    ClassicStar and FEEP have neither performed these agreements nor fully refunded MacDonald's payment.

176.    Upon information and belief, ClassicStar and GeoStar created GeoEquities to function as an alternative investment like FEEP, but contrary to their representations to MacDonald, never funded or operated that entity.

177.    Thus, ClassicStar misrepresented the value of both programs to MacDonald, did not disclose the value of the quarter horse interests, and did not disclose the status of NELC. Plummer and Ferguson made such representations and/or omissions at the meetings described above, and Spencer Plummer executed documents containing the inflated values without disclosing same.  Further, neither NELC nor Terry Green disclosed its connection to ClassicStar, despite MacDonald's dealings with NELC as a lender.

178.    Representatives of ClassicStar first approached plaintiff Nelson Breeders in February or March of 2004.

179.    At a March 2004 meeting between representatives of ClassicStar, including Plummer, and Nelson Breeders, ClassicStar provided Nelson Breeders with an "Illustration" of the Mare Lease Program.

180.    The Illustration, which identified ClassicStar as "a division of the GeoStar Group," represented that, for an up-front investment of approximately $2,900,000, Nelson's

32

participation would generate tax savings of approximately $11,000,000 and net after tax mare lease revenue of approximately $9 million.

181.    Nelson Breeders' Illustration also outlined several options to exchange a portion of the Mare Leases for alternative investments, including ownership of an interest in an entity called First Energy Partners, Inc. and exchange of that interest for stock in GasStar, Ltd., a publicly traded company controlled by GeoStar and its principals.  The Illustration also offered the option of using a percentage of the interests for repayment of the NELC loan and, by virtue of a put option associated with the GasStar stock, provided for a projected net after tax return of 326%.  The projections contained in the Illustration lacked any factual basis.

182.    ClassicStar prepared a second Illustration for Nelson Breeders in April 2004, which closely resembled the first except that the alternative investments now involved First Equine Partnership and an entity called GeoEquities LLC.

183.    Plummer met with Nelson Breeders in April 2004 in Lexington, Kentucky, and discussed the Illustration and various features of the Program.

184.    ClassicStar's agents, including Plummer, represented to Nelson that the projections contained in the Illustrations rested on verified past results and that transactions described by the Illustrations would not raise any concerns with the IRS because they were structured to comply with IRS rules and regulations.  These representations were false.

185.    Moreover, ClassicStar represented that it owned sufficient thoroughbred interests to justify the cost of the Program and that Nelson Breeders would own any foals resulting from its pairings and be free to sell them, train them, or contribute them to one of the alternative investments at its option.  These representations were false.

33

186.    Nelson Breeders attended additional presentations by Plummer, Ferguson and other representatives of ClassicStar, including Doug Anderson, in May and October of 2004, at which times they explained the Mare Lease Program business model, including the basis for the fees (which was misrepresented), the expected returns (which had no basis in fact), and the tax benefits (which were misrepresented).

187.    Relying on these representations, Nelson Breeders executed a binding letter agreement (with an effective date of April 28, 2004) signed by Spencer Plummer committing it to a schedule of payments and to executing the actual mare lease and boarding agreements after consultation with ClassicStar regarding the particular thoroughbred pairings.

188.    Shortly thereafter Nelson made a payment of $2,812,000 to ClassicStar by wires dated May 17, 2004 and June 22, 2004, and continued to make payments and incur obligations (to NELC) totaling $28 million up until the execution of the mare lease and boarding agreements in December 2004.  Nelson made such payments through interstate mail and wire in reliance on the representations of ClassicStar and in response to invoices, received by mail or other interstate carrier, including a September 24, 2004 invoice from ClassicStar.  ClassicStar's representatives Plummer, Ferguson and the other defendants knew and intended that Nelson, like other participants, would do so.

189.    Again, ClassicStar and NELC acting through their agents misrepresented the ownership and value of the mares, concealed material facts regarding same, and failed to disclose the NELC connection with ClassicStar.

190.    West Hills attended a presentation by Plummer and Doug Anderson in March-April 2004, in which Plummer made representations regarding the expected returns on the Programs, the tax benefits of the Programs and the costs associated with the Programs.  Each of

34

these representations was false, in that the Programs were not structured so as to confer the touted tax benefits and the projected returns and the fees both lacked any basis in fact.

191.   ClassicStar presented an Illustration similar to the Nelson Illustration to West Hills in or around May 2004, in which it represented that for approximately $800,000 upfront, West Hills' participation would generate $3,100,000 in after tax revenue, based on tax savings of approximately $5,800,000 and utilizing a NELC loan of $6,500,000 (half the amount of the total program).

192.   Also in May 2004, Plummer and other agents of ClassicStar explained to West Hills the operation of the Mare Lease Programs, including the methodology of setting the fees based on the fair market value of the interests and services provided at a meeting attended by Plummer.  Plummer also met with West Hills in June 2004 and, in addition to the representations described above, explained GeoStar's affiliation with ClassicStar and GeoStar's connection to Gastar, as the majority owner of a publicly traded company.

193.   Again ClassicStar and its agents, including Plummer, represented that the total cost of the Mare Lease Program, (approximately $13,000,000 in West Hills' illustration) reflected 30% of the fair value of the mares, the fair value of the stallion nominations, and the fair value of the services provided by ClassicStar and/or ClassicStar Farms, that ClassicStar had assured the Mare Lease Program's compliance with all IRS requirements, and that historical performance figures supported the projections.  All these representations were false.

194.   ClassicStar also falsely represented that West Hills would own any foals resulting from the pairings and that it owned thoroughbred horses sufficient to justify the projections and costs.

35

195.    Plummer met with Arbor Farms around May 2004 at the London Grill to give a general description of the programs and explained the fee structure, including the establishment of the Mare Lease fee as 30% of the value of the mare, and the tax benefits as outlined above.

196.    ClassicStar also provided information, including the Karren Hendrix opinion letter and the attorney opinion letter to Plaintiffs.  Green, with knowledge of the fraudulent scheme, also transmitted the ClassicStar tax returns prepared by Karren Hendrix, which grossly overstated the expenses of ClassicStar's operations, by mail or other interstate carrier, to Arbor Farms' and West Hills' accountant on or around July 29, 2004.

197.    In reliance on these representations, including the accuracy of the values in the tax returns, Arbor Farms and West Hills, on or around July 30, 2004, forwarded to ClassicStar executed letter agreements from Plummer and Spencer Plummer committing them to making payment and executing the mare lease and boarding agreements after consultation with ClassicStar regarding the pairings, in essentially the same form as the Nelson agreements.

198.    In late August 2004, both Arbor Farms and West Hills forwarded, by mail or interstate carrier, checks to ClassicStar which represented their initial payment in relation to the 2004 Mare Lease Programs.  ClassicStar accepted these checks with knowledge of the fraudulent representations.

199.    On September 24, 2004, ClassicStar mailed invoices to West Hills and Arbor Farms for $4,482,494 and $4,491,807, respectively, and included a schedule of additional payments.  These amounts were represented to reflect the value of the interests and services to be provided by ClassicStar in connection with the Mare Lease Programs, but were in fact far in excess of the true value of such interests and services.

200.    At a subsequent meeting in or around October 2004 at the Breeder's Cup, attended by Plummer and Ferguson, Plummer again described the programs.  Plummer specifically explained the potential financing arrangements available to Arbor through NELC, emphasizing the deductibility of the loan.  At no time did Plummer disclose the connection between NELC and ClassicStar.  Plummer and Ferguson both also vouched for the soundness of the Program and the quality of the equine interests involved.

201.    Agents of ClassicStar and GeoStar, including Ferguson, further sought to reassure Arbor regarding the stability of the Programs by discussing with Arbor GeoStar's oversight of the ClassicStar operations.  Both Plummer and Ferguson reiterated their representations at the Keeneland Sales in November 2004.

202.    Thereafter, from October 2004 through December 2004, West Hills and Arbor Farms, in reliance in the invoices and the representations, each paid, by wire and check, approximately $7,000,000 to ClassicStar, including October 15, 2004 wires in the amount of $3 million each from Arbor Farms' and West Hills' Portland, Oregon accounts to ClassicStar in Utah, and transfers of approximately $7 million from Hanna Strader P.C. in Oregon, on behalf of West Hills and Arbor Farms to ClassicStar in Utah.

203.    As part of their normal operation of ClassicStar, the defendants, including GeoStar, Ferguson, Robinson, Parrott, Plummer and Spencer Plummer, intended that such transfers would take place and knowingly caused these uses of the mail or interstate carriers or wires as part of their fraudulent scheme.

204.    Plaintiffs also executed notes to NELC, in the principal amount of $25,088,000 for Nelson Breeders and $7,000,000 each for West Hills and Arbor Farms.  ClassicStar

represented to plaintiffs that it had received the proceeds of these loans in letters dated December 23, 2004.

205.    On or around December 23, 2004, ClassicStar transmitted by mail or interstate carrier to West Hills and Arbor Farms the final Mare Lease and breeding agreements making up the body of the Program, which falsely represented that ClassicStar owned the mares involved, the schedules of pairings that contained the fraudulently overvalued quarterhorse pairings and various other information.

206.    West Hills and Arbor Farms each executed and sent, by mail or interstate carrier, the mare lease and breeding agreements making up the body of the program to ClassicStar.  By this time, in accordance with the terms of the letter agreement, Plaintiffs had already transferred tens of millions of dollars to ClassicStar.

207.    The Leases specifically warranted that ClassicStar owned the mares involved.

208.    The Leases also gave ClassicStar the right to substitute another mare for the thoroughbred mares chosen by defendants, but required that the substitution be of equal value to the original mare.

209.    Unknown to Plaintiffs until well after payment for the 2004 Programs, ClassicStar filled the Nelson, West Hills and Arbor Farms 2004 Programs with a small portion of thoroughbred and a majority of quarter horse pairings.

210.    Accordingly, as described above, these Plaintiffs received only a fraction of the promised value.

211.    Moreover, they did not receive interests in mares owned by ClassicStar, but rather, it appears, in mares owned by Plummer or SOS, for which ClassicStar lacked any rights.

212.    Plaintiffs have therefore suffered the loss of the greater portion of their investments.

213.    Defendants Plummer and ClassicStar subsequently attempted to forestall Plaintiffs' inquiry into this loss by continuing to assure Plaintiffs of the viability of the Programs and by offering investment in FEEP and other GeoStar controlled entities as potential alternatives.  West Hills and Arbor Farms received the false and misleading FEEP prospectus by way of electronic mail in November 2005.

214.    In addition, Spencer Plummer, by, upon information and belief, United States mail, forwarded to West Hills and Arbor Farms correspondence summarizing the 2004 income and expenses associated with ClassicStar, for use in tax preparation.  Unknown to Arbor Farms and West Hills, this summary was based on the misrepresented values described above.

215.    Grovers were introduced to the Mare Lease Program in late 2002/early 2003 in several face-to-face meetings with Plummer and thereafter with Ferguson.  Plummer explained the components of the Programs, including the fees charged in connection with the Programs, the projected returns based on past profits, and the establishment of the mare lease fee at one-third the fair market value of the mares, while Ferguson explained GeoStar's connection with and backing of the Programs.  As explained, *supra*, the representations regarding these features were all inaccurate.

216.    At these meetings the Programs were described by Plummer and Ferguson as thoroughbred breeding Programs, which included a realistic potential for profit based on past experience, the tax benefits described above, and the potential for alternative investments which would maintain the favorable tax treatment promoted by ClassicStar and its agents.  These representations also lacked any basis in fact.

217.   ClassicStar prepared an "Illustration" for Grovers, presented by Plummer and Ferguson, dated October 20, 2003.  This Illustration identified ClassicStar as "a Division of the GeoStar Group" and offered a net after tax revenue projection on a $1.085 million payment of $4.823 million, with options to convert equine interests to methane gas working interests which could then convert to Gastar stock.  The projections contained in this Illustration lacked any factual basis.

218.   In connection with this Illustration, ClassicStar represented that it owned the mares being leased and it would board these mares at ClassicStar Farm's property in Kentucky. In fact, ClassicStar intended to and did lease a number of quarter horses owned by Plummer or SOS.

219.   Grovers elected to participate in the 2003 Program, and purchase mare leases, based on ClassicStar, Ferguson and Plummer's misrepresentations regarding the value of the mares, their ownership by ClassicStar, the expected return and ClassicStar's conformity to the regulations applicable to the advertised tax benefits.

220.   Grover consulted with ClassicStar regarding certain breeding pairs and made payment, through the use of interstate mail, carrier and wire, to ClassicStar in the amount of $8,065,112 million, consisting of cash and the proceeds of an NELC loan.

221.   In early 2004, David Plummer and Tony Ferguson recommended to Grovers that they exchange a substantial portion of their equine interests for alternative available investments in oil and gas, which they were told represented a better and more diversified strategy for generating profits.  During this meeting, Plummer and Ferguson assured Grovers that they could convert tax free into these new oil and gas investment opportunities.

222.    Pursuant to this proposal, ClassicStar arranged for Grovers to contribute approximately 60% of their equine interests to FEEP in exchange for preferred units of FEEP of equivalent value.

223.    The units had associated with them both a "put" and a "call" feature.  Pursuant to the put, the owners of FEEP units had an option to require FEEP to purchase the units at a fixed price per unit.  However, under the FEEP agreement, FEEP would first apply the purchase price to payment of any NELC debt.  GeoStar guaranteed the put option.

224.    In reality, FEEP served as a vehicle for concealing the fraudulent valuation of the quarter horse interests, because it virtually guaranteed that participants would not seek other purchasers for those interests and provided a methodology for repayment of the NELC loan which, through the participation of NELC in the scheme, did not reveal that the equine assets securing the loan lacked the value placed on them by ClassicStar.

225.    Because of the gross overvaluation of the equine interests contributed to FEEP, it appears that the FEEP units received by Grovers cannot have the represented value.

226.    FEEP's other assets purportedly consisted of working interests in gas wells assigned to FEEP by its managing member, GEEI, which is controlled by GeoStar.

227.    However, upon information and belief, these working interests were not assigned because they had been previously transferred to Gastar or lacked the value represented.

228.    GeoStar, GEEI and Gastar were aware of this fact and failed to disclose same to Grovers.

229.    Accordingly, Grovers' units lack the value represented by ClassicStar and, upon information and belief, FEEP cannot perform its obligation on the put.

230.    In addition, ClassicStar arranged for Grovers to exchange substantially all of their remaining equine interests for an Installment Note in the amount of $3,796,707, payable by a purported GeoStar entity called GeoStar Financial Services Corporation ("GFSC").  Ferguson signed for GFSC.  The full Note amount was due and payable on or before July 15, 2007.

231.    Upon information and belief, GFSC had no assets and was intentionally created by GeoStar as an undercapitalized shell corporation with no intent that it make payment.  GFSC has failed to make any of the required payments of its Installment Note to Grovers.

232.    Thereafter, in late 2004, based on representations from Plummer and Ferguson and other agents of GeoStar and ClassicStar that the 2003 Mare Lease Program was performing as represented and that their oil and gas investments were generating profits, Grovers purchased an additional $2.2 million of Mare Lease Program interests, the vast majority of which equine interests they exchanged for FEEP units in early 2005.

233.    To date, despite demand, Grovers have received no information about their FEEP investments or their installment note, and they have received no payments or installments or other distributions from FEEP or GFSC.

234.    Grovers have exercised their put option with FEEP, but FEEP has not performed.

235.    In this manner, from 2003 forward, ClassicStar and its affiliates defrauded the Plaintiffs in the amount of $20 million in direct losses and far more including debt and potential tax liabilities.

236.    At all times, ClassicStar was operating under the control and subject to the direction of GeoStar, its principals Ferguson, Robinson and Parrott, and Plummer, and the majority of the proceeds collected by ClassicStar were transferred to GeoStar, which accepted

the proceeds with knowledge, through Ferguson and others, of the fraudulent scheme by which they were generated.

237.    At all relevant times, Gastar also operated under the control of GeoStar and subject to its direction.   In fact, Gastar had no employees and GeoStar performed all of its operational and managerial functions such that the knowledge of GeoStar and its principals and agents is attributable to Gastar.

238.    From 2001 forward, GeoStar utilized substantial sums derived from the Mare Lease Programs, including the transactions with Plaintiffs, to fund its operations and those of Gastar or to develop properties for their joint benefit.    These operations included the development of the wells assigned to participants as part of the working interest exchange feature of the Programs, which wells it appears Gastar acquired from GeoStar and then sold for tens of millions of dollars.

239.    Defendants' omissions complained of herein have defeated or placed into substantial jeopardy the tax benefits represented by defendants to Plaintiffs to be available as a result of their participation in the ClassicStar Mare Lease Program.    These omissions include, but are not limited to, the following: defendants' failure to tell Plaintiffs that most if not all of the breeding pairings upon which Plaintiffs were basing their tax deductions were fictitious; defendants' failure to tell Plaintiffs that the loan portion of their packages was financed entirely by ClassicStar or was itself fictitious; and defendants' failure to tell Plaintiffs that the FEEP entity into which they were converting or offering to convert a portion of Plaintiffs' breeding interests had no oil and gas or other assets and that there was no intention of converting any breeding interests into that entity.

43