UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

IN RE CLASSICSTAR MARE LEASE      )        MDL No. 1877
LITIGATION                        )
                                  )         Master File:
and                               )    Civil Action No. 07-353-JMH
                                  )
WEST HILLS FARMS, LLC, *et al.*,  )
                                  )
    Plaintiffs,             )
                                  )
v.                                )
                                  )    Civil Action No. 06-243-JMH
CLASSICSTAR, LLC, *et al.*,       )
                                  )
    Defendants.             )    **MEMORANDUM OPINION & ORDER**


**\*\*\* \*\*\* \*\*\***

    This matter is before the Court upon the Motion to Dismiss filed by David Plummer, Spencer Plummer, and Strategic Opportunity Solutions, LLC, d/b/a Buffalo Ranch ("Buffalo Ranch" and collectively, with the individual defendants, "Plummer Defendants") [5:06-cv-243-JMH, DE 313] and the Motion to Dismiss of GeoStar Financial Services Corp. ("GFSC"), GeoStar Equine Energy, Inc. ("GEEI"), GeoStar Corporation ("GeoStar"), ClassicStar Farms, Inc. ("CFI"), ClassicStar Thoroughbreds of Kentucky, LLC ("CTK"), Tony Ferguson, Thom Robinson, and John Parrott (hereinafter, collectively, "GeoStar Defendants") [5:06-cv-243-JMH, DE 319].[1]

---

[1]    Defendants Tony Ferguson, ClassicStar 2004, LLC, ClassicStar Thoroughbreds, LLC, Geostar Equine Energy, Inc., John Parrott, Thom Robinson, ClassicStar Farms, Inc., ClassicStar, LLC,

Plaintiffs (hereinafter, collectively, "West Hills Plaintiffs") have responded [5:06-cv-243-JMH, DE 323, 338] to each motion, respectively, and the moving Defendants have replied in further support of their respective Motions [5:06-cv-243-JMH, DE 328, 353].

## I.   Factual Averments in Plaintiffs' Fourth Amended Complaint

Plaintiffs' Fourth Amended Complaint paints a complex and detailed portrait of entities and individuals involved in the development, execution, and furtherance of the Mare Lease Program offered by ClassicStar, LLC, which Plaintiffs complain was operated to the benefit of Defendants at Plaintiffs' detriment through misrepresentations made by Defendants and actions that were subsequently taken to cover up the fraud being worked by Defendants.

Plaintiffs were among more than 150 separate individuals or entities that participated in the Mare Lease Program between 2001 and 2004, investing over $500 million dollars. During their participation in the Program, between 2003 and 2005, the five plaintiffs purchased approximately $80 million of equine breeding pairings from ClassicStar between them. Plaintiffs were

---

ClassicStar Farms, LLC, and ClassicStar 2005 Powerfoal Stables, LLC, GeoStar Financial Services Corporation, and GeoStar Corp. [5:06-cv-243-JMH, DE 203], as well as Defendants David Plummer, S. David Plummer, II, Spencer Plummer, Spencer D. Plummer, III, and Strategic Opportunity Solutions, LLC [5:06-cv-243-JMH, DE 204], had previously filed Motions to Dismiss the Third Amended Complaint. These Motions were rendered moot by the filing of the Fourth Amended Complaint and shall be denied as such.

disappointed with the return on their investment, ultimately receiving 20 foals valued at less than $10 million. No doubt, this type of investment has an element of risk. Plaintiffs claim, however, that the risk was never accurately portrayed to them because – unbeknownst to them – the vast majority of pairings provided actually consisted of quarter horse interests instead of the thoroughbred pairings that Plaintiffs had been promised when they invested. Further, many of the pairings that had been promised were ultimately never delivered to them. Plaintiffs aver that Defendants operated the Program in this way, driving sales through the misrepresentations made to Plaintiffs and others and, thus, raising funds to benefit a number of entities and individuals, including the named defendants in this matter. In other words, Plaintiffs invested because (1) they believed that ClassicStar had assets that, unbeknownst to them, either never existed or were so grossly misrepresented as to be fictitious and (2) because they were told that certain tax shelter aspects of the investment Program would inure to their benefit.

According to Plaintiffs, Defendants David Plummer, Spencer Plummer, Buffalo Ranch, GeoStar, and its principals, including Robinson and Parrott, aided, abetted, and controlled ClassicStar with respect to fraudulent sales – millions of dollars worth – but ultimately were the among the parties who benefitted from the misconduct. ClassicStar ended up in bankruptcy, and Plaintiffs

-3-

aver that the defendants walked away with the proceeds. [Fourth Amended Complaint (hereinafter, "Compl.") at ¶¶ 133-34, 135, 138-39, 143, 243.]

By way of history, ClassicStar, LLC, existed well before the events at bar in this case began to unfold. However, this Court is most concerned with what happened after ClassicStar, LLC, was acquired from Defendant Spencer Plummer by GeoStar in 2001.[2] [Compl. at ¶ 51.] At all relevant times and as described below, Plaintiffs aver that ClassicStar, LLC, and a number of its subsidiaries and related entities operated a thoroughbred breeding business on farms belonging to its wholly owned subsidiary, ClassicStar Farms. ClassicStar, LLC, marketed Mare Lease Programs to individuals and companies having an interest in the thoroughbred horse industry. The Programs purportedly allowed purchasers to lease a thoroughbred mare belonging to ClassicStar, LLC, for one breeding season at a cost set at 30% of the fair market value of the mare. Under the terms of the Program, that mare was, in turn,

_____

[2] GeoStar Corporation is a limited liability company owned by Defendants Ferguson, Robinson, and Parrott. [Compl. at ¶¶ 27, 51.] Prior to its acquisition of ClassicStar, GeoStar had operated as an energy development company with interests in various mineral reserves, primarily coal bed methane beds, located throughout North America. [Complaint at ¶ 82.] GeoStar had raised funds for its development of these properties primarily through the sale of working interests in various wells to be drilled on the properties. It undertook this development through various subsidiaries, including a public traded company known as Gastar Exploration, Ltd. ("Gastar"), which was wholly controlled by GeoStar and its members Ferguson, Robinson and Parrott. [Compl. at ¶ 81-82.]

to be bred to a selected thoroughbred stallion and board provided for the mare and the resulting foal.

After its acquisition of ClassicStar, GeoStar designed the Mare Lease Programs as an alternative means of raising funds for its mineral development. [Compl. at ¶ 68.] Throughout this period, it continued to maintain and exercise control over the substantial portion of ClassicStar's books, records, bank accounts, financial reports, and tax returns. [Compl. at ¶ 51.] The Mare Lease Programs themselves were operated by ClassicStar, and by numerous of its subsidiaries including CFI and ClassicStar Thoroughbreds. [Compl. at ¶ 53.]

Even after ClassicStar was acquired by GeoStar, the Plummers remained involved in the business. David Plummer acted as director of marketing and a salesperson on behalf of ClassicStar and GeoStar, promoting the Programs to potential investors, including the Plaintiffs. [Compl. ¶¶ 66, 68, 73, 123, 149-51, 170, 177, 179, 183-84, 186, 190, 192-93, 105, 200-201, 213, 215, 217, 221, and 232.] Spencer Plummer was ClassicStar's president or vice-president and signed correspondence and agreements relating to the Programs on behalf of ClassicStar. [Compl. ¶¶ 65, 122-23, 154, 177, 187, 197, 214.] In these roles, David and Spencer Plummer also served as salespeople for ClassicStar, representing to Plaintiffs that the cost of participating in the Mare Lease Programs was evaluated by means of the value of the mares owned by ClassicStar.

They also represented to Plaintiffs that the full cost of the Program could be tax deducted by qualified individuals participating in a breeding business. [Compl. ¶¶ 71-73.]

As the Programs and the scheme matured, GeoStar and Ferguson, Robinson and Parrott formed various other entities to facilitate the sales and enlisted other entities to further the scheme. NELC, a company financed by ClassicStar and operated by ClassicStar's accountant, existed to provide financing to parties transacting with ClassicStar. [Compl. at ¶ 126-131.] Karren Hendrix, the accounting firm which represented ClassicStar and at which its accountant was a partner, and its agents were compensated for assisting in marketing the Programs. [Compl. at ¶¶ 96-97, 126.]

The Mare Lease Programs were promoted using marketing materials featuring the Kentucky properties owned by ClassicStar Farms and touting the success of ClassicStar's Mare Lease Programs. The marketing materials and ClassicStar's agents represented to investors, including Plaintiffs, that the cost of participating in the Mare Lease Programs was evaluated by means of the value of the mares owned by ClassicStar. They further explained that the full cost of the Program could be deducted on their income tax return by qualified individuals participating in a breeding business. [Compl. ¶¶ 71-73, 100.] According to ClassicStar's marketing materials and the information provided to Plaintiffs by its salespeople, the Programs were structured so that purchasers could

claim a tax deduction in the full price of the package, including a loan, because ClassicStar encouraged purchasers to participate in the program despite its very high price tag by arranging for investors to finance at least half the cost through a lender selected by ClassicStar. [Compl. at ¶ 95.] ClassicStar passed the invested dollars along to its parent company, GeoStar, which – by these means – raised tens of millions of dollars to fund its own operations. [Compl. At ¶¶ 135, 138-39, 238.] Once the Mare Lease Programs were purchased, investors were then offered subsequent investment options in which ClassicStar's parent, GeoStar, and its affiliates would allow purchasers to retire their note and convert a number of their equine interests into other investments – less labor intensive investments. [Compl. at ¶¶ 74-79, 88-92.]

Plaintiffs complain, however, that the breeding pairings for which they paid were often actually populated by quarter horses and, in reality, had significantly lower values than the thoroughbred pairings upon which the purchase price had been based.

ClassicStar's salespeople and promotional materials represented to the Plaintiffs and others that the values charged for the Mare Lease Programs bore a relationship (in the amount of 30%) to the value of the underlying mares owned by ClassicStar and that the full cost of the Program could be tax deducted by qualified individuals participating in a breeding business. [Compl. at ¶¶ 71-73.] In fact, the breeding pairings for which the Plaintiffs

paid tens of millions of dollars often consisted primarily of quarterhorses owned by David Plummer, not ClassicStar, and were not actually worth nearly what the pairings that Plaintiffs had paid for were ostensibly worth. [Compl. at ¶¶ 113-19, 121-23.] Plaintiffs aver that ClassicStar resorted to this tactic because it consistently oversold the Programs, by offering Programs having a far greater total value than the thoroughbreds actually owned by ClassicStar could support. [Compl. at ¶¶ 104-106.] But ClassicStar was not acting alone. Rather, GeoStar and Ferguson, Robinson and Parrott specifically approved this substitution of overvalued quarterhorses for the thoroughbreds that the contracts and marketing materials represented that participants would own. [Compl. at ¶¶ 13-14.]

The Plummers were heavily involved in this element of the business through a separate business, Strategic Opportunity Solutions, LLC ("SOS") d/b/a Buffalo Ranch, which they operated. Plaintiffs aver that SOS was set up to support purported embryo implants from quarter horses into surrogate roundup mares, theoretically producing quarter horses. While SOS may have owned embryos resulting from quarter horse pairings, Plaintiffs explain that SOS did not own a sufficient number of mares to support even the quarter horse aspect of the Program let alone to own or lease enough quarter horses to ClassicStar for use in its breeding programs as a substitute for thoroughbreds. Buffalo Ranch's

provision of quarter horses was used by the defendants to disguise the overselling of the Mare Lease Program by providing something, albeit not the thoroughbred mares and breeding pairings promised, to investors including Plaintiffs. [Compl. ¶¶ 31, 116-18, 122-23.]

Others participated in the scheme, as well. As explained above, ClassicStar along with other Defendants sought to conceal the strategy of overselling the programs by having ClassicStar arrange for investors to obtain loans from NELC, a company financed by ClassicStar and operated by ClassicStar's accountant, Terry Green (who also happened to be related to the Plummers through marriage). NELC did not insist on independent confirmation of the horses' value because it was affiliated with ClassicStar and in on the scheme, [Compl. at ¶¶ 95, 127-131], and NELC provided financing to parties transacting with ClassicStar to purchase the Mare Lease Programs.[3] The relationship between NELC and ClassicStar was a close one for NELC lacked the resources to finance such a large volume of transactions, so ClassicStar transferred the amounts needed to fund the loans to NELC which NELC then transferred back to ClassicStar as loan proceeds. This arrangement, according to Plaintiffs, placed the tax deductibility of the loans into question since the applicable regulations do not allow for the deduction of debt owed to interested parties. The deductibility of the loan,

---

[3]     Meanwhile, Green's accounting firm as well as its agents were compensated for assisting in marketing the Programs to the firm's clients.

however, was one of the major selling points of the Programs. Plaintiffss complain that the Plummer and the GeoStar Defendants knew that Plaintiffs relied on NELC's status as a third party lender to obtain that deduction and knew that NELC was not independent yet concealed or did not disclose its status as an interested party – all in order to encourage and secure Plaintiffs' participation in the Programs.

Plaintiffs also aver that the Plummer and GeoStar Defendants, as well as others, devised means of cloaking the underlying deception about the horses and the initial investment because they knew that if Plaintiffs ever needed to liquidate a portion of their Programs to repay the NELC loan, that the investors would have discovered the inflated values.  To forestall that eventuality, it was arranged for GeoStar to propose a number of secondary transactions that would allow a portion – presumably the overvalued portion – of the Program to be exchanged for some asset provided by or associated with GeoStar: stock in Gastar, which GeoStar controlled, working interests in coal bed methane fields operated by GeoStar, and units in limited liability companies managed by GeoStar affiliates. [Compl. at ¶¶ 74-79, 88-92.]  NELC would accept some portion of those interests in "repayment" of the loan, thus, Plaintiff's aver, perpetuating the fraud because Plaintiffs and others like them would never be the wiser about the actual value of their investments. [Compl. At ¶¶ 164-224.]

First Equine Energy Partnership ("FEEP"), managed by GEEI, provided one such secondary transaction. Participants were encouraged to exchange equine interests for FEEP units [Compl. at ¶ 88], and FEEP's assets were, purportedly, the contributed breeding rights as well as working interests in a number of coal bed methane wells contributed by the manager and owner of the common units, GEEI. [Compl. at ¶ 90.] These working interests were to generate cash sufficient to service the debt associated with the Mare Lease Programs, and the FEEP units would serve as collateral for the NELC debt. [Compl. at ¶ 91.] The FEEP units carried with them a put option guaranteed by GeoStar, a company whose principals, Ferguson and Robinson, served on the FEEP Advisory Committee. [Compl. at ¶ 92.] Plaintiffs aver, however, that FEEP could not perform as represented because GeoStar and Gastar had already engaged in transactions involving the supposedly contributed working interests – facts which Robinson and Ferguson, principals of GeoStar and Gastar and members of the FEEP Advisory Committee, knew but did not reveal to investors. [Compl. at ¶ 94.]

Plaintiffs complain that GFSC played a similar role in the scheme, masking the true value of the Mare Lease Programs when compared to the investments made by investors, by offering notes to dissatisfied Mare Lease participants in order to forestall their inquiry into the differences between the value promised and the interests they actually received. However, as a shell corporation

with no assets, GFSC never had the ability to live up to these commitments. [Compl. at ¶ 231.]

All of this was to what end?  This is also a question which Plaintiffs' Fourth Amendment Complaint purports to answer. Plaintiffs aver that the Plummer and GeoStar Defendants, as well as others, used ClassicStar for their own purposes having each, in turn, taken an active role in the scheme.  Indeed, the marketing materials that David Plummer, as director of marketing for ClassicStar and GeoStar, used identified ClassicStar as part of the "GeoStar Group" and identified the alternative investments that would allow purchasers to cash out a portion of their interests and repay the loan. [Compl. at ¶¶ 66, 74-79, 88-92, 106-110.] Each time these exchanges were encouraged and took place, which they did, the defendants continued the concealment of the unsupported nature of the Mare Lease Programs themselves. [Compl. at ¶¶ 162-69, 174, 222, 229, 232.] Eventually, using these transactions to mask the underlying deception averred by Plaintiffs, ClassicStar funneled $100 million to GeoStar, including $40 million in 2004 alone. [Compl. at 135, 138, 238.] All the while, GeoStar knew that ClassicStar's assets could not support legitimate sales of this magnitude and actively cooperated with ClassicStar to conceal that fact as described above.

As part and parcel of this scheme, Robinson, as director, president, and CEO of GeoStar, director and CEO of Gastar, and a

member of the FEEP Advisory Committee, approved many operational decisions related to ClassicStar including the negotiation of commission arrangements with the salespeople promoting the Mare Lease Program and executing, on behalf of CFI, an employment agreement with David Plummer obliging him to promote the Mare Lease Programs. [Compl. at ¶¶ 63, 94.] Parrot, a vice-president of GeoStar, director of Gastar, and occasional member of ClassicStar's management, negotiated agreements between ClassicStar and a lawyer representing Plaintiffs West Hills Arbor Farms, and Nelson which called for ClassicStar to pay a commission to that lawyer for procuring their participation in the Mare Lease Programs. [Compl. at ¶¶ 64, 98.] He reviewed and approved the marketing materials – some of which contained material misrepresentations relied upon by Plaintiffs in entering into the Mare Lease Programs and which were used by David Plummer and other ClassicStar agents. [Compl. ¶ 64, 71-72, 170-72, 188.]

Plaintiffs also complain that David Plummer acted not only on behalf of ClassicStar and GeoStar in promoting this scheme, but on his own behalf because he owned many of the horses included in the Mare Lease Program. In this way, Plaintiffs argue that he vouched for their stated value – which ultimately was greatly inflated as part of the scheme – when he personally prepared the schedules of breeding pairings upon which the invoices sent to Plaintiffs and the Plaintiffs' payments were based. Plummer also met with

Plaintiffs personally or by phone in order to induce them to participate in the Mare Lease Program and executed the legal documents provided to Plaintiffs in his role as ClassicStar's CEO. Finally, he received at least 2% of the total receipts for the Program. [*See* Compl. at ¶¶ 56, 59, 66, 121-23, 133, 149-51, 170, 183-86, 190-93, 195, 200-201.]

Spencer Plummer identified himself as ClassicStar's president, in charge of the day-to-day operations of the business. His role in furthering the alleged scheme, according to Plaintiffs, was the execution of documents comprising the Program, including the Letters of Intent signed by Plaintiffs and contracts reflecting the trade of equine interests for alternative investments. These documents, according to Plaintiffs, contained fraudulent values for the promised thoroughbred pairings which were actually quarter horse pairings, if anything – values that Spencer Plummer knew to be false and which value he requested to be paid to ClassicStar. Plaintiffs aver that Spencer Plummer knew of the misrepresentations all the while, yet participated in the transactions and accepted commissions and other substantial compensation from the sales. [Compl. at ¶¶ 65, 119,121-24, 133-34, 143, 154, 177, 187-88, 199, 203.]

Further, SOS was used to support the illusion of quarter horse pairings since it was purportedly set up to support embryo implantation into other horses to produce quarter horse foals. As

the Court understands it, Plummer's quarter horse interests were held by and through SOS, even though they were ultimately represented as owned by ClassicStar and located in Kentucky, instead of owned by David Plummer and boarded at his Utah ranch operated by SOS, all with the knowledge by the Plummers that they were being "leased" (or not) to participants. [Compl. at ¶¶ 115-124.] SOS was paid for its "services," as were the Plummers, out of the proceeds of the Mare Lease Program. [Compl. at ¶¶ 119-133, 134.]

As for the Plaintiffs in this case, David Plummer allegedly introduced Lynn MacDonald of MacDonald Stables to the ClassicStar Mare Lease Programs during a telephone conference in mid-2003. Plummer described the Programs as comprised of thoroughbred horses, described how the fees charged in connection with the programs would be calculated by ClassicStar in relationship to the value of those thoroughbred horses, and assured MacDonald of the realistic potential of the projected returns based on past profits and the favorable tax treatment which MacDonald would enjoy by virtue of his participation. [Compl. at ¶¶73, 149-50.] Plummer also presented an "Illustration," dated June 18, 2003, prepared by ClassicStar with assistance from Green for MacDonald, and Spencer Plummer executed the Letter of Intent directed to the MacDonalds.[4] [Compl.

_____

[4]    Plaintiffs aver that each of the Letters of Intent misrepresented the value of the equine interests included in their respective Mare Lease Programs. [Compl. at ¶¶ 65, 154, 187, 197.]

at ¶¶ 154.] Macdonald , in reliance on the representations made in these communications, ultimately wired or caused to be wired $14 million to ClassicStar in reliance on these representations. [Compl. at ¶¶ 151-55.] When MacDonald later objected to the breeding pairings that he received from ClassicStar and raised the issue with David Plummer in 2004, David Plummer, ClassicStar, and GeoStar responded by agreeing to substitute various GeoStar assets for MacDonald's equine interests, including units in FEEP.[5] FEEP never performed its obligations.

In 2004, MacDonald wired or caused to be wired another $8 million to ClassicStar for the 2004 Mare Lease Program based on David Plummer's assurances to MacDonald that the Program would consist of the expected thoroughbred interests rather than the lesser value interests that MacDonald actually received in the 2003 program. [Compl. ¶¶ 170-72.] David Plummer made these assurances even though he knew that the pairings would again consist primarily of quarter horse pairings and did not disclose that fact. [Compl. at ¶¶ 113-16, 119-20.] Plaintiffs aver that Plummer knew at all relevant times that the Programs involved primarily fictional

---

[5] Plaintiffs make the argument that by merely serving on the board of FEEP, the Plummers, along with Robinson and Ferguson who were principals of Geostar and Gastar, vouched for the legality and stability of the FEEP transaction. The Court is not persuaded that so much can be reasonably read out of their membership on the FEEP Advisory Committee without more. Nonetheless, their participation on that board permits their inference that they had knowledge of the transactions and the true situation.

quarterhorses, not thoroughbreds, had no history of past performance which made profits likely, charged fees based on a completely false valuation of the horses involved, and, if the real facts were known, that MacDonald's investment likely would not qualify for favorable tax treatment. [Compl. at ¶¶ 113-19, 121-24, 128.]

David Plummer also presented a similar illustration to Nelson Breeders in March 2004 during a meeting between Brian Nelson and Plummer. [Compl. at ¶ 179.] Plummer met again with Nelson in Lexington, Kentucky in April of that year. [Compl. at 183.] During both meetings, Plummer represented to Nelson that the projections were based on verified past results and that the transactions described in the illustrations would qualify for the favorable tax treatment described – notwithstanding the fact that Plummer knew his statements to be false when he made them. [Compl. at ¶¶ 103, 117-19, 121-22, 124, 133, 180-84.] Plummer made similar statements as well as representations of the value of the horses as a basis for the fees charged and expected returns at meetings with Nelson in May and October of 2004, even though he knew his statements were not based in fact. [Compl. at ¶¶ 124, 186-87, 291.] Spencer Plummer executed the Letter of Intent directed to Nelson. [Compl. at ¶¶ 187.] Much like MacDonald, Nelson wired millions of dollars to ClassicStar, as the Plummers had intended for him to do all along. [Compl. ¶¶ 188.]

West Hills attended a presentation by David Plummer and an individual named Doug Anderson in March or April of 2004, during which Plummer again described the expected returns, tax benefits, and fees associated with the Mare Lease Programs. [Compl. at ¶ 190.] Again, the presentation was made with Plummer's awareness or reason to know that the program was not structured so as to confer the tax benefits touted and that the projected returns and fees lacked factual basis. [Compl. at ¶¶ 122-24, 128, 190.] Again, in May and June of 2004, Plummer discussed the illustration prepared for West Hills with its representatives, explaining GeoStar and Gastar's affiliation with ClassicStar, the method for calculating the price for the Programs based on the fair value of the equine interests involved, and assuring the potential investors that the Program would comply with IRS guidelines and that historical data supported the projected returns, even though Plummer knew or had reason to know that his statements were false. [Compl. at ¶¶ 103, 117-19, 121-24, 133,191-93, 291.]

Arbor Farms met with Plummer, through its representatives, in the winter, spring, and fall of 2004, during which meetings Plummer described a thoroughbred program, the fee structure, and the supposed tax benefits. [Compl. at ¶¶ 195, 200-201.] At an October 2004 meeting, Plummer represented that the loan from NELC would be tax deductible, but he never disclosed the affiliation between ClassicStar and NELC, notwithstanding his knowledge of it. [Compl.

at ¶¶ 128, 200.] Spencer Plummer executed the Letter of Intent directed to West Hills and Arbor Farms. [Compl. at ¶ 197.] Based on these representations and in response to invoices mailed to them, which purported to represent the value of the equine interests involved. West Hills and Arbor Farms mailed and wired payments to ClassicStar totaling approximately $7 million each, as the Plummer intended for them to do. [Compl. ¶¶ 199, 202-203.] David Plummer then continued to assure these Plaintiffs of the viability of the Program when they learned that they had not received equine interests as described by Plummer, and he prompted ClassicStar to email them the FEEP prospectus to secure the future participation and forestall inquiry into the fraud averred by Plaintiffs. [Compl. at ¶ 213.]

Finally, the Grovers met with David Plummer on several occasions in late 2002 and early 2003. [Compl. at ¶ 215.] Plummer explained to them the method of calculating the value of the Programs, projected returns based on past profits, and tax benefits resulting from the structure of the transactions. [Compl. at ¶¶ 124, 215-16.] Again, Plaintiffs aver that Plummer knew that there was no basis in fact for his representations to them. [*Id.*] The Grovers also received an illustration from Plummer which they contend was similarly baseless. [Compl. at ¶¶ 217.] The Grovers sent their payments to ClassicStar through the mail and the wire, as Plummer intended that they do, only to have Plummer suggest in

early 2004 that they exchange a substantial portion of their equine interests for alternative oil and gas interests through the acquisition of membership interests in FEEP on the grounds that it was a more diversified strategy and that the Grovers could convert their investment into this additional opportunity on a tax free basis. [Compl. at ¶ 221.] Plaintiffs contend that Plummer knew, however, that the FEEP interests did not have the value represented because the underlying Mare Lease Program investment had been grossly overvalued. [Compl. at ¶¶ 122, 125, 225, 291.] Additionally, ClassicStar arranged for the Grovers to exchange substantially all of their remaining equine interests for an Installment Note in the amount of $3,796,707, payable by a purported GeoStar entity called GFS. With respect to that note, Ferguson signed on behalf of GFS.[6] [Compl. at ¶¶ 230-21.] In late 2004, Plummer represented to the Grovers that the 2003 Programs were performing as represented, and the Grovers purchased an additional $2.2 million of interests in the Mare Lease Programs. [Compl. at ¶ 232.]

Further, Plaintiffs have alleged that David Plummer was responsible for marketing the Programs [Compl. at ¶ 66] and oversaw

---

[6] While the full Note amount was due and payable on or before July 15, 2007, GFS has never made any of the required payments to the Grovers. Plaintiffs aver that is now considered highly unlikely to happen since, allegedly, GFS had no assets and was intentionally created by GeoStar as an undercapitalized shell corporation with no intent that it make payment. [Compl. at ¶¶ 230-21.]

the distribution of brochures which described the "Ultimate Tax Solution, which converts ordinary income into capital gains," by

The Plummer and GeoStar Defendants make, at their heart, strikingly similar arguments with respect to why they believe that Plaintiffs have failed to state a RICO claim against them. Both the Plummer and GeoStar Defendants argue that Plaintiffs have failed to properly plead a § 1962(c) violation as to David or Spencer Plummer or Parrott or Robinson as they have failed to inform them of their alleged participation in the fraud with sufficient particularity.[7] The Plummer Defendants next argue that Plaintiffs have not alleged a valid claim under § 1962(a) because (1) they fail to state with particularity their alleged participation in the fraud and, as well, (2) because they have failed to allege that the Plummers used or invested any income derived from any "pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce. Finally, both the Plummer and GeoStar Defendants argue that Plaintiffs cannot state a claim for conspiracy to violate any of the other sections of the RICO statute under § 1962(d) if they have not at least set forth a viable claim for those violations.

_____

[7] The Plummer Defendants also argue that the averments against Defendant Buffalo Ranch are insufficient but, upon a review of the Fourth Amended Complaint, the Court finds that Plaintiffs do not purport to state a claim against that entity under the federal RICO statute. Accordingly, the Court considers this argument no further.

Specifically, they argue that Plaintiffs have failed to identify with the requisite specificity any representations made to them or any use of the mail or wires by these Defendants which could support the conclusion that they violated 18 U.S.C. § 1962(a), (c), or (d).

The Court, however, disagrees. The Defendants' first argument as to the claims under subsections (a) and (c) relies on the flawed notion that Plaintiffs must aver that the Plummers or Parrott or Robinson personally made the misrepresentations or used of the mails or wires with respect to Plaintiffs in order for them to be able to state a claim against these individuals. While it is clear that the Sixth Circuit requires Plaintiffs to identify with specificity the actions that each defendant has taken in furtherance of the alleged fraud, *see, e.g., Central Distr. Of Beer, Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1983) and *In re Reciprocal of America (ROA) Sales Practice Ltigiation*, Master No. MDL 1551 Civ. No. 04-2078, 2007 WL 2900285, *8 (W.D. Tenn. Sept. 28, 2007), the law makes no requirement that *each* defendant involved must have personally made a misrepresentation.

Certainly, in order to prove a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show:

> (1) [that] there were two or more predicate offenses; (2) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) an injury to his business or property by

reason of the above.

*Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993) (citing *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274 n. 5 (9th Cir. 1988)). A plaintiff must allege that the defendants "conduct[ed] or participat[ed] . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). An enterprise includes "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). A "pattern of racketeering activity" consist of at least two acts of racketeering activity, which may include mail and wire fraud. 18 U.S.C. § 1961(1), (5).

That said, in order to meet the requirement that a RICO complaint describe the predicate acts of mail or wire fraud with particularity, a plaintiff must allege that each RICO defendant participated in a scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further fraudulent scheme. Neither 18 U.S.C. §§ 1341 nor 1343, the mail and wire fraud statutes, require that the defendant personally make the relevant communication, only that his

actions cause another to use the mail or wires.  To satisfy the particularity requirement, a plaintiff need only allege that each RICO defendant participated in a scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further the fraudulent scheme. *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.*, 176 F.3d 315, 322 (6th Cir. 1999).  "It is not necessary to allege that the defendants have personally used the mail or wires; it is sufficient that a defendant 'causes' the use of the mails and wires." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 76 (E.D.N.Y. 2006); *Beard v. Worldwide Mortgage Corp.*, 354 F.Supp.2d 789, 802-803 (W.D. Tenn. 2005) (citing *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001); *United States v. Brown*, 146 F.3d 477, 488 (6th Cir. 1998); *United States v. Oldfield*, 859 F.2d 3992, 400 (6th Cir. 2008)) (personal use of the mail or electronic communication is not required to state a claim for mail or wire fraud).

The Sixth Circuit takes this holistic approach to RICO claims which are founded on mail or wire fraud.  In *Mackenzie v. Murphy*, 178 F.3d 1295, 1999 WL 115485 at *3 (6th Cir. 1999), for example, the "vast majority" of the allegations dealt with one particular defendant who actively marketed the fraudulent investments.  *Id*. However because the other defendants allegedly "caused" the use of the mails and made the misrepresentations, the complaint describing

the overall scheme stated a claim against them as well. *Id*. Despite the paucity of allegations regarding the involvement of the moving defendant, the Court held that allegations that he had a knowing connection with a pattern of racketeering activity by an enterprise of which he was a part was enough to state a RICO claim. *Id*. at *4. The same is true here, although it can hardly be said that there is a paucity of averment against the Plummers or Parrott or Robinson.

As the Court understands the factual basis for the claims and averred in the complaint, David and Spencer Plummer and Parrott and Robinson were in the scheme to defraud described by the Plaintiffs up to their eyeballs. David Plummer was talking directly to the Plaintiffs, preparing and/or presenting schedules and illustrations of potential performance, negotiating and signing contracts, all the while misrepresenting the value of the breeding pairings available in the Mare Lease Programs as well as the actual availability of the tax benefits which he touted so often and, apparently, so well. He was reassuring parties about the excellent performance of the Mare Lease Programs, when that was not so, even while he was busy leasing quarter horses to ClassicStar to make up some of the shortfall in its base of thoroughbred horses available to breed. Spencer Plummer was busy affixing his signature to the Letters of Intent, sending letters which explained how investors could get the tax benefits associated with their investment, and

managing the day-to-day operations of the company – whatever they might have been. Robinson and Parrott were quite busy themselves, deciding how to make sure that investors did not find out about their overvalued investments – creating and organizing funding from ClassicStar for NELC, making sure that alternative investments were available for investors that wanted out of the equine investment (even if those alternative investments were largely illusory), and taking the proceeds shunted GeoStar's way and using it to fund development and exploration there. And Plaintiffs sent in their money – enormous sums of it – via the wires, as they tell it.

Even if only David and Spencer Plummer (and, by extension, ClassicStar) made the relevant communications (identified with specificity) to Plaintiffs, the law does not require that every defendant involved in the scheme also personally make a relevant communication – only that his actions cause another to use the mail or wires. For this reason, David and Spencer Plummer, as well as Robinson and Parrott (and Ferguson, ClassicStar, ClassicStar 2004, ClassicStar Farms, GeoStar, and Gastar), are clearly on the hook for any role they played in so conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

As to the Plummers assertion that Plaintiffs have not alleged a valid claim under § 1962(a) because they have failed to allege that the Plummers used or invested any income derived from any

"pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, this argument also fails. The Fourth Amended Complaint clearly avers that the Plummers invested income derived from the racketeering activity in which they participated, i.e., the proceeds received from Mare Lease Sales, into Buffalo Ranch which was used to facilitate the cover up of the fraud averred in the amended complaint and inured to the benefit of the enterprise.

Finally, Section 1962(d) requires simply that a defendant agree that he or another commit two acts of racketeering activity in violation of the substantive sections, not that he personally carry out the requisite acts. *See United States v. Joseph*, 781 F.2d 549, 554 (6th Cir. 1986). Since Defendants argue that the claim of conspiracy under subsection (d) must fail in the absence of a viable claim for a violation of either subsection (a) or (c), and the Court has concluded that Plaintiffs have adequately averred those claims, this portion of the motion shall be denied, as well.

Ultimately, Plaintiffs' averments of a violation of § 1962(a) and (c) in the Plaintiffs' Fourth Amended Complaint have been sufficiently pleaded to put the Plummers, Robinson, and Parrott on notice of the claims against them, at least insofar as their role in causing the use of the mail or the wires by themselves or others. Thus, Plaintiffs have stated a claim so as to survive the present Motions to Dismiss. *See Am. Town Center v. Hall 83*

*Assocs.*, 912 F.2d 104, 110 (6th Cir. 1990) (complaint satisfied 9(b) because it provided facts to support fraud allegations and gave defendant fair notice of substance of plaintiff's misrepresentation claim). Accordingly, their Motions will be denied in this regard.

### B. Common Law Fraud and Other Claims

Similarly, the Court is of the opinion that the Complaint adequately describes the misrepresentations and omissions attributable to the moving Defendants for purposes of common law fraud under Kentucky law. In the Commonwealth of Kentucky, "[a] party claiming harm from fraud must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (fraud through direct misrepresentation); *Smith v. General* Motors Corp., 979 S.W.2d 128, 130 (Ky. Ct. App. 1998) (failure to disclose may be actionable where one party to a contract has superior information and is relied upon to disclose same when it fails to do so or where reliance is based on only a partial disclosure); *Raymond-Elderedge Co., Inc. v. Security Realty Inv. Co.*, 91 F.2d 168, 173 (6th Cir. 1937) (one who clothes another with the power to commit fraud and then remains silent may be liable); *Lappas v. Barker,* 375 S.W.2d

248, 272 (Ky. 1963) (one who aids and abets fraud becomes jointly liable); *Kirby v. Firth*, 311 S.W.2d 799, 802 (1958) (one who accepts proceeds of agents' fraud with knowledge ratifies that fraud and becomes liable because, "[t]hough innocent himself at the time of the misrepresentation, one may not accept the fruits of a business deal and at the same time disclaim responsibility for the measures by which they were acquired.").

Among other things, Plaintiffs aver that ClassicStar's agents (the Plummers) misrepresented the Mare Lease Program investment to Plaintiffs through specifically identified presentations and written documentation outlining – falsely – how the Mare Lease Programs would be populated and valued and, thus, induced Plaintiffs to pay for the overvalued investment. Plaintiffs also aver that ClassicStar and the Plummers did so at the behest of or in agreement with and with the blessing of Parrott and Robinson. It can safely be said that Parrott and Robinson and certain others can also be responsible for those misrepresentations and that reliance since it is averred that they had knowledge that false representations were being made to induce investment.

The Court is of the opinion that liability may lie with them upon a theory of common law fraud. As the facts are averred, they had knowledge of the underpopulation or overvaluation of the Mare Lease Program breeding population, the privity of NELC as a lender with ClassicStar, and the use of the alternative investments to

prevent discovery of the underlying fraud.  They worked together
with ClassicStar to promote and prolong the misrepresentations.
They benefitted from the misrepresentations knowing that Plaintiffs
could be induced to invest so long as the misrepresentation went
undiscovered.    Further  this  liability  is  clear  to  the  Court,
whether each Defendant had a direct obligation to speak the truth,
conspired with or authorized or aided and abetted those that did
not speak the truth, or because some among them acted as agents of
those  who  did  not  speak  the  truth.    This  would  include  the
Plummers, who allegedly pronounced many of the misrepresentations
received by the Plaintiffs.  It also includes Parrott and Robinson
who allegedly authorized ClassicStar and the Plummers to proceed as
they did.  Parrott and Robinson were allegedly behind or at least
aware  of  many  of  the  instruments  used  to  cover  up  the
misrepresentations and mask the underpopulation or overvaluation of
the   Mare   Lease   Programs   from   Plaintiffs   (including   the
establishment of NELC and the provision of alternative investments
through other entities like GEEI and GFSC).  This also includes
entities  that  were  privy  to  and  participated  in  the  fraud,
including, again, GEEI and GFSC, as well as GeoStar, CFI, CTK, and
SOS or Buffalo Ranch, all of whom played a role in making the
misrepresentation happen and some of whom may have benefitted from
the misrepresentation in the form of proceeds from investments in
the falsely portrayed Mare Lease Programs, GeoStar being the most

notable example in the Complaint.

Further, any claims which arise out of or can be understood as related to such a fraud claim, including Plaintiffs' claims for theft by deception and aiding and abetting, as well as conspiracy to commit these acts and liability for other Defendants' actions (or inactions) based on an agency theory are supported by these averments. As for Parrott and Robinson, Plaintiffs allege that they committed theft by deception and aided or abetted the fraudulent scheme by obtaining sales people to market the Mare Lease Programs, preparing materials to promote the Programs, and causing other entities to issue stock or provide investment alternatives to conceal overselling of the Programs. They did these things with the intent that Plaintiffs would invest and pay funds to ClassicStar which would, in turn, be used to fund other interests and endeavors of theirs and their family of companies. Most importantly, Plaintiffs allege that they took these actions with knowledge of the underlying fraud. To the extent that scienter or guilty knowledge is required for this claim (and any other arising out of fraud, as the GeoStar defendants aver, citing *Scott v. Farmers State Bank*, 410 S.W.2d 717, 720 (Ky. 1966)), Plaintiffs have alleged it with respect to Parrott and Robinson, as well as others.

No less, an allegation of a decision to give substantial assistance to another to accomplish a tortious act, like fraud, is

sufficient to support a claim of conspiracy, assuming the underlying tort is sufficiently pleaded. Allegations describing the tortious acts, here the adequately identified misrepresentations made by ClassicStar and/or the Plummers and, eventually by other participants in the scheme like GFS and FEEP, along with the allegation that Defendants Parrott and Robinson acted in concert, are enough to fulfill Plaintiffs' pleading obligation with respect to conspiracy. *See James v. Wilson*, 95 S.W. 3d 875, 897 (Ky. App. 2002)**;** *see Stevenson v. Sanders*, 311 F.Supp. 683, 685 (W.D.Ky. 1970); *Streipe v. Liberty Mutual Life Ins. Co.*, 47 S.W. 2d 1004, 1007 (Ky. 1932).

For that matter, the Court is also persuaded that, to the extent particular misrepresentations made by someone affiliated with a scheme must be identified to support claims for unjust enrichment, money had and received, and constructive trust, Plaintiffs have adequately alleged those claims, as well, Defendant's objections notwithstanding. The Court considers, as well, Defendants' argument that Ferguson, Robinson, Parrott, GEEI, GFSC, CFI, and CTK must have received a benefit from Plaintiffs in order to state a claim for unjust enrichment, money had and received, and constructive trust. Here, the Complaint alleges that Ferguson, Parrott, and Robinson owned the primary interest in GeoStar, which received over a hundred million dollars from the scheme and owned a controlling interest in Gastar, which used the

proceeds it received to prove up mineral reserves which it sold for large sums of money. [Compl. at ¶¶ 27-28, 81, 84, and 85.] The complaint also alleges that Ferguson, Robinson, and Parrott knowingly accepted the proceeds of the schemes. [Compl. at ¶ 135.] CFI never existed separately from ClassicStar, if the Complaint is correct, received all of its funding from ClassicStar using it to purchase assets – a benefit which, if proven traceable to proceeds of the fraud alleged in the Complaint, could be recoverable on these theories. [Compl. at ¶¶ 53, 142-43, 155, 172, 188, 198, and 202.] No less, while the Complaint avers that there is not value to that portion of the Grovers' equine breeding interests transferred to GFS, the Grovers are well within their rights to plead that, if in the alternative, there is value there, they are entitled to a constructive trust over whatever asset GFS received. [Compl. at ¶230.] The same can be said for any value received from the transfer of the Grovers and MacDonalds' equine interests to FEEP by either FEEP or its managing member, GEEI. [Compl. at ¶¶ 162, 174, 232.]

However, the Court is not persuaded that Plaintiffs can maintain an action for negligent misrepresentation against anyone who did not actually make the object misrepresentation to the Plaintiffs. The reality is that one cannot conspire, i.e., intend to agree and actually agree, to commit something that is founded on negligence. *See, e.g., Ruth v. A.O. Smith Corp.*, No. 1:04-cv-

18912, 2005 WL 2978684, at *3 (N.D. Ohio, Oct. 11, 2005). The Plummers statements and even those of other agents for the various entities allegedly involved in the scheme may be attributable to Parrott and Robinson and the other GeoStar Defendants where intent to make those misrepresentations is present and alleged, but liability cannot lie on a theory of negligent misrepresentation. To the extent that any count in the Fourth Amended Complaint seeks recovery from Parrott and Robinson on a theory of negligent misrepresentation for statements made by others, this claim shall be dismissed.

## IV. Conclusion

For all of the foregoing reasons, Defendants Motions shall be granted in part and denied in part as set out above.

Accordingly, **IT IS ORDERED**:

(1) that Defendants' Motions to Dismiss the Third Amended Complaint [5:06-cv-243-JMH, DE 203 & 204] are **DENIED AS MOOT**;

(2) that the Plummer Defendants Motion to Dismiss [5:06-cv-243-JMH, DE 313; 5:07-cv-353-JMH, DE 816] is **DENIED**; and

(3) that the GeoStar Defendants Motion to Dismiss [5:06-cv-243-JMH, DE 319; 5:07-cv-353-JMH, DE 843] is **GRANTED IN PART** and **DENIED IN PART**;

(4) that Plaintiffs' claims which seek to impose liability on Defendants Parrott and Robinson for negligent misrepresentation shall be **DISMISSED**.

This the 15th day of August, 2011.



Signed By:

_**Joseph M. Hood**_

Senior U.S. District Judge