UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

|                                      |   |                                    |
|--------------------------------------|---|------------------------------------|
|                                      | ) | MDL No. 1877                       |
|                                      | ) |                                    |
| IN RE CLASSICSTAR MARE LEASE         | ) | Master File:                       |
| LITIGATION                           | ) | Civil Action No. 07-353-JMH        |
|                                      | ) |                                    |
| and                                  | ) |                                    |
|                                      | ) |                                    |
| WEST HILLS FARMS, LLC, *et al.,*     | ) |                                    |
|                                      | ) |                                    |
|     Plaintiffs,                      | ) |                                    |
|                                      | ) | Civil Action No. 06-243-JMH        |
| v.                                   | ) |                                    |
|                                      | ) |                                    |
| CLASSICSTAR, LLC, *et al.,*          | ) | **MEMORANDUM OPINION AND ORDER**   |
|                                      | ) |                                    |
|     Defendants.                      | ) |                                    |

\*\*\* \*\*\* \*\*\*

This matter is before the Court upon the Motion for Summary
Judgment made by Plaintiffs Arbor Farms, LLC, Jaswinder Grover,
Monica Grover, MacDonald Stables, LLC, Nelson Breeders, LLC, and
West Hills Farms, LLC [DE 482].[1] David Plummer, Spencer Plummer,
and Strategic Opportunity Solutions, LLC, which did business as
Buffalo Ranch, have filed a Response stating their objections [DE

---

[1] Additionally, Plaintiffs have made a Motion to Substitute
Certain Exhibits in Support of their Summary Judgment Pleadings [DE
565]. The sole response received to this Motion was authored by
Defendant Gastar Exploration, Ltd. [DE 575], no longer a party to
this case. The Court has reviewed the motion, the objections,
and Plaintiffs' Reply in further support of their Motion [DE 588],
and concludes that – even if the objections are considered – the
Motion will be granted. In its review of the present Motion for
Summary Judgment, it is the substituted exhibits – the sworn
reports of the experts – that have been considered part and parcel
of the record.

514, 524], as have ClassicStar 2004, LLC, ClassicStar Farms, Inc., Tony Ferguson, GeoStar Corporation, GeoStar Financial Services Corporation, and Thom Robinson [*see* DE 515, 523],[2] and John Parrott [DE 533].[3]  In turn, Plaintiffs have filed replies in further support of their Motion for Summary Judgment [*see* DE 549, 550, 556].[4]  Additionally, the Court has had the benefit of the parties' additional briefs and oral argument on issues related to damages: the Plaintiffs' Notice Supplementing the Amount of Damages Sought in Motion for Summary Judgment [DE 741]; Defendants GeoStar Corporation, ClassicStar Farms, Inc., Tony Ferguson, Thom Robinson, First Source Wyoming, Inc., and GeoStar Financial Services Corporation's Notice of Objections to Plaintiffs' Request for

---

[2]  Defendant ClassicStar 2004, LLC, ClassicStar Farms, Inc., Tony Ferguson, GeoStar Corporation, GeoStar Financial Services Corporation, and Thom Robinson's  Motion for Leave to File Excess Pages [DE 515] shall be granted, and their response as tendered shall be filed in the record of this matter.

[3]  James D. Lyon, Trustee, has also filed a Response [DE 503] in which he indicates that the Motion is moot as to Defendant ClassicStar, LLC, as a settlement has been reached by and between the Trusttee and the West Hills Plaintiffs with respect to all claims asserted in this action and *In re ClassicStar LLC*, Debtor, Chapter 6, Case No. 07-51786-JMS in the Bankruptcy Court for the Eastern District of Kentucky.  There being no disagreement with the trustee's assertions by the West Hills Farms Plaintiffs, the Court will deny the Motion as Moot as to James D. Lyon in his capacity as Trustee for the Estate of ClassicStar, LLC, substituted for Defendant ClassicStar, LLC, on July 3, 2008.

[4]  Plaintiffs' Motions for Leave to File Excess Pages [DE 535, 536, 555] shall be granted and their tendered replies filed in the record.

Damages and Motion for Briefing[5] [DE 742, 744]; Defendant Parrott's Notice of Objections to Plaintiffs' Request for Damages [DE 743]; Plaintiffs' Reply to Objections [DE 745]; Defendants GeoStar Corporation, ClassicStar Farms, Inc., Tony Ferguson, Thom Robinson, First Source Wyoming, Inc., and GeoStar Financial Services Corporation's Reply in Support of Objections to Plaintiffs' Request for Damages [DE 750]; and Plaintiffs' Sur-Reply to Objections [DE 755]. [*See also* DE 756, Minute Entry Order for Hearing, September 29, 2011.]

## I. Factual and Procedural Background

### A. The ClassicStar Mare Lease Program

Between 2001 and 2005 the ClassicStar Mare Lease Program generated over $600 million in sales primarily to high income individuals with an interest in participating in the thoroughbred horse industry. The Mare Lease Program, in theory, allowed participants to lease valuable thoroughbred mares from an operation with a long track record of success in the thoroughbred industry and breed those mares for a season, keeping the resulting foal. During the relevant period, GeoStar Corporation ("GeoStar") owned ClassicStar, LLC ("ClassicStar"), which represented to potential investors that participants in its (and its predecessor's) Programs

_____

[5] Defendants GeoStar Corporation, ClassicStar Farms, Inc., Tony Ferguson, Thom Robinson, First Source Wyoming, Inc., and GeoStar Financial Services Corporation have since indicated that they no longer wish to have additional briefing, and this motion shall be denied.

had sold horses for an average of 130% of the cost to lease the mare and produce the foal. ClassicStar warranted to its investors that it owned the mares involved in the Program and represented that the base price of a mare lease would be approximately 30% of the value of the mare.

Investors often purchased packages involving multiple pairings and carrying large price tags. Financing was available for these large purchases, and participants could finance half or more of their packages with a supposedly reputable third party lender. Moreover, the Mare Lease Program was marketed as structured so as to allow purchasers to claim tax deduction for the expenses associated with their breeding business including the loan, and investors were advised that no investor had ever had a deduction associated with the Program disallowed.[6]

Finally, participants were provided the opportunity to exchange portions of their mare lease interests for other assets including working interests in coal bed methane developments stock in Gastar Exploration, Ltd. ("Gastar"), GeoStar's publicly traded affiliate, and units in First Equine Energy Partners, L.L.C.

---

[6] As an example of how the tax benefits were touted, a third-party promoter for the ClassicStar Program, Douglas C. Anderson, was provided and used tax opinions in marketing the program. He kept an opinion prepared by the law firm of Handler, Thayer & Duggan (positive, of course) on hand for use when requested from potential investors. He also referred principals of several of the Plaintiffs (Walter Remmers, Dennis Sackhoff, and Bryan Nelson) to the law firm of Hanna Strader for tax opinions.

("FEEP"), an entity crafted by GeoStar's principals which purported to have interests in both horses and coal bed methane properties.

**B.    The Ruse**

If the potential for returns and the generous tax benefits associated with the Mare Lease Program seemed too good to be true, it was because they ultimately were.  This was not apparent, of course to investors, because the participants were not told the truth.

From the beginning, ClassicStar sold more Mare Lease Programs than its existing interests in thoroughbred breeding opportunities could support, promising participants far more breeding pairings than it had thoroughbreds to deliver.  It was represented to Plaintiffs that mare leases would be priced at approximately 30% of the cost of the mare, which was in keeping with industry custom where mare leases are priced at approximately 30-40% of the cost of the mare, and the agreements between Plaintiffs and ClassicStar stated in no uncertain terms that ClassicStar owned the horses that it purported to lease to participants.  Yet, GeoStar maintained tax asset ledgers listing all of ClassicStar's equine assets and which show that, at the same time ClassicStar was selling an average of $150 million in mare lease packages in each of 2001, 2002, 2003, and 2004, it owned less than $10 million dollars worth of mares in 2001, only $37 million dollars worth of mares in 2002, $56 million worth of mares in 2003, and $48 million worth of mares in 2004.

Even though ClassicStar's horse wealth grew with each year, ClassicStar would have needed more than $300 million worth of mares to support $150 million of Mare Lease Program sales in any given year, and its assets were never even close.[7]

Early on, ClassicStar glossed over its shortfall of thoroughbred inventory by providing participants listings of pairings denominated as "TBN" or "to be named." Participants were encouraged to exchange their yet unnamed pairings for interests in GeoStar's mineral programs, relieving ClassicStar of the pressure to produce an adequate number of thoroughbred pairings to its Mare Lease Program participants. Eventually, ClassicStar stopped using the "TBN designation" and started including quarter horse breeding pairs in the packages, although the cost of participating and the value listed for those horses still reflected those associated with thoroughbred pairings. Effectively, the prices were inflated beyond what the best quarter horse foal could be expected to bring at sale and substantially overstating the number of potential embryos which a mare could generate in a season. ClassicStar did not actually own the quarter horses. Rather, they were "on loan" from the Plummers and their aptly named business, Strategic Opportunity Solutions, LLC ("SOS") which operated as Buffalo Ranch.

---

[7] ClassicStar's books, maintained by GeoStar, also included entries for accrued mare lease liabilities which GeoStar's representative has explained as the amount of money required to fill the prior years' packages – approximately $250 million in 2003 and 2004.

Indeed, it was only in late 2004 that Tony Ferguson executed back-dated lease agreements with SOS.  Until those back-dated agreements were signed, ClassicStar had no formal arrangement to lease the quarter horses it included for the price of $400 million in the Mare Lease Packages for 2002, 2003, and 2004.  Of course, according to Shane Plummer who handled the quarter-horse element of the business for ClassicStar, the quarter horses were never actually to be leased to ClassicStar or to be bred for Mare Lease participants – rather the quarter horse breeding pairings were placeholders, designed to support tax deductions then to be traded out for some other asset before breeding occurred.[8]

Throughout this case, Plaintiffs have theorized that the participation of an actual independent lender might have exposed the overvaluation and underpopulation issues because such a lender would likely have wanted to confirm that participants did acquire the rights to leased mares and stallion pairings and that the prices paid bore some relationship to the value of the horses

---

[8]  It is also clear from emails exchanged by accountant Terry Green, Ferguson, and the Plummers that it was never intended that ClassicStar would be saddled with payment for the quarter horses. Bill Bolles, the GeoStar accountant who maintained the ClassicStar general ledgers, testified that he was unaware of any lease agreement with Buffalo Ranch and that he was told by Thom Robinson and others that ClassicStar's "lease payments" to Buffalo Ranch were really loan payments.  It is telling that, at the termination of the Plummer Defendants' involvement with ClassicStar, in late 2005, GeoStar voided out the Buffalo Ranch leases with the effect that none of the $400 million of quarter horse mare lease interests pledged to ClassicStar's 2002, 2003, and 2004 Mare Lease Program participants could be delivered to them.

involved.  That might be, and, of course, that is not what happened.  Instead, the loans were placed with NELC, a small company and a shell formed by persons affiliated with ClassicStar and controlled by ClassicStar.  Not surprisingly, NELC did not insist on independent confirmation of the value of the horses. David Plummer's brother-in-law, Gary Thomson, acted as NELC's manager and answered to David Plummer.  Thomson has testified that NELC could not make a loan without ClassicStar's consent, that it made no investigation of the collateral and relied totally on ClassicStar, and that it made no inquiries before accepting substitute collateral when Mare Lease Program participants exchanged their equine assets for interest in other GeoStar programs or entities.

NELC had no other business and no funds of its own.  In fact, ClassicStar transferred the amounts needed to fund the loans to NELC, and NELC transferred them back to ClassicStar as loan proceeds, often on the next day.  In fact, ClassicStar did not even treat the proceeds of these "loans" as "funds received."  As an example, NELC wrote $7 million check to ClassicStar for Plaintiff Arbor Farms' financed interest on December 7, 2004; it wrote a $7 million check to ClassicStar for West Hills' financed interests in December 7, 2004; and it wrote three checks totaling $21.5 million to ClassicStar for Nelson Breeders' financed interests on December 8, 2004.  ClassicStar's bank records and the NELC general ledgers

show that NELC received the money in the amount necessary to write out those checks through payments from ClassicStar on the same day they were made.[9]

Of course, because a subset of the horses touted as available either did not really exist because of underpopulation of the Mare Lease Program or were, at best, extremely overvalued (quarter horses rather than thoroughbreds) when they were available, Plaintiffs and other investors should not have been able to claim the business deduction on their federal income tax returns as advertised by ClassicStar. Almost certainly the participants needed actual mares and not the promise of mares or mere placeholder horses to support current year deduction for expenses associated with those mares. Participants were then paying fees and taking deductions associated with breeding, board, and insurance activities which never occurred. By encouraging investors to take the deduction, knowing about the endemic underpopulation/ overvaluation problems, ClassicStar and its agents were working a tax fraud on the United States Government (triggering a criminal investigation into its practices and, eventually, convictions for

_____

[9]  As if the lending situation were not stilted enough, ClassicStar lawyers, financial planners hired by or affiliated with ClassicStar and GeoStar, and, in the case of the Plaintiffs, the investors' own supposedly independent lawyers were effectively paid by ClassicStar to validate the Program, advising participants that all was in order and that they could deduct the full amount of the Mare Lease purchase as horse breeding deduction on their tax returns.  This is explained in more detail below.

that fraud for some of the individual defendants in this case) as well as perpetuating the misrepresentations it had visited on the participants with respect to the benefits of participating in a Mare Lease Program. Ultimately, the packages had precious little economic value to offer apart from the tax benefits, but ClassicStar never revealed earlier audits of its Programs by the IRS nor revealed that at least one participant had his deduction disallowed.[10]

Of course, since ClassicStar never had sufficient equine assets to deliver the required number of pairings, GeoStar offered participants several alternative transactions through its subsidiaries, described in further detail below, each of which would relieve ClassicStar of its obligation to produce an equine pairing and ultimately disguise its lack of inventory. From the inception, according to GeoStar accountant Bill Bolles, GeoStar and ClassicStar intended at least 60% of participants to convert from

---

[10] With respect to the potential for tax benefits, the NELC loans were also problematic. Defendants marketed the Mare Lease Program to include leverage provided by the loans as a means of expanding the available tax benefits. The fact that NELC functioned entirely within the control of ClassicStar raised the question, however, of whether participants were at risk on the loans because it was not known if ClassicStar intended for NELC to enforce the participant's notes or whether NELC would have succeeded. As Plaintiffs explain it, through the report of their expert Edward A. Morse, it is necessary to be "at risk" in order to deduct losses under I.R.C. § 465(b), and the failure to disclose the captured nature of NELC was germane to both the deductibility of their loans and was, thus, material to their decision to participate in the Programs.

mare lease to working interests and ultimately to stock.  In other
words, these exchanges were always necessary in order for the
program to work.  As Ferguson explained to Douglas C. Anderson, a
third-party promoter paid to market the Mare Lease Programs,
GeoStar ultimately sought to pump money into the gas program and
drilling gas wells, from which the Court gathers that GeoStar
acquired and operated ClassicStar as a means of financing the
development of its mineral properties.[11]

To make these conversions attractive, GeoStar represented to

_____

[11] Even prior to GeoStar's acquisition of ClassicStar in 2001,
David Plummer and GeoStar representatives marketed the Mare Lease
concept together with GeoStar's existing drilling programs as a
"Combination Program."  As early as 2000, when David Plummer, who
was operating a mare lease business, joined forces with Ferguson,
Parrott, and Robinson who, through GeoStar, were promoting
development of coal bed methane properties.  Once it acquired
ClassicStar, it solicited the 2001 Mare Lease Program participants
to convert the majority of their equine breeding packages into oil
and gas working interests in various wells jointly owned by First
Source Wyoming ("FSW") (GeoStar's wholly owned subsidiary) and
Gastar (GeoStar's publically traded subsidiary).  The Combination
Program was touted for several years because it would preserve
significant tax benefits from the initial farm loss carry back
provision, then permit investors to avoid taxes related to the sale
of foals when they exchanged their equine interests into gas wells
begin drilled by FSW in the subsequent year, and, ultimately, avoid
ordinary tax income on their ultimate sale of that asset by
exchanging the working interest for stock in Gastar and holding
that stock for the required period.

Of course, Ferguson also told third-party promoter Anderson
that the reason GeoStar bought ClassicStar in the first place was
to raise money for the oil and gas business.  The owners of
ClassicStar and GeoStar intended for at least 60% of Mare Lease
Participants to convert from mare lease to working interests and
ultimately to stock.  The conversions, which disguised the lack of
mares needed to support the volume of leases, also provided the
only substantial source of funding for the development of gas
properties which GeoStar acquired and then transferred to Gastar.

the ClassicStar participants that 90% of the conversions made could be deducted as intangible drilling costs on participant's tax returns. Thus, GeoStar Controller Frederick Lambert issued letters to those participants converting their investments which represented that no less than $60 million in intangible drilling costs deductions were available for 2002. However, for the working interests in 100 wells owned in part by the subsidiary First Source Wyoming ("FSW") at the relevant times, GeoStar ultimately was working with a maximum in $10,000,000 in working interests on a yearly basis. Nonetheless, GeoStar sold $30 million worth of interests in FSW in 2000, $30 million in 2001, and $70 million in 2002. The 2002 sales of interests in FSW were comprised almost exclusively of conversions by Mare Lease participants. For those conversions to work, a converting participant would need to take a deduction sufficient to offset the gain from the transaction – otherwise they would incur a tax liability. With respect to the wells in question for FSW, capital expenditures on wells averaged less than $100,000, with intangible drilling costs less than that. GeoStar nonetheless promoted the wells as having intangible drilling costs of well over $360,000 per well. In this way, GeoStar promoted a tax free conversion from mare lease to working interests which was ultimately a fabrication. Ultimately, of course, GeoStar never paid operating income to any of the working interests participants converted out of ClassicStar Mare Lease

Programs nor actually account to these working interest participants fro the revenues or expenses associated with the well operations. Rather, if participants received distributions, they related to a fixed percentage of the amount of the initial purchase, rather than actual operating revenues – and it came from sources other than the drilling programs. It did so with the intention that the interests would never actually be conveyed and would instead be converted into Gastar stock.[12] When those conversions were made, the conversion rate for Gastar stock was based on the price of the stock at the date of the participants' conversions to the drilling program so that no subsequent valuations were ever made for participants.

Ultimately, GeoStar no longer wished to offer Gastar stock as an "exit strategy," so additional companies were created. By 2004, the FSW oil and gas conversion program had been terminated, and GeoStar began to offer the conversion of any quarter horse interests obtained from the Mare Lease Packages into shares of FEEP. The principal assets were purported to be quarter horse breeding interests traded to FEEP by participants and working

---

[12] Indeed, GeoStar never recorded those participations in working interests or made actual assignments to the participants. When GeoStar, together with Gastar, sold the wells in which it purported to have conveyed $100 million of working interests, it represented to the purchaser that there were no working interests associated with those wells. This is in keeping with the fact that GeoStar never treated the working interests as anything other than a means of generating a tax deduction along the path to participant's ownership of Gastar stock.

interests in Wyoming wells – the same ones discussed above under the FSW iteration of this option.

Of course, GeoStar (along with others) was aware of the shortage of horses in the Mare Lease Program and the insufficiency of the gas interests, but $100 million of 2002-2003 Mare Lease Program interests were converted into the FEEP program. Another $82 million of the Mare Lease Program interests for the 2004 participants were slotted for conversion to FEEP by October 19, 2004 – even though FEEP acquired no assets at anytime and never actually operated. The private placement memorandum distributed to Mare Lease Program participants stated that GeoStar would buy back the FEEP units at the price the participants had initially paid ClassicStar for the breeding interests traded for the FEEP units. GeoStar ultimately decided that it would not honor this commitment. Effectively, then, the FEEP units never had any value.

Beginning in 2004, GeoStar committed to buy back numerous other mare lease and oil and gas working interests that its subsidiaries could not deliver, doing so itself and through its subsidiaries ClassicStar Financial Services, Inc. ("CFSI"), and GeoStar Financial Services Corp. ("GFSC"). GeoStar would offer a promissory note from one of the subsidiaries in consideration for the buy-backs. Of course, records reveal that these subsidiaries never had the cash to pay back the notes – indeed, never had assets besides unpaid accounts receivable from other GeoStar subsidiaries.

## C. The Role of the Defendants

As described above, the scheme – for a scheme it was – was complex and involved many participants. Even before ClassicStar's acquisition by GeoStar, when it was known as New Classic Breeders, LLC, and owned by the Plummers, the entity was the primary marketing vehicle for not only its own mare lease offerings but also a combination equine-mineral investment programs. Through its successful sales of the combined Mare Lease and drilling programs, ClassicStar generated a revenue stream which supported Gastar and GeoStar's mineral exploration interests. That role continued once GeoStar acquired ClassicStar. NELC provided the loans which increased the size and feasability of the packages for investors. GeoStar managed ClassicStar's finances and, through its other subsidiaries, oversaw the development of mineral properties. GeoStar's financial stability was used to reassure participants of ClassicStar's ability to meet its obligations and, to prove the point, it actually guaranteed or paid for many of ClassicStar's obligations.[13] Gastar was designed to hold the mineral properties until they could be developed sufficiently so as to become

---

[13] GeoStar has, along the way, argued that the Plummer Defendants were really responsible for this entire situation. GeoStar, however, wholly owned and controlled Classic Star throughout the relevant period. It was GeoStar and not the Plummer Defendants who maintained ClassicStar's general ledger and who had exclusive control and signatory authority over the ClassicStar checking and other financial accounts for the relevant time period. And, from the funds taken in by ClassicStar in the Mare Lease Program, GeoStar took more than $115 million of the revenues.

marketable and its stock provided an additional and critical incentive to early participants in the form of liquid asset which would allow them to realize their gain. Gastar's resources were also used to assure investors of the financial stability of the Mare Lease Program, as some investors were told that Gastar would purchase additional thoroughbred interests to populate ClassicStar's Mare Lease Programs. Eventually, FEEP, GFSC, and other shells created by GeoStar and made offerings which took the place of the now more valuable Gastar stock. FEEP and GFSC opportunities were, as interests in FSW before them, ultimately used to disguise the overselling of the Mare Lease Program by purporting to relieve ClassicStar of its lease obligations through the exchange of other assets.[14]

The individual defendants had their own particular areas of

---

[14] One such additional entity, the ClassicStar Racing Stable Limited Partnership, is not involved in any of the claims raised by Plaintiffs. It is worth noting, however, that it served a similar purpose in the enterprise by purporting to accept contributions of mare lease pairings from participants in exchange for units in the partnership which then paid shares of its earnings to the participants. The partnership had no assets. It nominally acquired stallions and race horses from ClassicStar in exchange for participants' lease rights, but it then immediately leased these horses back to ClassicStar. The lease payments thus generated supposedly paid interest on the participants NELC loans which, in actuality, had been funded by ClassicStar At the end of the required capital gains holding period the partnership would be liquidated but because the majority of participants had substantial NELC debt, the proceeds generated would do nothing more than cancel the notes. Ultimately, of course, ClassicStar was relieved of its obligations to provide equine interests but no substantive transaction took place.

responsibility in making the scheme work. Robinson, Parrott, and Ferguson owned GeoStar. Robinson, who held the titles of CEO and President of Geostar, made most of the financial decisions for the enterprise. He directed the purchase of New Classic Breeders, LLC, which became ClassicStar, from David Plummer in 2001 and executed the purchase documents. He, Ferguson, and Parrott personally guaranteed the loan documents with Fifth Third Bank which provided financing to the equine side of the enterprise, i.e., ClassicStar itself. Robinson's involvement did not stop there. He also acted as ClassicStar's co-manager, placed insurance for its inventory, oversaw its salespeople, and participated in presentations marketing the Mare Lease Programs to potential investors. Robinson also hired David Plummer to serve as GeoStar's Marketing Director and ClassicStar's head of marketing so that he could promote the combined mare lease and drilling programs. Robinson was listed in the FSW working interest promotions as a founder and key member upon whose services the success of the drilling programs depended. He participated in the transactions that led to the acquisition of Gastar by GeoStar, served as Gastar's CEO and President from 2000–2004, and served as the Chairman of the Board of Directors for Gastar until 2006. He participated, as well, in the drafting of the conversion documents for what ultimately became the FEEP offering.

Parrott's role was largely behind the scenes or at least he

was a faceless presence to many investors in the Mare Lease Programs, but his involvement in the Enterprise was wide reaching. He reviewed and approved marketing materials used by ClassicStar, including attorney opinion letters, and negotiated agreements with various promoters of the Mare Lease Programs. It was Parrott who negotiated an agreement to pay Hanna Strader, the law firm who ultimately represented the Nelson, West Hills and Arbor Farms Plaintiffs in their purchase of Mare Lease Programs, a commission for persuading its clients to participate in the Program. He also drafted or revised the Mare Lease agreements used by ClassicStar, occasionally made presentations about the Mare Lease Programs, and executed documents as ClassicStar's vice-president. Parrott drafted the organizational documents when GeoStar established FEEP and prepared the FEEP private placement memorandum ("PPM") upon which various of the participants relied. He drafted and then executed the documents relating to the 2002 drilling program offering on behalf of FSW. Finally, Parrott executed the documents through which GeoStar contributed certain of its mineral properties to Gastar and was often introduced as founder and partner of Gastar as in the subscription agreement for the 2002 drilling program.

Ferguson had an active role as promoter of both the Mare Lease Program and the alternative investments.[15] He was identified at

---

[15] Ultimately, Tony Ferguson urged ClassicStar to "do all [it] could to pump as much money into the gas program and drilling gas wells as possible." Anderson testified that Ferguson "mentioned on

various times on marketing materials and contract documents as the President, Vice-President, or CEO of Gastar and GeoStar, the President of FSW, and as the President, Chairman, or the Co-Managing member of ClassicStar. He both promoted the programs himself and hired sales representatives and other employees to do so and was the individual who directed the payments of commissions to Handler Thayer. Together with Robinson and Parrott. Ferguson was a principal officer of Gastar and held himself out as a Gastar representative. Ferguson also "negotiated" and signed the Buffalo Ranch quarter horse leases – after the fact, as explained above. Ferguson was touted in FEEP's PPM as FEEP's tax partner and a member of its advisory committee.

Robinson, Parrott, and Ferguson did all of this knowing that the ClassicStar Mare Lease Program was oversold, knowing that they or others were marketing the Mare Lease Program for the "available" tax benefits, the true nature of NELC as a captive of ClassicStar, and the absence of assets in FEEP. They attended meetings where ClassicStar's business, including the lack of mares, was discussed, received summaries of ClassicStar assets on various occasions, were aware of and facilitated the trade outs of interests to accommodate

---

several occasions the need to sell horses to use money for oil and gas." David Plummer "lamented on one occasion" to Anderson that Ferguson "was taking his money for horses and using it for something else, using it for gas." Anderson testified that Parrott put together the ClassicStar sales commission arrangements on behalf of ClassicStar.

those shortages, and clearly had available to them information from which they could draw the conclusion that the programs were never intended to provide enough horses to deliver foals (or even the chance of foals) to participants.

David Plummer was GeoStar's director of marketing and ClassicStar's head of marketing. He promoted the combined equine-mineral programs and the Mare Lease Programs, often making presentations to potential investors. As a principal of SOS, which operated as Buffalo Ranch, he "leased" (or failed to lease, as the case may be) quarter horses to ClassicStar to make up the shortage of thoroughbred stock – knowing that quarter horses were never intended to be bred for participants. He helped to put together the schedules, including pairings that did not exist, for participants.

Spencer Plummer, ClassicStar's president and also involved with SOS, engaged in marketing and showed off ClassicStar's farming operations. He was also President of ClassicStar Farms from April 2003 to February 2006, during which time it was owned and controlled by GeoStar. He also helped to prepare schedules which included "temporary assign[ment] of quarter horses instead of thoroughbreds to some of the . . . investors," with the knowledge that "GeoStar was trying to cover this shortage by convincing some of these . . . investors . . . to trade their mare lease interests to a new entity called FEEP and move into units of gas working

interests." He encouraged these trades by offering them written agreements to do so. In other words, he was actively marketing these Programs knowing that there were not enough horses to meet the commitments to participants and knowing that he would ultimately be encouraging a trade-out of mare lease interests for FEEP units to cover the shortage.

### D.  Plaintiffs

Plaintiffs are entities and individuals who purchased over $37 million in equine breeding pairings from ClassicStar from 2003 to 2005. Specifically, in 2003, the Grovers invested $4.483 million and MacDonald Farms invested $7.3 million. In 2004, Arbor Farms invested $7 million, Nelson Breeders invested $2.912 million, the Grovers invested $1.1 million, MacDonald Farms invested $4 million, and West Hills Farms invested $7 million. In 2005, MacDonald Farms invested $3 million.

Prior to investing, each was presented with an "Illustration" of its or their proposed participation, outlining the potential return on the investment, the associated tax benefits, and the availability of subsequent investments in GeoStar affiliates. Each received promotional literature detailing the thoroughbred assets owned by ClassicStar and the stock available for breeding. Each of these Plaintiffs also signed a Mare Lease Agreement which stated, as a term of the agreement, that ClassicStar owned the mares that were the subject of the Agreement.

Remmers, Sackhoff, and Nelson – as principals of Arbor Farms, West Hills, and Nelson Breeders – received, as well, an opinion letter authored by accountant Terry Green which "confirmed" the validity of the tax deduction for the entire cost of participating in the Programs, including that portion of the cost which was financed by the loan from NELC. A legal opinion letter prepared by the law firm of Handler Thayer purported to exhaustively analyze both the Program and the applicable regulations in order to reach a conclusion that the Program met all legal requirements.

Plaintiffs engaged legal counsel to review the program for them. Unknown to Plaintiffs was the fact that these attorneys had incentive, through commissions paid by ClassicStar and others associated with them, to render a favorable opinion. Plaintiffs MacDonald[16] and the Grovers selected the law firm of Handler Thayer, and Arbor Farms, West Hills, and Nelson selected the law firm of Hanna Strader to opine regarding the availability of the tax benefits touted by ClassicStar. While both firms agreed to evaluate the soundness of the program for their respective clients and to negotiate the terms of their participation in the Program with ClassicStar, neither firm disclosed the fact that they would receive "commissions" based on Plaintiffs' participation in the

_____

[16] Handler Thayer had represented Lynn MacDonald of MacDonald Stables prior to his introduction to the Mare Lease Program and brought the Program to his attention.

Mare Lease Programs.[17]

Further, each of the Plaintiffs funded a portion of their

---

[17] Notably, in its engagement letter with Plaintiffs, Hanna Strader disclosed that ClassicStar had retained it in the past to represent ClassicStar in connection with tax matters but that at the time that it was undertaking representation of these soon-to-be-investors, "there [was] not conflict of interest between your interests and the interests of ClassicStar nor [did the firm] anticipate that such a conflict [would] arise in the future." Hanna Strader did not disclose was that the firm was being paid a commission by a third-party promoter of the ClassicStar Mare Lease Programs, Anderson, in an amount equal to three percent of the amounts that Arbor Farms, West Hills, and Nelson ultimately paid to ClassicStar (which represented a portion of Anderson's own commission). David Plummer and Tony Ferguson were aware of this arrangement because Anderson, whose company served as a commission sales representative for ClassicStar, disclosed to David Plummer and Ferguson that he was paying half of the commissions that he received to Joe Hanna for referring his clients to the program.
Further, ClassicStar had a fee agreement with respect to opinion letters prepared in advance of inquiries whereby ClassicStar would pay Hanna Strader – "on behalf of the client" who received the letter and eventually invested – an amount equal to two percent of what ClassicStar's clients ultimately paid ClassicStar, with a minimum of $10,000 up to $50,000. Hanna Strader received $150,000 from ClassicStar in connection with Sackhoff, Remmers, and Nelson's decisions to have their companies participate and received an additional $420,000 from Anderson in connection with Sackhoff and Remmers decision to have their companies participate in the Mare Lease Programs.
Handler Thayer had a similar arrangement, and the firm accepted more than $1 million in connection with the Grovers and MacDonald's participation in the Programs. Like Hanna Strader, Handler Thayer did not disclose those payments and recommended that the Grovers and MacDonald continue to participate in the Mare Lease Programs. Further, these arrangements were no secret. Handler Thayer's commissions (or "legal fees" as they were termed after a while) for the years 2002-2005 were openly discussed in emails dated from 2003 to 2005 by and between individuals from GeoStar, Gastar, ClassicStar, and Handler Thayer. Recipients of these emails included "sdplummer@classicstar.com," "tferguson@gastar.com," "sdplummer@aol.com, "spencer@classicstar.com," and "david@classicstar.com," among others.

investment through a loan from NELC. No one told them, of course, that NELC was funded entirely by ClassicStar. Nor did anyone tell them that investments in alternative programs were highly desired (indeed, necessary) because there simply were not enough horses to go around in the Mare Lease Programs and ClassicStar wanted to avoid its contractual liability to provide the pairings or at least the type of pairings that it had promised.[18]

After substantial payment was received by ClassicStar, each Plaintiff received a document entitled "Schedule A," which purported to identify the specific breeding pairings assigned to the receiving plaintiff. Of course, none of the Plaintiffs were told that ClassicStar did not own sufficient thoroughbreds to complete the number of packages sold or that fictitious or overvalued equine pairings were inserted into their Schedule A listings to make them appear full.

The specifics of each Plaintiffs' participation were as follows.

### 1. MacDonald Stables

In 2003, Handler Thayer attorneys arranged for Lynn MacDonald, a member of MacDonald Farms, to participate in a teleconference

---

[18]  Clearly, some horses were available. Plaintiff's accounting expert reports that Arbor Farms received $1.494 million in proceeds from the sale of horses. He reports, similarly, that the Grovers earned $422,000, West Hills Farms earned $2.43 million, Nelson Breeders earned $54,000, and MacDonald Stables earned $530,000 in this manner.

attended by David Plummer. During that call, David Plummer described the basic attributes of ClassicStar's Mare Lease Programs, including how thoroughbred mares were leased to investors for a breeding season, those mares were bred to proven stallions, and the investor would own any foal that resulted from the breeding opportunity. MacDonald then met with advisers from Handler Thayer and Ferguson in mid-2003. Ferguson described the same features of the Programs as David Plummer had and explained that GeoStar and Gastar were financial backers for ClassicStar.[19] Indeed, Ferguson, who said that he spoke on behalf of ClassicStar, Gastar, and GeoStar, explained that Gastar would purchase the thoroughbred mares which would be available for inclusion in any Program packages that MacDonald Farms purchased. Ferguson also explained that MacDonald would have the option, in subsequent years, to exchange foals or mare leases for mineral assets, including Gastar stock, in such a way that would preserve the tax benefits of the program. The touted tax benefit was striking: MacDonald Farms would be able to deduct the entire cost associated with the Program – including the loan – as a business expense. To sweeten the deal, MacDonald was told that no participant in the Program or its predecessor had ever had their deduction disallowed. He was not told, however, that the Program was the subject of an IRS

_____

[19] Robinson also discussed how GeoStar and Gastar provided financial backing to ClassicStar with Lynn MacDonald during a meeting in St. Croix. Parrott was also present at that meeting.

investigation – which it was.

During discussions with David Plummer, Ferguson, and advisors from Handler Thayer, each described to MacDonald how prior participants in the Mare Lease Programs had sold foals obtained from the Mare Lease Programs for an average 130% pre-tax return on their investment. They also explained that the price of a mare lease corresponded to approximately 30% of the value of the mare. With respect to that investment, they told MacDonald that a reputable lender with experience in the equine business, NELC, would provide financing for a substantial portion of the package. Lynn MacDonald was never told, of course, that ClassicStar was the sole source of funding for NELC. MacDonald also received an Illustration identifying ClassicStar as a "Division of the GeoStar Group" and which offered what was supposed to be a revenue projection based on historical returns. The document explained that there was an option to convert the investment into coalbed methane working interests and, eventually, Gastar stock. Handler Thayer undertook to review those materials and assured MacDonald that the tax structure of the Program would deliver the promised benefits. Neither Handler Thayer nor anyone else bothered to disclose to MacDonald that Handler Thayer was receiving a commission from ClassicStar commensurate with the amount of MacDonald Stables' participation in the Mare Lease Programs.

Ultimately, based on representations that the Mare Lease

Programs would be populated with pairings of thoroughbreds of proven value, that MacDonald's participation would have the particular tax consequences described, and that Gastar would be backing the Program financially, MacDonald purchased $14 million worth of Mare Leases in the 2003 Program. $1.4 million was wired from Wisconsin to ClassicStar in Utah. $5.6 million was wired from Wisconsin to NELC in Utah in satisfaction of a note, another $300,000 was wired for payment on a note and interest, and 5 separate checks totaling approximately $212,000 were mailed from Wisconsin to NELC in Utah.

MacDonald received and sent a number of items concerning the Mare Lease Programs through the mails, including (1) a July 15, 2003, letter from Toby Norton, written for ClassicStar, which explained the financing for his 2003 Mare Lease Program package, (2) an August 1, 2003, letter from Spencer Plummer, again written for ClassicStar, which enclosed an executed 2003 Letter of Understanding; (3) a September 30, 2003, letter from Mike Snow, written for ClassicStar itemizing sums due and sums received with respect to MacDonald's 2003 Mare Lease Program package; (4) a December 12, 2003, letter from Mindi Morashita, written for ClassicStar, enclosing ClassicStar's Broodmare and Stallion Pedigree CD; (5) a December 31, 2003, letter from Mike Snow, written for ClassicStar, confirming ClassicStar's receipt of $5.6 million from NELC on behalf of MacDonald Stables; (6) a May 28,

2004, letter from Spencer Plummer, written for ClassicStar, telling MacDonald of the need to sign a Letter of Understanding for 2004 while inventor was still available; (7) an April 18, 2005 letter from Mindi Morashita enclosing a trade out agreement replacing quarter horses in MacDonald's 2004 package with thoroughbreds; (8) his own letter returning that trade out agreement, once executed, to ClassicStar on April 25, 2003, and (9) a May 5, 2006, letter mailed from Florida from Tony Ferguson on behalf of GeoStar enclosing a Gastar stock certificate. In late 2003 and again in early 2004, MacDonald received Schedules describing its assigned pairings from ClassicStar's Utah office by both email and overnight courier.

The Schedule as described included far more pairings than Lynn MacDonald had expected based on the selection process, and, ultimately, Lynn MacDonald objected to the larger number of presumably less valuable pairings represented on that schedule in lieu of the fewer select pairings that he expected. Tony Ferguson assured him that the matter would be addressed. David Plummer later told MacDonald that ClassicStar temporarily lacked the thoroughbreds necessary to fulfill its mare lease obligations for that year and that he had assigned MacDonald Stables quarterhorses again instead of thoroughbreds. Ferguson arranged for MacDonald, who negotiated through its attorneys at Handler, Thayer, to exchange those pairings for 1,680,890 shares of Gastar stock and

units in FEEP.  Ferguson described FEEP, including its association

with GeoStar and Gastar, to MacDonald, and Lynn MacDonald agreed to

the substitution, relying on the description of FEEP's assets, the

put option, the GeoStar guarantee, and a recommendation received

from Handler, Thayer.  Of course, the shares were not delivered

immediately - far from it.  Rather they were delivered eighteen

months after the agreed upon time for delivery.  The shares were

then restricted from being sold for one year.

In 2004, David Plummer assured MacDonald that he would be

assigned the type of interests in the 2004 Program that he had

expected to receive in 2003.  MacDonald then purchased $8 million

of 2004 Program pairings, sending two separate wires from Wisconsin

to Utah for a total of $4,000,000 and mailing four separate checks

from Wisconsin to Utah for a total of $164,000, and financing the

remaining cost with a loan from NELC.  When the Schedule of these

pairings was received by overnight mail in late 2004, they were not

the thoroughbred pairings promised. Again by negotiating with

MacDonald through its attorneys at Handler Thayer , ClassicStar

agreed to exchange the 2004 leases for additional FEEP  and shares

of an entity called GeoEquities, which was supposed to have

additional valuable mineral properties and acquired and traded

Gastar stock.  MacDonald did not receive the promised Gastar stock

until well after the delivery date at which time the one year

transfer restriction began to run.  Further, FEEP did not perform

nor did GeoStar honor the guarantee. After accounting for the
value received from horses and stock combined, as well as other
sources, MacDonald suffered out of pocket losses of $4,733,885.68.[20]

### 2. The Grovers

David Plummer and Ferguson introduced the Grovers to the Mare
Lease Program during a series of meetings in late 2002 and early
2003. David Plummer and Ferguson again described the basic
attributes of the Mare Lease Programs, including the lease of
thoroughbred mares at 30% of their value, a history of favorable
returns, the financial backing from GeoStar, the opportunity for
future mineral investments and the realization of substantial tax
benefits. The Grovers received an Illustration in October 2003
which identified ClassicStar as a "Division of the GeoStar Group,"
and projected 130% appreciation on the horses with options to
convert equine interests to coalbed methane working interests which
would then convert to stock. Based on the representations made,
the Grovers purchased $8 million worth of what they believed to be
thoroughbred Mare Leases in the 2003 Program.

---

[20] Plaintiffs have, since filing their Motion for Summary
Judgment, filed an updated expert report in support of their claim
for damages which they state accounts for monies recovered by other
means or subsequently paid from various sources. That updated
report is the subject of some controversy but no one disputes the
amount of investment dollars paid in to the Mare Lease Programs by
the Plaintiffs or the amounts paid back to them by Defendants over
time. The loss figures included here reflect the information
provided by Plaintiffs to the Court by their Notice Supplementing
the Amount of Damages Sought in Motion for Summary Judgment [DE
741].

In early 2004, David Plummer and ClassicStar's accountant, Terry Green, recommended to Grovers that they exchange substantial portion of these supposed equine interests for mineral interests which they were told represented more diversified strategy for generating profits while still preserving the tax benefits of the initial participation. Eventually GeoStar mailed Grovers the FEEP PPM which described a put option, the assets supposedly held by FEEP, the GeoStar guarantee, and the role of Ferguson and GEEI in the management of FEEP. Relying on these representations, the Grovers exchanged a substantial portion of their equine interests for FEEP units, ultimately exchanging substantially all of their remaining equine interest for an Installment Note from GFSC in the amount of $3,796,707, which came due on July 15, 2007. Even though the Grovers attempted to exercise the FEEP put option, it has not performed, nor has GeoStar performed on the guarantee, nor has any payment on the Installment Note been made to the Grovers.

Meanwhile in late 2004 and in reliance on representations from ClassicStar that the 2003 Program was performing as anticipated, the Grovers purchased an additional $2.2 million as part of the 2004 Mare Lease Program. The Grovers exchanged the majority of the 2004 pairings for FEEP units in early 2005 on terms largely similar to the 2004 arrangement. Again, neither FEEP nor GeoStar performed on the put or the guarantee, although requested to do so.

The Grovers received materials which repeated the

representations that had been made to them via email, mail, and overnight courier, sent from Utah to Nevada. Jaswinder Grover has identified a number of items related to the Mare Lease Program that he received through the mail or wires, including (1) an August 25, 2003, letter from Linda Ridley, written for ClassicStar, enclosing a Mare Lease Brochure and CD Packet and a Due Diligence & Mare Lease Information Booklet; (2) a December 16, 2003, letter from Mindi Morashita, written for ClassicStar, enclosing a 2003 ClassicStar Pedigree CD; (3) a December 31, 2003, letter from Mindi Morashita, written for ClassicStar, and enclosing the Grovers' 2003 Mare Lease Agreements and Schedule A; (4) a December 31, 2003, letter from Spencer Plummer, on behalf of ClassicStar, providing suggestions for how the Grovers' horse business should be managed and concerning material participation; and (5) a December 23, 2004, letter from Morashita, written for ClassicStar, enclosing the Grovers' 2004 Mare Lease Agreements and Schedule A of horse pairings. Jaswinder Grover also mailed, from Nevada to Utah, at least six separate checks, totaling $5.58 million.

All told the Grovers paid over $5.5 million cash to ClassicStar. They did receive $400,000 from the sale of few thoroughbred foals and distributions from racing partnership into which ClassicStar transferred certain other foals, as well as payments in settlement of this matter from other sources, but ultimately have remaining out of pocket losses on their equine

investment totaling $3,466,633.68.  As the Court understands it,
those assets exchanged for mineral interests remain an unrealized
investment – notwithstanding the promises made and as described
above.

### 3.   Nelson Breeders

Nelson was first approached by third-party promoter Anderson,
in late 2003 or early 2004.  David Plummer, who represented himself
as speaking for both ClassicStar and GeoStar, then met with Nelson
in early 2004.  David Plummer again described the basic attributes
of the Mare Lease Programs, including the lease of thoroughbred
mares at 30% of their value, a history of favorable returns, the
financial backing from GeoStar, the opportunity for future mineral
investments and the realization of substantial tax benefits, if
Nelson participated in the Program in the manner prescribed by
ClassicStar.  Nelson also received an Illustration which outlined
several conversion options including acquisition of shares in an
entity called First Energy Partners, Inc., which would then be
exchanged for Gastar shares.  A second Illustration carried over
the same representations except that it substituted an entity
called GeoEquities, LLC, for Gastar.   Nelson engaged Hanna
Strader to evaluate the Program for him.  Hanna Strader produced an
opinion letter upon which Nelson relied stating that the Program
could perform as promised by ClassicStar.  Relying on the opinion
letter and the representations made by David Plummer and others

Nelson made payment of $2.9 million to ClassicStar and signed notes with NELC totaling another approximately $2.5 million.

From ClassicStar, Nelson received via mail, email, or over night courier at least seven pieces of correspondence which traveled from Utah to Washington, including (1) Illustrations; (2) the ClassicStar Brochure and Breeder's Handbook; (3) a June 28, 2004, letter from Boyce Sanderson of ClassicStar providing information about ClassicStar personnel who could help him develop his horse business and the requirements of material participation; (4) a September 24, 2004, letter from Steve Peck enclosing an invoice for payment due on the 2004 Mare Lease Program; (5) a December 6, 2004 letter from Morashita enclosing the 2004 ClassicStar Mare and Stallion Selection CD; (6) a December 24, 2004, letter from Morashita enclosing Schedule A pairings for the 2004 Mare Lease Program; and (7) a December 31, 2004, letter acknowledging receipt of $25,088,00 from NELC on behalf of Nelson Breeders for payment due on the 2004 Mare Lease Program.

Nelson received little in return, except for some funds which were gained from the sale of single thoroughbred foal and payments from others in settlement of claims related to this matter, yielding an out of pocket loss currently valued at $1,887,914.40.

### 4.   West Hills and Arbor Farms

West Hills became familiar with ClassicStar's Mare Lease Programs through 2004 presentation by David Plummer and Anderson

and subsequent meetings in which David Plummer and others participated. During those meetings, these individuals represented that the prices charged for participation represented approximately 30% of the value of the thoroughbred mares used in the programs, that the projected returns were based on historical performance, that GeoStar's financial backing gave ClassicStar access to substantial assets to support the Program, and that the structure of the Program conformed to IRS requirements and that no participant had ever had a deduction disallowed. Through its representatives, Arbor Farms attended several of these later meetings and received the same representations. In mid-2004, West Hills and Arbor Farms each received an Illustration similar to the others which represented that their initial cash purchase would generate substantial returns and set forth various conversion options. In July of 2004, West Hills and Arbor Farms each signed a letter of understanding for the purchase of $14 million of mare lease pairings through the end of 2004. West Hills and Arbor Farms paid ClassicStar $7 million and executed an NELC note for the remaining $7 million of their purchases. Unbeknownst to them, their packages would be predominantly filled with fictional quarter horse pairings.

Dennis Sackhoff and Walter Remmers, members of Arbor Farms and West Hills Farms, respectively, would later learn about the inclusion of quarter horse pairings, but they were assured that the

values listed were accurate and that the horses existed. They did not know, prior to 2006, that ClassicStar did not own sufficient thoroughbreds to fill participant's packages, that overvalued pairings were included in their Schedule A packages, or that NELC was funded solely by ClassicStar, among other things. These men have identified a number of items received through the mails, including their company's respective Schedules, which were received by overnight courier.

Ultimately, West Hills and Arbor Farms received for their $14 million investment a few thoroughbred foals with value of approximately $2.4 million and $2 million, respectively. They have since received funds in settlement of their claims from other parties, as well. At present, as presented by Plaintiffs, Arbor Farms' out-of-pocket losses on the investment total $3,323,236.60, while West Hills' net losses come to $3,056.933.51.

## II.  Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing

the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). While the moving party must demonstrate that no genuine issue of material fact exists, in response, the non-moving party must move beyond the pleadings and present evidence in support of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

## III. Motion for Sanctions and Request that Adverse Inferences Be Drawn

Plaintiffs ask this Court to draw an adverse inference as to certain facts as a result of the decision of the individual defendants to invoke the Fifth Amendment privilege against self incrimination and to remain silent in the face of discovery in this matter. It was the individual defendants' right to assert that privilege, but it may not be used to unfairly prejudice other parties to a civil action.[21] For this reason, a court may appropriately preclude such a party from offering evidence in support of the position whose basis he refuses to disclose, and

---

[21]The Plummers and Parrot were the subjects of Criminal Actions No. 09-391-HA and No. 10-81-KI in the District of Oregon, in which they were charged with the crime of tax fraud for their role in the overall scheme alleged in this civil action. Obviously, Ferguson and Robinson were circumspect about the possibility of finding themselves on the receiving end of an indictment or criminal information for their role in the same scheme.

adverse inferences against parties to civil actions in the face of silence which results from invoking the privilege is permissible in certain situations. *See Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976).

However, adverse inference can only be draw when independent evidence exists as to the facts about which the party refuses to answer. *See*, *e.g.*, *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995). Defendants insist that, in this action, Plaintiffs cannot lay a foundation for each fact on a question-by-question basis in deposition or at trial, as should be done, to permit the inference to be drawn. They argue that the foundation could never be laid because of the arrangement, permitted in this case by the Court, whereby Plaintiffs submitted lists of subjects about which questioning would take place at deposition and in response to which the defendants were to submit a declaration identifying any subjects about which they would assert the Fifth Amendment privilege against self-incrimination. [*See* Order, dated December 2, 2008, 5:06-cv-243-JMH, DE 285.] At the time, the Court intended for the parties to avoid the expense and time associated with arranging depositions where these defendants simply asserted the Fifth Amendment privilege against self-incrimination in response to every question asked of them, which was widely anticipated at the time the issue was addressed by

the Court.  The individual defendants' argument that no adverse inference would ever be permitted in the face of such an arrangement seems more than a little too coy to the Court at this point.  Frankly, they had their cake, and now they want to eat it, too.

Having considered the pleadings, though, determining whether an adverse inference should be drawn would be largely academic at this point.  Frankly, Defendants has offered no evidence, by way of an affidavit or otherwise, to support the existence of a material issue of fact or to contradict any of Plaintiffs' evidence.  Each, in turn, has argued instead that Plaintiffs' evidence is insufficient to support a finding in Plaintiffs' favor as a matter of law.  Certainly, the lack of affirmative evidence, coupled with his own assertion of a privilege against self-incrimination in response to the allegations against him, could warrant judgment in Plaintiffs' favor, *see, e.g., City of Chicago v. Wolf*, No. 91-C-8161, 1993 WL 524383, at *3 (N.D. Ill. Dec.13, 1993) (granting summary judgment on all but one issue where evidence support plaintiffs' RICO claims and all defendants had invoked the privilege against self-incrimination in response to substantive allegations and one defendant had pled guilty to facts supporting RICO violations in criminal matter), but the evidence presented by Plaintiffs stands on its own without the inference.  So, the Court leaves the issue of whether an adverse inference should be drawn

for another day.

Similarly, with respect to Plaintiffs' request that the Court sanction GeoStar and GFSC for their failure to participate in certain aspects of the discovery process by prohibiting them from bringing evidence or defending the case against them, the Court need not reach a conclusion today. Plaintiffs can obtain relief on their claims which are before the Court in the present Motion for Summary Judgment without such a decision, so – for the moment – the Court declines to issue the sanction requested.

## IV. Impact of the Guilty Pleas of Defendants David and Spencer Plummer and John Parrott

Defendants David and Spencer Plummer and John Parrott have pleaded guilty to conspiracy to defraud the United States by impairing and impeding the United States Revenue Service, in violation of 18 U.S.C. § 371, in proceedings before the United States District Court for the District of Oregon, Criminal Actions No. 09-391-HA and No. 10-81-KI. These criminal cases stemmed from the same overall scheme which is the subject of the present lawsuit.

A guilty plea is an "admission of all the elements of a formal criminal charge." *United States v. Skinner,* 25 F.3d 1314, 1316 (6th Cir. 1994) (quoting *McCarthy v. United States,* 394 U.S. 459, 466 (1969)). Thus, when a defendant pleads guilty, he admits and is estopped from relitigating the material facts alleged in the

information or indictment, and a plaintiff is entitled to introduce pleas from criminal cases in subsequent civil cases to establish "all matters of fact and law necessarily decided by the conviction." *Emrich Motors Corp. v. Gen. Motors Corp.,* 340 U.S. 558, 569 (1951); *see also Gray v. Comm'r,* 708 F.2d 243, 246 (6th Cir. 1983) (defendant estopped from denying liability in a civil suit for tax fraud after pleading guilty to tax evasion in prior criminal action arising out of same conduct); *SEC v. Quinlan,* No. 02-60082, 2008 WL 4852904, at *4 (E.D. Mich. Nov. 7, 2008) ("Collateral estoppel bars 'successive litigation of an issue of fact or law actually litigated and resolved . . . even if the issue recurs in the context of a different claim.'") (quoting *Taylor v. Sturgell,* 553 U.S. 880, 892 (2008)). The doctrine of collateral estoppel may be used offensively by a litigant who was not a party to a prior proceeding, and the doctrine extends to those facts and law "distinctly put in issue and directly determined in the criminal prosecution." *Emrich,* 340 U.S. at 569; *see also Columbia Pictures Indus., Inc. v. T&F Enters., Inc.,* 68 F.Supp.2d 833, 839 (E.D. Mich. 1999) (offensive use of collateral estoppel was proper in civil case where defendant pled guilty to copyright offense in prior criminal action; mutuality of parties not required).

Hence, the Court treats the admissions of the Plummers and Parrott, i.e., the matters of fact and law necessarily decided, at the time they entered their guilty pleas as established for the

purposes of this litigation with respect to the individuals making those admissions. None of the parties dispute that the Court can do so.[22] What the Plummers and Parrott do contest, though, is what facts and law were "necessarily decided by the conviction" and argue that it should only include the very words recited at the hearing or written in their plea agreement documents.

Those documents alone are damning, but the Court believes that it is fair to consider, as well, the facts that the government

---

[22] Indeed, the Court has a hard time imagining a situation in which it would be more appropriate to do so. The conspiracy which was the subject of the Plummers and Parrott's guilty pleas in the criminal fraud case "was an integral part of the entire connivance" against these Plaintiffs, and the harm caused here was "an immediate consequence" of the defendant's misrepresentations and false promises. Further, the conspiracy, as described in the charging documents with respect to the Plummers and Parrott mirrors that described in detail by the plaintiffs in this case. The elements of that crime are (1) the existence of an agreement between two or more persons to defraud the United States; (2) defendant's knowing participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy, as well as the fact that the conspirators had an "agreement as to the 'object' of the conspiracy." *United States v. Rosenblatt*, 554 F.2d 36, 38, 42 (2d Cir. 1977). It is necessary that the prosecution "plead and prove an agreement with respect to the essential nature of the alleged fraud," *id.*, because "the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* at 39.

The "essential nature" of the fraud which was the subject of the criminal action is identical to that described in Plaintiffs' Fourth Amended Complaint and demonstrated by competent proof in the present motion. In addition to the Plummers and Parrott, ClassicStar, GeoStar, NELC, FEEP, SOS/Buffalo Ranch, FSW, and Gastar are identified as part and parcel of the scheme in which Mare Lease Programs were oversold and investments in those oversold programs financed by a purportedly independent NELC, which was actually funded and controlled by ClassicStar.

stated it could prove if asked to do so and to which the Defendants did not object.

When the Plummers entered their guilty plea, the government explained that it could prove a variety of things, none of which were disputed by the Plummers:

> . . . [A]mong the means by which these defendants conspired to defraud the United States [of] significant tax revenues is:
>
> One, they drafted or caused to be drafted fraudulent quarter horse mare leasing agreements.
>
> Two, they encouraged investors to participate in a subsequent investment in something called [FEEP], which was an artificial entity whose principal purpose was to extinguish loans that never really exist[ed] and cover up the lack of thoroughbred mares.
>
> Three, they concealed the fact that they were funneling a large part of the money from this Mare Lease Program to the parent company's bank accounts for purposes unrelated to the breeding of these thoroughbred mares.
>
> Fourth, the caused law firms to prepare favorable tax opinions and distribute those opinions to investors.
>
> Fifth, they caused investors . . . to file tax returns that were false.

Its list of proof included evidence to support the 54 overt acts listed in the charging document, among which (1) that, on September 7, 2001, accountant Terry Green sent a tax opinion letter concerning the Mare Lease Program to David Plummer and (2) that, on

December 5, 2003, Green sent an email to the ClassicStar controller, with copies to Spencer Plummer, describing the need for ClassicStar to fund the artificial loans or recycling of money from ClassicStar to NELC to the investor and back to ClassicStar. The government also stated on the record that it could demonstrate that on March 8, 2004, Spencer Plummer participated in a conference call in which he attempted to reassure an investor's financial adviser that, while ClassicStar was purportedly not affiliated with NELC, the owner and operator of NELC was his uncle and that he could be controlled; that (4) that David Plummer had met with investors in Portland in March and June of 2004; and (5) that on May 25, 2005, Green sent an email message to Spencer Plummer and another ClassicStar employee in which he said that he IRS had requested the investors original Schedule A and that they needed to "work back and prepare it."

David Plummer, when asked what he was admitting that he did "in [his] words," stated:

> I am guilty of assisting people to take tax deductions, which they would not have been entitled to under a full disclosure basis with the Government or with anyone who looked at it closely.

He also stated that he "agreed with [Spencer Plummer and Green] and people of GeoStar and ClassicStar that this did happen; that we did conspire." In his Petition to Enter Plea of Guilty, however, David Plummer went into more detail, about his own actions and his

complicity with others, as follows:

> In 2000 and 2001 I sold my mare-lease business
> to individuals involved in the oil and gas
> business, the owners of GeoStar. I continued
> to work for them in the mare-lease business,
> primarily responsible for sales. With new
> capital in the business it grew rapidly,
> increasing more than 10 fold in the first year
> under new ownership. The new owners wanted to
> take money from the mare-lease business to use
> in oil and gas ventures and I went along with
> that. The investors were not told that more
> than half of the cash they paid for mare lease
> programs was transferred to oil and gas
> programs in which the mare lease participants
> had no legal interest.

> Additionally, up to half of each participant's
> investment was a loan. Borrowed funds could
> support a tax deduction, but only if there was
> really a loan from an unrelated financial
> institution. Using NELC, a controlled
> financial entity, GeoStar orchestrated a
> series of paper transactions where the cash
> contributed by the investor was essentially
> loaned back to him. This had the effect of
> doubling the deductible investment without
> having the additional money at work in the
> business.

> A third problem with the mare-lease business
> was the insufficient inventory of mares to
> fill the contracts the participants had
> bought. While Classicstar bought many high
> quality horses, it did not keep pace with the
> sales of mare-lease programs. For the most
> part, the investors were not made aware of
> this shortfall.

> Each of these three problems, if known to the
> IRS, would have impacted the deductibility of
> the mare lease investments. Classicstar was
> operated in a way to keep the investors and
> the IRS from knowing about any problems that
> would have impacted deductibility.

Spencer Plummer, in his guilty plea to the charge of

conspiracy, admitted that he was President of ClassicStar Farms from April 2003 to February 2006 during which time Classicstar Farms "was owned and controlled by GeoStar." Through that position he "met with investors/breeders who wanted to participate in ClassicStar's Mare Lease Program, and offered them assistance." He also admitted that investors who took out loans did so through NELC, "an entity that was controlled by ClassicStar and its parent company GeoStar." He admitted further actions, stating:

> I was aware that GeoStar was taking most of the operating capital from ClassicStar and not providing sufficient funds to buy thoroughbred horses to meet on-going breeding commitments. I helped temporarily assign quarter horses instead of thoroughbreds to some of the breeder/investors. I also knew that GeoStar was trying to cover this shortage by convincing some of these breeder/investors to trade their mare lease interests to a new entity called FEEP and move into units of gas working interests. I encouraged investors/breeders to do this by offering written agreements, but GeoStar never really funded FEEP nor did it actually exchange anything of value to the investors.

In other words, he admitted his own acts and complicity with others in the commission of acts by them as alleged in the charging document.

John Parrott stated in Paragraph 24 of his Plea Agreement that:

> As Vice President of GeoStar Corp. Between approximately 2001 and 2009, I assisted in the preparation of documents and other activities designed, pursuant to conversations and agreements with others, to allow taxpayers to

take deductions to which they were not
entitled, relating to their investments in the
ClassicStar Mare Lease Program and related
endeavors.

Parrott admitted in his guilty plea that, between 2001 and 2009, he knowingly and intentionally conspired with others to defraud the United States by impeding the Internal Revenue Service in its collection of income taxes and that he personally committed "a number of overt acts in furtherance of" that conspiracy. Much as with the Plummers, the government stood ready to prove those overt acts. Thus, when he admitted that he assisted "in the preparation of documents and other activities, pursuant to conversations and agreements with others, to allow taxpayers to take deductions to which they were not entitled, relating to their investments in the ClassicStar Mare Lease Program" in furtherance of the conspiracy, he admitted his complicity in those overt acts.[23]

In reality, the parties have no reason to object to the Court's judicial notice of the charging documents against them or their guilty pleas, for they do not suggest that either the

_____

[23]The Information against Parrott describes how GeoStar effected "massive diversions of funds from ClassicStar" and arranged for investors to trade their interests in the Mare Lease Programs which were, like the oversold Mare Lease Programs, effectively non-existent because GeoStar did not convey the interests to FEEP. It also describes how GeoStar moved approximately $330 million in Mare Lease Program sales proceeds from ClassicStar's accounts to its own bank accounts then used the money to fund ClassicStar's operations, oil and gas operations for itself and its subsidiaries and related entities, including Gastar, and for the personal enrichment of GeoStar's principals.

contents of the Information (or, for that matter, his Plea Agreement) are not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," as permitted under Fed. R. Evid. 201(b) and required by Fed. R. Evid. 201(d) ("A court shall take judicial notice if requested by a party and supplied with the necessary information."). Rather, each truly objects to the relevance or legal conclusions that can be drawn from the facts drawn from their pleas and the charging documents.

All told, these Defendants are correct. Their admissions during their plea agreements do not refer specifically to the Plaintiffs in this case, even when the larger universe of factual material from the charging documents lodged against them are considered. Their admissions are, however, extremely probative and offer support for Plaintiffs' allegations about these Defendants' overall involvement in the scheme alleged in the Fourth Amended Complaint, and the facts certainly lend themselves to the resolution of the claims against the Plummers and Parrott by Plaintiffs. *See, e.g.*, *Stirum v. Whalen*, No. 90-CV-1279, 2000 WL 976881, at *4-5 (N.D.N.Y. July 12, 2000) (court considered tax fraud scheme, as a whole, set forth with detail in indictment to which party had pleaded guilty, and concluded that guilty plea to tax fraud resolved issues in civil complaint by investors against the defendant because, that fraud was "an integral part of the

entire connivance" against the civil plaintiffs).

The Court therefore, takes notice of these guilty pleas, pursuant to Fed. R. Evid. 201(b) and (d), and considers the admissions of the wrongdoing which was the subject of the proceedings against the Plummers and Parrott before the United States District Court for the District of Oregon, Criminal Actions No. 09-391-HA and No. 10-81-KI. The Court will consider the facts, so admitted, as conclusively established for the purposes of this action. The Court takes notice only of those facts to which the Plummers and Parrott have admitted and only to the extent that those facts implicate the Plummers and Parrott – as opposed to third parties.[24]

That said, the Court these admissions and pleas, even with such limited consideration as described above, are admissible and relevant as to the other defendants so long as the activities of the Plummers and Parrot are relevant to the averments against them. *See Conn. Gen. Life Ins.*, 60 Fed. Appx. at 88 (district court, in entering summary judgment against defendant on plaintiff's RICO claims, appropriately considered indictments and pleas of co-defendants where the indictments and pleas described the "scope and details of the fraud" and were therefore "extremely probative to

---

[24] The Court finds itself in good company in this regard for the district court in *Great American Ins. Co. v. GeoStar Corp.*, Nos. 09-12488, 09-12608, 09-14306, 2010 WL 845953, at *18 (E.D. Mich. March 5, 2010), took notice of the records of the criminal proceedings against the Plummers for the same reasons.

illustrate a 'pattern of racketeering activity.'").

## IV. Analysis

### A. Plaintiffs' RICO Claims

Plaintiffs argue in their Motion that they are due relief from RICO Defendants Ferguson, Robinson, Parrott, David Plummer, Spencer Plummer, ClassicStar 2004, ClassicStar Farms, and GeoStar, together, for injuries sustained to Plaintiffs' business and property due to violation of the Racketeer Influenced Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1962(c) and (d), by these RICO defendants and others.[25] As set forth below, Plaintiffs have established their claim.

18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Under 18 U.S.C. § 1964, "[a]ny person injured in his business or property by reason of a violation of [§] 1962 of this chapter may sue therefor . . .and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . ."

_____

[25] Although Plaintiffs' Fourth Amended Complaint also avers a violation of 18 U.S.C. § 1962(a), Plaintiffs have not requested summary judgment on that claim. Obviously, as well, the Court has omitted ClassicStar and Gastar from this list, for the claims against them have been resolved by agreement of the parties.

In order to demonstrate a violation of 18 U.S.C. § 1962(c) and to recover under § 1964, a plaintiff must show:

> (1) [that] there were two or more predicate offenses; (2) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) an injury to his business or property by reason of the above.

*Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993) (citing *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274 n. 5 (9th Cir. 1988)).

The undisputed material facts presented to this Court by Plaintiffs demonstrate that each of these defendants, as RICO "persons," acted culpably under the statute. There existed an organized enterprise, the ClassicStar Enterprise, engaged in or affecting interstate commerce in which each "person" played a specific role with a defined area of responsibility in conducting the enterprise's affairs, i.e., promoting and perpetuating the mare lease programs, alternative investments, and collecting funds to use for oil and gas programs, through a pattern of racketeering activity, i.e., mail and wire fraud, ultimately injuring each Plaintiffs' business and property.

Plaintiffs have identified the requisite number of predicate offenses and then some, the interstate nature of the enterprise, the connection between the pattern of racketeering activity and the enterprise, and injury by means of the fraudulent investment

scheme.  They have also successfully navigated their way through the more peculiar requirements of a claim under RICO.  They have identified RICO "persons" that are distinct from the "enterprise" itself and, thus, liable for wrongs committed under the statute.  They have brought forth adequate proof of the existence of an enterprise in addition to the pattern of racketeering activity.  Thus, Plaintiffs are entitled to judgment against Defendants Ferguson, Robinson, Parrott, David Plummer, Spencer Plummer, ClassicStar 2004, ClassicStar Farms, and GeoStar on their RICO claims.

## 1. Plaintiffs Have Identified a Pattern of Racketeering Activity and a Fraudulent Scheme

The court first turns its attention to whether Plaintiffs have identified a pattern of racketeering activity because a fraudulent scheme and the predicate acts of mail and wire fraud are first and foremost required for their claim to succeed.  Plaintiffs must demonstrate that the RICO "persons" conducted the affairs of the enterprise through a pattern of racketeering activity, i.e., at least two acts of racketeering activity within a ten-year period, including any act indictable under 18 U.S.C. §§ 1341 or 1343, the federal mail and wire fraud statutes.  18 U.S.C. § 1961(1), (5). 18 U.S.C. §§ 1341 and 1343 make it unlawful for a person who has "devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" to use the mails or wires

"for the purpose of executing such scheme or artifice."

A fraudulent scheme may be demonstrated by proof that it was reasonably calculated to deceive persons of ordinary prudence and comprehension, and communications of half-truths and concealment of material facts are both actionable. *See Irwin v. United States*, 338 F.2d 770, 773 (9th Cir. 1964); *United States v Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). Further, each defendant is liable whether or not that person personally made any misrepresentations. *See* 18 U.S.C. §§ 1341, 1343; *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir. 1995) ("a RICO violation based on the predicate acts of mail or wire fraud does not require an allegation of misrepresentation or common law fraud . . ."; plaintiff may establish the existence of a scheme to defraud coupled with forseeable use of the mail or wires); *Grange Mut. Cas. Co. v. Mack*, Civil Action No. 6:06-555-DCR, 2009 WL 1036092, at *7-8 (E.D. Ky. Apr. 17, 2009) (defendant attributed with submitting fraudulent bills to insurance companies when she directed employees to do so). Nor does each defendant have to be "a mastermind of the scheme to defraud; proof of a defendant's willful participation in a scheme with knowledge of its fraudulent elements is sufficient," and a defendant is not "exonerated by the fact that he may have participated in a scheme to a lesser extent than others." *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984). Further, "where sufficient circumstantial evidence is

presented, [the fact finder] may properly infer that the defendant was culpably involved from his conduct, statements, and role in the overall operation." *Id.* at 441.

Evidence linking each defendant with a scheme in which misrepresentations were made establishes the existence of a predicate act of mail or wire fraud as to that defendant. Thus, in *Beecroft*, the defendants were convicted of mail fraud and conspiracy to commit mail fraud where it was found that "each defendant made, or permitted or encouraged others to make, false misrepresentations." *Beecroft*, 608 F.2d at 756. The *Beecroft* defendants were officers in a company that purported to assist inventors with marketing and promoting their inventions, charging them fees for their services. *Id.* at 755. While the company had never marketed an invention successfully, it included misleading photographs and success claims in its brochures. *Id.* at 755-56. One of the defendants merely participated in meetings where the fraudulent brochures were discussed and approved and "expressed no disapproval and took no action to prevent the dissemination of the misrepresentations," even though he had the authority to question them as a corporate officer. *Id.* at 759. Such evidence "demonstrated his knowing involvement in the fraudulent scheme." *Id.* at 760.

In the series of transactions described by Plaintiffs, the Court is hard put to find a representation made about the Mare

Lease Programs and subsequent investments that was truthful. The lion's share of the investments were ultimately illusory (although the Court cannot ignore that some thoroughbred breeding actually occurred), the descriptions provided to investors omitted crucial facts, and, in large part, no one intended for the opportunities described to be realized. ClassicStar made a series of contracts with Plaintiffs to provide thoroughbred breeding pairings and stated, as a term of that agreement with each Plaintiff, that it owned the thoroughbreds that would populate the Mare Lease Programs in which the plaintiffs had invested. Yet, ClassicStar never owned enough thoroughbreds to populate the Programs it sold. Indeed, instead of the valuable thoroughbreds it promoted, ClassicStar consistently assigned Plaintiffs unnamed (and, as far as the evidence before this Court is concerned, non-existent) thoroughbred pairings or quarter horse breeding pairings of lesser value as part of their Programs. In either instance, the pairings, real or imagined, did not have nearly the value in relationship to the investment dollars paid in to ClassicStar as had been advertised. Further, the evidence shows that, even when named quarter horse pairings were assigned, Defendants never intended to deliver those interests actually provided. The quarter horses listed on the schedules did not belong to ClassicStar and were never actually leased, except on paper and as an afterthought, to ClassicStar by the Plummers, who did own them.

Contrary to representations made about the tax benefits enjoyed by participants and past allowances of the Program's tax benefits by the IRS, at least one participant's deduction had been disallowed. Further, no one revealed that David Plummer's earlier version of the operation had been raided by the IRS and that the IRS was investigating ClassicStar's Mare Lease Program as an abusive tax shelter as early as 2004. Further, and as part of the represented tax strategy associated with and touted alongside the investment in the Mare Lease Program, Plaintiffs' initial loans were supposed to be placed with an independent company so that their full amount could be deducted as part of the investment, but they were, instead, placed with NELC, which was controlled and funded by ClassicStar and GeoStar. The "loan" moved through the accounts, from ClassicStar to NELC and back to ClassicStar, within a day or so.

GeoStar then offered participants the option to exchange equine interests for oil and gas working interests and, later, FEEP units, and ClassicStar, the Plummers, and the other individual defendants played a part in encouraging that exchange, providing the mechanism (the shell, the paperwork, etc.) by which that would occur, and closing the "sale." Much like the breeding programs, the working interests for which exchanges were made were oversold, the FEEP units were never actually backed by assets, and – in fact – FEEP never operated. Further, even though GeoStar "guaranteed"

FEEP's promise to buy back Plaintiff's membership interests, it never made good on that promise. GeoStar also committed to buying back mare lease packages by offering promissory notes from subsidiaries – subsidiaries that had no cash or assets other than unpaid accounts receivable from other GeoStar related entities.

Plaintiffs have testified that they relied on Defendants' representations about the Mare Lease Program and these alternative investments and that they would not have made the initial investment, agreed to exchange their investment methods, or stayed invested in the Mare Lease Programs and alternatives for the time that they did, had they known the truth about the Program. But none of these realities – the underpopulation and overvaluation of the Mare Lease Programs, the issues with the IRS, the not-so-independent lender, the overselling of the working units in oil and gas interests, the lack of assets actually available in FEEP – were revealed to Plaintiffs. And the misrepresentations having been made to secure their investment, invest these Plaintiffs did, paying Defendants handsomely for the opportunities advertised. Whether Plaintiffs really wanted a chance to strike it rich in the equine industry, an opportunity to ultimately participate in the oil and gas industry, or simply to obtain the tax benefits promoted as a reason to participate in the Mare Lease Program or the investment alternatives (this being one of the rare cases where a loss can be as valuable as a win, depending on your

personal wealth, as the Court understands it), they relied on the representations and misrepresentations made before paying for that opportunity.

Further, Plaintiffs have identified no fewer than thirty-seven uses of the mails and wires for the purpose of executing the fraudulent scheme or artifice within a three year time frame which create a pattern of racketeering activity, ranging from letters, checks, and other items sent through the mails (either by means of the United States Post Office or private or commercial interstate carrier, as provided for under 18 U.S.C. § 1341) and large sums of money wired in interstate transmissions on at least 3 occasions. Among those were invoices and accountings, and mailings used to collect the proceeds of a fraudulent scheme or made by the scheme's victims may satisfy the requirement of mailing, as may mailings or use of the wires, even after payment, to lull victims into complacency. Here, Defendants used or caused to be used the mail or wires to send to Plaintiffs those illustrations describing the Mare Lease Program, promotional brochures explaining the Mare Lease Program, Letter Agreements, Mare Lease Agreements, other correspondence about payments due and summarizing income and expenses paid by each Plaintiff, Schedules describing assigned breeding pairings, and letters confirming receipt of payment. The Plaintiffs, themselves, used the mail and wires to make payments for the mare lease interests and send executed mare lease

agreements from their homes in Washington, Oregon, Wisconsin, and Nevada, to ClassicStar or GeoStar offices in Utah or Michigan. Indeed, ClassicStar agent Morishita has confirmed that ClassicStar primarily communicated with its clients by email or mail.

As for the intent of the Defendants, the Court concludes from the circumstantial evidence that they knew or – at the very best – recklessly disregarded the fact that the Mare Lease Program was represented as a viable program with sufficient stock to meet its obligations, even though it could not. Spencer and David Plummer have admitted that they knew there were not enough horses to populate the Mare Lease Programs sold, yet they sold the Programs anyway, even knowing that GeoStar was making massive transfers of funds from ClassicStar, leaving it undercapitalized, and orchestrating loans through NELC to encourage more investments in Mare Lease Programs that were oversold. GeoStar and its principals owned and controlled ClassicStar, and GeoStar agents maintained ClassicStar's general ledger, had exclusive control and signatory authority over ClassicStar accounts, and – most tellingly – received more than $114 million in mare lease revenues. The knowledge and intent of GeoStar's officers and agents is imputed to them, and Ferguson, Robinson, and Parrott were all in attendance at executive meetings where ClassicStar's business was discussed. They also received summaries of ClassicStar's assets and, knowing what they had to have learned from that data about the absence of

stock to support the sales of Programs made, they all attended and participated in sales presentations.

As described in the facts above, each of the Defendants participated in and furthered the scheme to defraud Plaintiffs and were part of an association-in-fact enterprise. ClassicStar was the marketing vehicle, GeoStar directed the finances, GeoStar and Gastar organized and held (or purported to hold) the mineral portions of the combined programs and provided financial clout to reassure investors, NELC was the not-so-independent lender, and FEEP, GFSC, and other shell companies disguised the overselling of the Programs and staved off the discovery of the fraud and the fall-out. Ferguson, Robinson, and Parrott were the owners and principals of GeoStar and controlled it. Since they controlled GeoStar and GeoStar controlled ClassicStar, they likewise controlled ClassicStar. But their involvement did not stop there, for these men were shapeshifters when it came to the enterprise. At various times, these men represented themselves to Plaintiffs as officers of GeoStar, Gastar, or ClassicStar, or some combination of these entities. The evidence is such that the Court can easily conclude that each of these individuals was aware of the plan and the misrepresentations (as well as the likelihood and reality that the mails and wires would be used during the scheme).

The Court concludes that, over the three year period described, from 2003 through 2006, the pattern of racketeering

activity, i.e., defendants's predicate acts of mail and wire fraud, were related and continuous and continued for a sufficiently long period of time. In each instance, the defendants used or intended the use of the mails or the wires in an effort to gain investments to use for their own purposes and not to provide the bargained for opportunities to Plaintiffs (and others). *See H.J. Inc. Nw. v. Bell Tel. Co.*, 492 U.S 229, 239-40 (1989) (predicate acts are sufficiently related when they have the same or similar purposes, results, participants, victims, or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated events). The conduct was repeated over and over again – the same presentations and representations made to the various plaintiffs, the same types of mailings made, and the repeated expectation that money would be transferred to ClassicStar by the mail and wires. *Id*. at 241-42 (continuity can be established by showing closed period of repeated conduct or past conduct that by its nature projects into the future with threat of repetition). Further, each mailing or use of the wires constitutes a separate violation. *See In re Best Distribution Co.*, 576 F.2d 1360 (9th Cir. 1978). Here, there is evidence of multiple mailings and frequent use of the wires (far more than the two instances required) in furtherance of the scheme within the relevant 10-year time period.

Plaintiffs have alleged more than a dozen predicate acts

comprised of fraudulent communications by mail and wire, both among the defendants, from the defendants to the plaintiffs, and from the plaintiffs to defendants. Whether through the marketing materials describing the Programs, the initial contract documents which obligated Plaintiffs to participate in the Programs or the payments made by Plaintiffs from which each of these defendants directly benefitted, Defendants acted with the intent and the knowledge that the mails and wires would be used in this way to further the scheme. They also acted with a common purpose to induce Plaintiffs to participate in and to remain in the Mare Lease Program or the alternative investments. These acts over the period of time described are enough to establish the requisite continuity of the activity. *See, e.g.*, *Brown v. Cassens Transport Co.*, 546 F.3d 347, 355 (6th Cir. 2008) (series of related predicate acts spanning over period of three years constituted period of closed-ended continuity).

As set forth above, these corporate and individual defendants knowingly participated in a scheme to defraud Plaintiffs and acted from the beginning with knowledge of the common purpose to utilize the Mare Lease Program as a mechanism to finance development of oil and gas properties. Plaintiffs have established that each defendant was an integral part of the enterprise without which the primary goal of the enterprise would not be accomplished. Plaintiffs have established as set forth in detail above that at

various times throughout the scheme each defendant either made decisions on behalf of the enterprise or knowingly carried out those decisions. In addition to the involvement of the corporations in providing the investments, the loans, the funding, the transfer of funds, and other activities, the Plummers have admitted to promoting the Mare Lease Program with knowledge of the lack of horses to support the commitments to Plaintiffs. Robinson took every action described while keenly aware of the finances and the undercapitalization of ClassicStar considering its obligations. Parrott reviewed and approved marketing materials used by ClassicStar including the attorney opinion letters, and Ferguson personally promoted and hired sales representatives. Plaintiffs relied upon the representations made to them that were part and parcel of this scheme and the end result of every effort made by these Defendants. That is enough to establish a fraudulent scheme which, by its duration and the number of instances of mail and wire fraud, constitutes a pattern of racketeering action for the purposes of § 1962(c).

### 2.   Plaintiffs Have Identified RICO Persons and an Enterprise

Defendants Ferguson, Robinson, Parrott, David Plummer, Spencer Plummer, ClassicStar 2004, ClassicStar Farms, and GeoStar, as well as ClassicStar and Gastar, are "persons" who may be held liable for violations of § 1962(c). Further, Plaintiffs have identified an enterprise, the "ClassicStar Enterprise,"

-63-

which is an association-in-fact of those persons and sufficiently distinct from the persons comprising it for the purposes of their RICO claim.

Under § 1961(3), a RICO "'person' includes any individual or entity capable of holding a legal or beneficial interest in property." The individual persons (Ferguson, Robinson, Parrott, and the Plummers) and the corporate entities (ClassicStar, Gastar, ClassicStar 2004, ClassicStar Farms, and GeoStar) named as RICO defendants are each capable of holding a legal or beneficial interest in property and, thus, qualify as "persons" for the purposes of § 1962(c).

An enterprise includes "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). In this instance the evidence of such an enterprise is striking. The RICO defendants operated an association-in-fact enterprise to persuade investors to participate in the Mare Lease Program and, subsequently, alternative investment schemes in order to fund oil and gas interests of interest to GeoStar. Because of the interconnected nature of the RICO "persons," through corporate

affiliations, employment relationships, and ownership interests in the various businesses involved, everyone benefitted from the wealth to be gained from these interests. Of course, they were persuading investors to invest in business opportunities which were not everything that they purported them to be, which will be discussed elsewhere in this Memorandum Opinion and Order.

The ClassicStar Enterprise described by Plaintiffs is complex but, at its foundation, the "persons" comprising the association-in-fact enterprise intended to sell more and more Mare Lease Programs, even with the knowledge that the Programs sold could not all be sustained with the thoroughbred breeding interests that ClassicStar had on hand or could acquire. While some thoroughbred interests existed, the goal was clearly to sell as many Programs as possible, whether or not enough stock existed to support them, and the use of the mails and wires to accomplish this (for the dissemination and receipt of program and investor information and monies) was clearly anticipated - and realized on many occasions.[26] These sales were fueled by a marketing campaign

_____

[26]     As in their earlier Motions to Dismiss, Parrott and the GeoStar defendants argue that Plaintiffs have failed to identify with sufficient particularity any racketeering activity, i.e., instances of mail and or wire fraud, performed by Robinson, Parrott, or Ferguson and have, thus, failed to identify a valid RICO enterprise with respect to these Defendants. While the Sixth Circuit requires Plaintiffs to identify with specificity the actions that each defendant has taken in furtherance of the alleged fraud, *see, e.g., Central Distr. Of Beer, Inc. v. Conn*, 5 F.3d 181 (6th Cir. 1983) and *In re Reciprocal of America (ROA) Sales Practice Litigation*, Master No. MDL 1551 Civ. No. 04-2078, 2007 WL

which touted the possibility of return on the investment (albeit with risk) and the tax benefits available to those who participated, both of which relied on the actual existence of the horses and the assumption of risk taken on in bearing the expense of maintaining and breeding those horses.  The money brought in through those sales was, in turn, used in whole or in large part to

2900285, *8 (W.D. Tenn. Sept. 28, 2007), the law makes no requirement that *each* defendant involved must have personally made a misrepresentation to a plaintiff or used the mails or wires.  To satisfy the particularity requirement, a plaintiff need only allege that each RICO defendant participated in a scheme to defraud knowing or having reason to anticipate the use of the mail or wires would occur and that each such use would further the fraudulent scheme. *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.*, 176 F.3d 315, 322 (6th Cir. 1999).  "It is not necessary to allege that the defendants have personally used the mail or wires; it is sufficient that a defendant 'causes' the use of the mails and wires." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 76 (E.D.N.Y. 2006); *Beard v. Worldwide Mortgage Corp.*, 354 F.Supp.2d 789, 802-803 (W.D. Tenn. 2005) (*citing United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001); United States v. Brown, 146 F.3d 477, 488 (6th Cir. 1998); United States v. Oldfield, 859 F.2d 3992, 400 (6th Cir. 2008)) (personal use of the mail or electronic communication is not required to state a claim for mail or wire fraud).

　　As set forth in this Court's earlier decision on the Defendants' Motions to Dismiss Plaintiffs' Fourth Amended Complaint, Plaintiffs identified the fraudulent misrepresentations made to them with sufficient particularity to survive a motion to dismiss.  They have also identified the use of the wires and mails as part of the scheme.  These averments have been borne out in the proof offered in support of their Motion for Summary Judgment.  It is undisputed that misrepresentations were made to the Plaintiffs in order to induce their participation in the Mare Lease Programs and that the mails and the wires were used as part and parcel in the scheme to induce their participation.  Further, the facts demonstrate that Defendants caused or had reason to know of the use of the mails and wires as an integral part of their scheme to defraud Plaintiffs.  It is irrelevant that a particular utterance of the misrepresentation was not spoken by every one of their lips or that it did not flow from every one of their pens.

fund other ventures in which Plaintiffs had no interest. Of course, the ClassicStar Enterprise would have never been as successful at raising so much capital for the RICO defendants interests if the RICO "persons" had not been involved in a fraudulent scheme to sell more Mare Lease Programs than Classicstar's assets could support and to cover up the overselling of the Mare Lease Programs so that the monies remained invested and the funding of Defendants' interests could continue. When it became necessary to cover up the overselling, make it appear that the investor Plaintiffs had received the benefit of their bargain with ClassicStar (i.e., other investment interests or the legitimate and well founded opportunity to take advantage of tax deductions because of their investments), and make sure that no one wanted their investment monies returned, the alternative investment mechanism was devised and employed by the "persons" involved in the ClassicStar Enterprise.

Further, the facts before this Court detail the interactions of each of the corporate and individual "persons" working in concert as an "association-in-fact" to effect the ends of the enterprise to Plaintiffs' detriment. ClassicStar was the marketing vehicle, GeoStar directed the finances, GeoStar and Gastar organized and held (or purported to hold) the mineral portions of the combined programs and provided financial clout to reassure investors, NELC was the not-so-independent lender which

facilitated the large investments, and FEEP, GFSC, and other shell companies disguised the overselling of the Programs, staving off the discovery of the fraud and the fall-out. Ferguson, Robinson, and Parrott were the owners and principals of GeoStar and controlled it. Since they controlled GeoStar and GeoStar controlled ClassicStar, likewise controlled ClassicStar. But their involvement is not so simply explained, for these men were shapeshifters, representing themselves to Plaintiffs as officers of GeoStar, Gastar, ClassicStar, or some combination of these entities. These individuals, together with accountants, attorneys, and salespeople, developed and maintained the Mare Lease Program run by ClassicStar, developed marketing materials and documents that would draw investors in by touting returns based on equine stock owned by ClassicStar and the tax benefits that would flow from participation in the program as advertised, devised and refined documents that would bind investors to the program, orchestrated what appears to be - on the whole - minimal funding for the equine programs, and directed or permitted the flow of investor dollars away from the equine programs and into other endeavors in which investors like Plaintiffs had no interest and from which they had no hope of return.

The RICO enterprise must, as Defendants insist, be distinct from the "persons" comprising it. In other words, a RICO plaintiff may not allege a RICO enterprise which is, in reality, the

corporate "person" liable for the action. *See, e.g., Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000); *Old Time Enters., Inc. v. Int'l Coffee Corp.*, 862 F.2d 1213, 1217 (5th Cir. 1989). To do so would mean that RICO:

> . . . would encompass every fraud case against a corporation, provided only that a pattern of fraud and some use of the mails or of telecommunications to further the fraud were shown; the corporation would be [a] RICO person and the corporation plus its employees the 'enterprise.' The courts have excluded this far-fetched possibility by holding that an employer and its employees cannot constitute a RICO enterprise.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) (citations omitted); *see also Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1489 (6th Cir. 1989) (holding that where corporation is acting by and through its employees, it is acting in the only manner it is possible for a corporation to act and that corporation cannot be both the person and the enterprise for the purposes of a 1962(c) claim); *Yellow Bus Lines*, *Inc., v. Drivers Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 141 (D.C. Cir. 1989) (holding that an accused union organization could not associate with its own members to form a RICO enterprise which was itself and that § 1962(c) immunizes organizations which are merely victims); *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (holding company not liable for RICO violation simply because it purchased shares of plaintiffs' notes from its subsidiary, a

bank, because the bank, holding company, and employees had no distinct existence apart from the bank and could not constitute an enterprise).

While plaintiffs may not use RICO to impose liability vicariously on corporate "enterprises" because it would violate the distinctness requirement, vicarious liability under § 1962(c) is "'appropriate' in cases like this one, where the corporate principal is distinct from the RICO enterprise and 'is alleged to have attempted to benefit from its employees' racketeering activity.'" *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 379 (6th Cir. 1993) (quoting *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1361-62 (3rd Cir. 1987)).

In *Davis*, an insurance company was held liable as a "person" because of the actions of its agent (also a RICO "person"), an individual who sold life insurance policies for the defendant insurance company through his own company (which was named as the RICO "enterprise"), by which investors were defrauded. *Id.* at 371. Specifically, that agent told investors that, if they purchased policies in conjunction with the formation of a home-based business, they could potentially eliminate their federal income tax liability. *Id.* He and his associates went so far as to prepare tax returns for his clients, claiming very liberal business expenses, but clients found that, when audited, the deductions were mostly invalid. *Id.* at 371-72. Those clients were then assessed

hundreds of thousands of dollars in additional taxes, penalties, and interest by the IRS. *Id*. at 372. Because the insurance company actively promoted and sponsored the scheme enacted by its agent through his company, it had allowed and encouraged the scheme with knowledge of the fraud in violation of § 1962(c) and was liable for it. Specifically, the insurance company's officers had attended seminars, listened to presentations, and recruited employees to work in the combined insurance and tax program, then accepted and retained premiums. *Id.* at 374-75, 379-80.

Here, the ClassicStar Enterprise is distinct from GeoStar and was so much more than just a parent and its subsidiaries going about their business. GeoStar actively promoted and sponsored, facilitated, and participated in the scheme enacted by its agents and subsidiaries. GeoStar agents kept the books for ClassicStar and was, through its agents, undoubtedly aware of the shortfall of breeding stock for the Mare Lease Programs, the underfunding of ClassicStar by virtue of its own withdrawals from ClassicStar's coffers, and the diminished ability of ClassicStar to offer any hope of return to its investors in what was already a risky business, equine breeding, because of its lack of stock and lack of capital to obtain that stock. Its own agents, including David Plummer, agents of its subsidiaries, and others marketed the ClassicStar Mare Lease Progam offerings and the alternative investments that would ultimately mask the underpopulation and

overvaluation of the equine stock maintained by ClassicStar to support the Mare Lease Programs. The interconnectedness of the various parties, as corporate entities, agents, and officers of one another does not mean, however, that the ClassicStar Enterprise was GeoStar. As taught in *Davis*, such analysis is not applicable in cases where the alleged enterprise is an association-in-fact enterprise of which a corporation is but one member, even if the other members of the association-in-fact enterprise have relationships amongst themselves. *See Davis*, 6 F.3d at 378-79; *see Fleischhauer v. Feltner*, 879 F.2d 1290, 1296-97 (6th Cir. 1989) (upholding RICO verdict in a matter where the plaintiffs alleged a distinct enterprise and an association-in-fact comprised of two individuals and three corporations and concluded that the fact that one of those individuals owned 100% of all three corporations did not prevent them from being legally distinct entities capable of forming an association-in-fact enterprise).

Plaintiffs' Fourth Amended Complaint avers and the facts brought forth in support of their RICO claim demonstrate that they were injured by an enterprise which existed separate and apart from GeoStar in which GeoStar acted together with other "persons" (which, admittedly, included GeoStar's officers, employees, and subsidiaries) to harm them. GeoStar is a key "person" in the enterprise, although it was one among many. Thus, it is permissible to hold GeoStar (and any of the other corporate

defendants listed, for that matter) vicariously liable for the actions of its agents who are also participants and "persons" in the "association-in-fact" for violations of § 1962(c) attributable to that enterprise.[27]  The Court will not conflate the notion of the corporation-as-enterprise with the situation where a corporation like GeoStar is a "person" distinct from the "enterprise" and concludes that Plaintiffs have identified a RICO "enterprise" which is sufficiently distinct from the RICO "persons" in this matter.

Further, Plaintiffs have met their burden of demonstrating that the ClassicStar Enterprise, an association-in-fact comprised of the RICO Defendants, has an existence separate and apart from the racketeering activities, i.e., mail and wire fraud, conducted. Contrary to Defendant Parrott's argument that there must be separate proof of an enterprise's existence, beyond those facts demonstrating that racketeering  activities occurred, relying on *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995) (holding that enterprise must carry on some activity aside from the allegedly unlawful activities described in the complaint), the United States

---

[27]  The Court understands from Defendants' argument that they are truly asking the Court to protect them from the de facto and de jure veil piercing opportunities available in a RICO matter which is properly pleaded and supported.  The Court, however, can only afford them such protection as the statute permits by its own terms.  Because the distinctness requirement of 18 U.S.C. § 1961(4) has not been violated, their concern is one for the legislature, not this Court

Supreme Court has made it clear that the same evidence may support both the existence of a pattern of racketeering activity and the existence of the enterprise. *Boyle v. United States*, __ U.S. __, 129 S.Ct. 2237 (2009).

To establish an association-in-fact enterprise, a plaintiff must show only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 2244. No hierarchical or structural attributes are required; rather, the group "is simply a continuing unit that functions with a common purpose." *Id*. at 2245. To say that a plaintiff must show proof of the existence of an enterprise "beyond that inherent in the pattern of racketeering activity" means simply that "the existence of the enterprise is a separate element that must be proved," and evidence of an enterprise may be inferred from the same evidence establishing the pattern of racketeering activity. *Id*. For this reason, the *Boyle* court affirmed the conclusion that a group of bank robbers who stole night deposit boxes over a period of several years constituted a RICO enterprise, despite the defendant's claim that the group lacked ascertainable structure separate from the crimes it committed and despite the fact that the group carried on no other activity other than the criminal activity which was the racketeering activity for the purpose of the RICO claim. *Id*. at 2242.

This Court reaches a similar conclusion in the instant matter. The absence of some sort of formal structure for the ClassicStar Enterprise (which is particularly notable when the fluid and mobile enterprise is juxtaposed against the byzantine structure of the formal and legally recognized corporations, shells, officers, and agents that are the "persons") is not dispositive. Rather, the facts show that the RICO "persons" worked together to conduct a scheme of fraud to take in money to support their own ends over several years, long enough to permit these associates to pursue the ClassicStar Enterprise's purpose and take in millions of dollars to fund their own endeavors. Frankly, those facts are enough to prove the existence of the enterprise. It is of no consequence that the same facts support the conclusion that there existed a pattern of racketeering activity. *See id.*

### 3. Defense of In Pari Delicto

The Plummer Defendants insist that Plaintiffs cannot succeed as a matter of law on Counts I and II because there is a genuine issue of material fact as to whether Plaintiffs were *in pari delicto* with Defendants. The defense of *in pari delicto* is a simple construct: "In the case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (U.S. 1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)). "The defense embodies 'the common-law notion that a plaintiff's

recovery may be barred by his own wrongful conduct.'" *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)).  The purpose of the doctrine is twofold:

> Courts apply the defense to protect judicial integrity and to deter wrongdoing.  "The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler*, 472 U.S. at 306, 105 S.Ct. 2622 (footnotes omitted); see also *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) ("'No Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'") (quoting In re Dow, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)); In re Amcast Indus. Corp., 365 B.R. 91, 123 (Bankr. S.D. Ohio 2007) (noting that the doctrine "prevents one wrongdoer from recovering from another because each should bear the consequences of their wrongdoing without legal recourse against the other").
>
> The *in pari delicto* defense is available only when: (1) the plaintiff bears "at least substantially equal responsibility" for the wrongs he seeks to redress, and (2) preclusion of suit would not "significantly interfere" with the purposes of the law or harm the public interest. *Bateman Eichler*, 472 U.S. at 310-11; *Pinter v. Dahl*, 486 U.S. 622, 633 (1988).

*In re National Century Financial Enterprises, Inc.*, __ F. Supp. 2d __, 2011 WL 1397813, *7 (S.D. Ohio) (S.D. Ohio Apr. 12, 2011).

While the Sixth Circuit has not yet reached this issue, Courts in other circuits have held that *in pari delicto* can be valid

defense to a civil RICO claim because "[t]o allow co-conspirators to recover from each other would not, as the [Eleventh Circuit has] pointed out, deprive violators of their ill-gotten gains, but would transfer the ill-gotten gains between them." *Rogers*, 521 F.3d at 387-89 (citing *Official Comm. Of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152-56 (11th Cir. 2006)). The Court assumes, for the sake of argument, that the defense of *in pari delicto* would apply with respect to a RICO claim in the Sixth Circuit.

Having considered the matter, the undisputed evidence does not support a finding that Plaintiffs were as culpable for Defendant's wrongdoing as were defendants. First, there is no evidence that Plaintiffs knew of the underlying problems with the program when they invested or even well into their participation in the Programs – the underpopulation of horses for the number of Programs sold, the overvaluation of the available horses, or the fact that ClassicStar was funding NELC on a transaction by transaction basis. Nor is there evidence that these plaintiffs were aware of the illusory nature of the alternative investments that they were offered when they sought to transfer their equine interests for those alternatives in order to obtain something of value for their investment (whether that value is understood to be the possibility of return on the investment or the potential for tax deductions). That knowledge would be necessary for these Plaintiffs to be

considered the type of co-conspirator who was *in pari delicto* with the defendants.

True, as Defendants pointed out, no one forced Plaintiffs to participate in the scheme or in the risky equine business, and Plaintiffs were free to seek legal counsel to advise them. That does not change the fact that Defendants misrepresented the program to them in the first place. Defendants have offered no proof that, in fact, Plaintiffs had it within their power to and did discover the truth of the matter.

The fact that Plaintiffs might also "be on the hook" with the IRS for tax issues because they participated in or based deductions on the scheme provided to them by Defendants is irrelevant to the issues before this Court. So is the fact, as argued by the Plummers that shortly after engaging in their first Mare Lease Programs, these Plaintiffs knew that the investment was not structured so that they could receive the tax benefit promoted to them because, regardless of what they invested in, they each traded most of their mare lease programs for something else (whether to pay off their long term NELC debt and receiving alternative investments like promissory notes and securities).[28] Even if they

---

[28] Nor is the Court persuaded that it is particularly meaningful that, when these Plaintiffs were presented with performance horse pairings that they did not want, they did not ask for their money back or seek to reduce the program participation only to the thoroughbred pairings or ask for different pairings. No one disputes that, for the most part, they accepted the Schedules presented to them and proceeded to take the tax

were advised, by the tax opinions or advisors, that the investments would need to be and remain at risk of loss in order to obtain the desired tax benefit, the evidence remains that they did not know about the true nature of the program and its severe lack of assets when they made their investment. The Court is not willing to conclude, on these facts, that Plaintiffs bore equal responsibility for the wrongs they claim to have suffered at the hands of Defendants. The defense of *in pari delicto* will not aid Defendants on the facts before the Court.

### 4. Conspiracy

As to Plaintiffs' averment that, in violation of § 1962(d), the RICO Defendants conspired to violate § 1962(c), the Court is persuaded that the undisputed evidence demonstrates such a

---

deductions, then sought to transform the investment into something else. Even so, it does not change the nature of the underlying deception about the assets of the Mare Lease Program.

The Plummers also bring to the Court's attention that Sackhoff's wife attended a Hands-on Horse Care Conference at the Buffalo Ranch facility in Utah in August 2004 at which David Plummer explained to her that the leasing of performance horses and thoroughbreds was "how we put the packages together . . . We will sell the performance horses to pay off all your loans, your taxes, your interest, your board, and all of that." It is not clear how this is meaningful with respect to the fact that Defendants were told that they would receive one thing (thoroughbreds) in their Agreements, then received another (combination packages), if they received anything at all.

Nor is the Court particularly troubled by the fact that at least some of the Plaintiffs participated in subsequent years, knowing they had been subject to a "bait-and-switch" in prior years. Where the same misrepresentations were made again, with promises to do better, the Court is not tempted to adopt a "once bitten, twice shy" requirement for RICO claims involving investment fraud like the one at bar.

conspiracy. A RICO conspiracy is shown by the existence of an enterprise and the agreement that two predicates will be committed by at least one of the co-conspirators. *United States v. Joseph*, 781 F.2d 549 (6th Cir. 1986). Further, a conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in common plan. *United States v. Hughes*, 505 F.3d 578, 594 (6th Cir. 2007) (discussing necessary proof of conspiracy for purposes of 18 U.S.C. § 371). While "[a] meeting of the minds must be demonstrated, no formal agreement is necessary." *Beecroft*, 608 F.2d at 757. Plaintiffs need not demonstrate that each defendant was aware of every detail of the scheme or that "[e]ach participant in the in the conspiracy . . . [knew] what other participants are doing, or why." *Id.* (quoting *United States v. Jones*, 425 F.2d 1048, 1051 (9th Cir. 1970)). Once a conspiracy is demonstrated, "slight evidence is all that is required to connect a defendant with the conspiracy." *Id.*

The Court has already determined that these Defendants were the members in an association-in-fact enterprise which carried out a scheme to defraud. In light of the evidence of their participation in and their roles in the enterprise, the Court concludes that these defendants participated in a common plan to defraud Plaintiffs through the pattern of racketeering activity described elsewhere in this Memorandum Opinion and Order and are liable for conspiracy to violate § 1962(c).

**B.    Fraud**

In the Commonwealth of Kentucky, "[a] party claiming harm from fraud must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (fraud through direct misrepresentation); *Smith v. General* Motors Corp., 979 S.W.2d 128, 130 (Ky. Ct. App. 1998) (failure to disclose may be actionable where one party to a contract has superior information and is relied upon to disclose same when it fails to do so or where reliance is based on only a partial disclosure); *Raymond-Elderedge Co., Inc. v. Security Realty Inv. Co.*, 91 F.2d 168, 173 (6th Cir. 1937) (one who clothes another with the power to commit fraud and then remains silent may be liable); *Lappas v. Barker,* 375 S.W.2d 248, 272 (Ky. 1963) (one who aids and abets fraud by a fiduciary becomes jointly liable); *Kirby v. Firth*, 311 S.W.2d 799, 802 (1958) (one who accepts proceeds of agents' fraud with knowledge ratifies that fraud and becomes liable because, "[t]hough innocent himself at the time of the misrepresentation, one may not accept the fruits of a business deal and at the same time disclaim responsibility for the measures by which they were acquired.").

The Court has already determined that misrepresentations were

made, as described, above and explained how and when they were made by defendants or their agents to Plaintiffs, and they have been proven by clear and convincing evidence.  These misrepresentations – about the availability and ownership of thoroughbred horses to populate the Mare Lease Programs purchased, the value of the horses listed in the Schedules provided and upon which the investment price was based, and the independence of NELC and the nature of the funding for the NELC loans – were made repeatedly by David Plummer, Ferguson, Spencer Plummer, and Parrott and Robinson.  These individuals made this misrepresentations during presentations to or in conversation with Plaintiffs' principals or agents, in written materials, including contracts and opinions prepared and reviewed by the defendants, then provided to Plaintiffs' principals or agents, as specified in the discussion and description of facts above.

Further, each of the individual Defendants were involved, as described above, in the marketing of the program (presentations and individual contact with Plaintiffs), the preparation of schedules, the preparation of contracts, and/or the development of the marketing materials in and by which these misrepresentations were made.  It can be easily inferred from their actions and the information available to them and, in the case of the Plummers, their direct admissions, that they knew or should have known that the statements or omissions failed to accurately represent the

realities of the investment scheme.

Further, each of these defendants aided and abetted one another in making these misrepresentations by virtue of their participation in the fraudulent scheme, described above. Robinson, Parrott, and Ferguson, both as agents of GeoStar and ClassicStar and – considering their roles in the scheme described as an enterprise for the purposes of civil RICO – of their own accord, knowingly and intentionally clothed the Plummers with the power to commit fraud on Plaintiffs by providing them with the authority and the tools to sell the Programs by means of the misrepresentations described above and are, thus, liable for his actions. Geostar and ClassicStar are, in any event, liable for the acts of their agents – David Plummer, Ferguson, Spencer Plummer, Parrott, and Robinson.

As described above, these Defendants intended in each and every instance for potential investors, including Plaintiffs, to rely upon their misrepresentations in deciding whether to invest in the Mare Lease Program. These misrepresentations were made during sales presentations and conversations with Plaintiffs' agents and principals and those made in the marketing materials, schedules, and contracts provided to Plaintiffs. Defendants made those statements to induce participation in ClassicStar's Mare Lease Program in order that they could have those invested monies available to fund other endeavors, in which Plaintiffs had no interest. Plaintiffs did invest, basing their decision to do so on

those misrepresentations regarding ClassicStar's ownership of the equine stock, the value of the equine stock, participation in the equine breeding industry with the potential for foals, the relationship of their investment cost to that value, and the availability of tax benefits as a result of participation which relied on the program and its attendant risks being as described in the descriptions of the program, i.e., actual thoroughbred breeding opportunities valued as described. Plaintiffs invested to their detriment since they did not receive what they had been promised – the opportunity to assume the burdens and benefits of risk attendant in breeding thoroughbreds in instances where the promised thoroughbreds were not provided and any advertised opportunities, including profits or tax benefits, that could flow from that assumption of risk.

### C. Breach of Contract for Mare Lease Agreements

To establish a breach of contract, Plaintiffs must establish the existence of a contract, breach of that contract, and damages flowing from the breach of contract.[29]  *Brown v. Kinross Gold*

---

[29]  When a United States District Court is confronted with state law claims, that court uses the conflict of law rules of the forum state in which it sits to determine which state's substantive law will govern. *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000).  Kentucky courts look to see which state has the most significant relationship to the transaction and the parties.  *Breeding v. Mass. Indem. and Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982) (explaining Kentucky's abrogation of the *lex loci contractus* rule in favor of the most significant relationship test).  In the instant matter, Plaintiffs have indicated through their briefing that whatever law is applicable among those states

*U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008); *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007); *Hess v. Cannon Twp.*, 696 N.W.2d 742 (Mich. Ct. App. 2005); *Steele v. Pacesetter Motor Cars, Inc.*, 672 N.W.2d 141, 144 (Wis. Ct. App. 2003); *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) (citing *Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)); *Pawlak v. Redox Corp.*, 453 N.W.2d 304 (Mich. Ct. App. 1990).

It is undisputed that Plaintiffs entered into several agreements with ClassicStar to participate in the Mare Lease Programs, first executing Letter Agreements binding them to a schedule of payments and to executing the Mare Lease Agreements, which were subsequently executed by Plaintiffs. No one disputes that Plaintiffs made the required payments to ClassicStar or that ClassicStar failed to live up to its agreements with each of these parties to provide all of the promised thoroughbred pairings (replacing the promised offerings with quarter horse pairings of significantly less value if pairings were provided or available at all), ultimately depriving Plaintiffs of the benefit of their bargain.[30]

---

which might be considered to have the most significant relationship to the transactions and the parties, the result is the same. The Court agrees, as indicated above, and will not engage in any detailed choice of law analysis as a result.

[30] Plaintiffs have reached a settlement with ClassicStar as to this claim, and no one disputes that one of the central tenets

What is left before the Court then, is the question of what damages are available based on these breaches and whether Defendants GeoStar, Ferguson, Robinson, and Parrott are liable for them on a theory of alter ego or instrumentality. The Court will consider these issues in reverse order.

With respect to which jurisdiction's corporate veil piercing law applies in this case, this is largely an academic question. On the facts presented to this Court, the corporate veils of ClassicStar and GeoStar are appropriately pierced, whether the laws of the forum state (Kentucky) or the jurisdictions of incorporation (Utah for Classicstar and Delaware for GeoStar) are applied. *See First Const., LLC v. Gravelroad Entertainment, LLC*, 6:07-cv-155-DCR, 2008 WL 2038878 (E.D. Ky. May 12, 2008) (applying Kentucky law to resolve issue of piercing corporate veil of Tennessee corporation because there existed sufficient contacts and no overwhelming interests to the contrary); *Thomas v. Lytle*, 104 F.Supp.2d 906, 927 (M.D. Tenn. 2000) (applying law of state of incorporation to determine whether corporate veil should be pierced) (citing *United States v. Daugherty*, 599 F.Supp. 671, 673

_____

of that agreement – the representation that ClassicStar owned the interests in the horses that it claimed to have – was untruthful and that ClassicStar could not provide the types of pairings that it had agreed to provide to Plaintiffs. Whether the benefit of Plaintiffs' bargain with ClassicStar was to have been the breeding opportunity purchased, the ability to lawfully claim the tax deductions based on those pairings as promised, or some combination of both, no one disputes that they did not receive that for which they contracted.

(E.D. Tenn. 1984); *Soviet Pan Am Travel Effort v. Travel Committee, Inc.*, 756 F.Supp. 126, 131 (S.D.N.Y.1991) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."); 1 Fletcher Cyclopedia of Private Corporations § 41.90 (perm. ed. rev. vol. 1999) ("Although the choice of which state's law is to be applied in a diversity case is determined by the law of the forum state, the state of incorporation has the greater interest in determining when and if the corporate veil is to be pierced.")).

Under Kentucky law, courts will disregard the corporate entity and hold another entity or individual liable where the corporate form is abused. *White v. Winchester Land Development Corp.*, 584 S.W.2d 56, 61-62 (Ky. Ct. App. 1979) (explaining that Kentucky recognizes three theories of "piercing the corporate veil": (1) the instrumentality theory, (2) the alter ego theory, and (3) the equity formulation). "[T]he three prongs of the instrumentality theory of piercing the corporate veil that must be established in order to warrant piercing are that the corporation was a mere instrumentality of the shareholder; that the shareholder exercised control over the corporation in such a way as to defraud or to harm the plaintiff; and that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss." *Daniels v. CDB Bell,*

*LLC*, 300 S.W.3d 204, 213 (Ky. Ct. App. 2009) (citing *White*, 584
S.W.2d at 61).  The alter ego formulation requires a demonstration
"(1) that the corporation is not only influenced by the owners, but
also that there is such unity of ownership and interest that their
separateness has ceased; and (2) that the facts are such that an
adherence to the normal attributes . . . of a separate corporate
existence would sanction a fraud or promote injustice." *White*, 584
S.W.2d at 61-62.  "[T]he decision as to whether to pierce the
corporate veil is an equitable one to be decided by the trial court
and not the jury." *Daniels*, 300 S.W.2d at 213.  The corporate veil
should be pierced only "reluctantly and cautiously" and then only
where some combination of the following factors is present:
undercapitalization, failure to observe formalities of corporate
existence, nonpayment or overpayment of dividends, siphoning off of
funds by the dominant shareholders, where the majority shareholders
have guaranteed corporate liabilities in their individual
capacities, and where commingling of personal and corporate funds
has occurred.  *White*, 584 S.W.2d at 62.

In order to justify piercing the corporate veil under Utah
law, this Court must find that:

> (1) there [was] such unity of interest and
> ownership that the separate personalities of
> the corporation and the individual no longer
> exist, viz., the corporation is, in fact, the
> alter ego of one or a few individuals; and (2)
> the observance of the corporate form would
> sanction a fraud, promote injustice, or an
> inequitable result would follow.

*Salt Lake City Corp. v. James Constructors, Inc.*, 761 P.2d 42, 46-47 (Utah Ct. App. 1988) (quoting *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).  The factors to consider include whether there is:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporation entity in promoting injustice or fraud.

*Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987) (citations and footnotes omitted).

Delaware courts look to many of the same factors as ~~Kentucky~~ Utah courts, including whether:

> (1) corporate records were kept, (2) corporate formalities were observed, (3) officers and directors functioned properly, (4) the dominant shareholder(s) siphoned corporate funds, and, (5) the corporation was a mere facade for the dominant shareholder(s). *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del. 1988). The Delaware courts explain that a plaintiff must demonstrate a level of complete domination and control by the shareholder over the corporation in order to state a cognizable claim to pierce the corporate veil. *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999). "There also must be an element of fraud to justify piercing the corporate veil." *Case Financial,*

> *Inc. v. Alden*, Case No. 1184-VCP 2009 WL
> 2581873, at *4 (Del. Ch. 2009) (*citing Mason
> v. Network of Wilmington, Inc.,* Case No.
> 19434-NC 2005 WL 1653954, at *3 (Del. Ch.
> 2005) ).

*Hitachi Medical Systems America, Inc. v. Branch*, No. 5:09cv01575, 2011 WL 3921718, *5 (N.D. Ohio 2011).

GeoStar exercised absolute control over ClassicStar during the relevant time. That alone would not mean that the corporate veil between GeoStar and ClassicStar must be pierced to avoid sanctioning a fraud or permitting an injustice to be worked. However, it is clear that the separate identities of the companies were – as a working matter – intended to work a fraud on investors like Plaintiffs. ClassicStar, wholly owned by GeoStar, was operated by GeoStar without sufficient capital to transact the business it had with the creditors of ClassicStar, including Plaintiffs. No one disputes that GeoStar exercised essentially complete control over the funds and financial records of ClassicStar and that, rather than ClassicStar operating under its own auspices and paying dividends to GeoStar, there was a great deal of collusion between the companies.

GeoStar paid substantial sums for ClassicStar expenses while ClassicStar did the same for GeoStar expenses, and it was common practice for the various GeoStar affiliates, including ClassicStar, to fund various settlement obligations of other affiliates with "no rhyme nor reason" according to Defendants' own accounting expert,

Sulaksh Shaw.[31] Although Shah denominated all of these transactions as "intercompany loans to loan money to operate their businesses," the evidence strongly suggests that "funds were intermingled between the two entities [ClassicStar and GeoStar] for no related consideration," as articulated by Plaintiffs' accounting expert G.N. Keeney, III, for the "books and records of GeoStar and ClassicStar reflect" that there was little effort to document purported transactions between the two companies. In other words, separate accounts and books may have been maintained for the two companies, but little documentation was made as to the particulars of the transactions. The Court finds this troubling. The records were simply inadequate to capture all the instances or details of the transactions in which GeoStar and ClassicStar paid each other's obligations.

Of course, poor recordkeeping might not be enough to foist responsibility for ClassicStar's debts on GeoStar without more, but there is more. Time and time again the financial stability and resources of GeoStar and Gastar were promoted to Plaintiffs in order to assuage them of concerns about the ability of ClassicStar to perform its promises – whether by advertising ClassicStar as part of the GeoStar Group, assuring Plaintiffs that GeoStar

---

[31]   Shah also testified that GeoStar's "recordkeeping . . . was not up to the standards of a public company" and that, even though GeoStar was not a public company, "there was a lot of room for improvement" in the recordkeeping that he had reviewed.

financially backed ClassicStar, or asserting that Gastar would fund the purchase of thoroughbreds to populate the Mare Lease Program. When this is considered in light of the fact that ClassicStar was grossly undercapitalized and incapable of supporting the transactions into which it entered – in large part because GeoStar moved $100,000,000 from ClassicStar's accounts to its own over time – it is clear that GeoStar operated ClassicStar as a mere instrumentality, in such a way as to defraud ClassicStar's investors, and that piercing the corporate veil is necessary to avoid injustice. If the veil were to remain unpierced as between ClassicStar and GeoStar, Plaintiffs would be subject to an unjust loss.

The Court turns next to whether Ferguson, Parrott, and Robinson can be, in turn, liable for those contracts. Plaintiffs have provided no evidence that Ferguson, Parrott, or Robinson disregarded the corporate formalities of ClassicStar in the sense that they raided its accounts to directly pay their own personal liabilities, for example. Nonetheless, their actions demonstrate that they treated GeoStar and – by extension – ClassicStar as instrumentalities to achieve their own ends. They made personal guarantees of financing obtained for ClassicStar from Fifth Third Bank and, ultimately, were the individuals responsible for directing the transfer of multiple millions of dollars from ClassicStar's accounts to GeoStar's accounts with the knowledge

that the transfers would leave ClassicStar undercapitalized.  Even so, they benefitted handsomely (some more than others) from GeoStar's (and its affiliates') gains.  The funds transferred or "siphoned" from ClassicStar went to support GeoStar's oil and gas operations, including those operated by and through Gastar, and ultimately to pay the principals of GeoStar, Ferguson, Parrot, and Robinson.[32]  In other words, Ferguson, Parrott, and Robinson directed or permitted the transfer of funds from ClassicStar elsewhere knowing that ClassicStar had obligations that it could not meet.  They used GeoStar to loot ClassicStar to the detriment of Plaintiffs and for their own gain of millions of dollars.  The Court agrees with Plaintiffs that, on these facts, a second piercing of the veil between GeoStar and Ferguson, Parrott, and Robinson is necessary to avoid injustice because these individuals acted in such a way as to harm Plaintiffs and other investors and Plaintiffs would be subject to an unjust loss without the ability to recover from these individuals.

### D. Damages

As to damages, the Court begins its analysis with an assessment of RICO damages.  Plaintiffs must show a direct relation between their injuries and the conduct of the RICO defendants.  *See*

---

[32]  Net distributions from the accounts of ClassicStar, GeoStar, Gastar, and their affiliates from 2001 to 2008 to these individual defendants totaled $1,117,364 for Parrott, $7,936,800 for Ferguson, and $17,527,822 for Robinson.

*Cassens Transport*, 546 F.3d at 357.  Plaintiffs are not required to prove reliance on the misrepresentations made or the material facts omitted by Defendants, *see Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008), but proof that they did, which exists in this case, is sufficient to establish proximate cause in this Court's mind.

The amount of damages suffered by Plaintiffs is "the harm occasioned as a result of the predicate acts of the offenders." *Fleischhauer*, 879 F.2d at 1299 (6th Cir. 1989) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985))).  Thus, in *Fleischhauer*, the Court of Appeals for the Sixth Circuit held that investor damages were limited to the amounts that they actually invested, not expectancy or "benefit of the bargain damages." *Id.*; *see also  Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 506 (S.D. Fla. 1996) (holding that, with respect to the calculation of damages caused by RICO violations where an investment scheme is the source of the harm, the "appropriate measure is the total amount of Plaintiff's out of pocket capital invested which they would not have invested but for the Alleged Scheme").

Once that amount is ascertained, the Court applies a multiplier of three in keeping with 18 U.S.C. § 1964, which provides that "[a]ny person injured in his business or property by reason of  a violation of [§] 1962 of this chapter . . . shall recover threefold the damages he sustains." In this instance,

the Plaintiffs' out-of-pocket losses, i.e., their cash investment less any return, total $16,468,603.87.  Using a multiplier of three, the Court arrives at Plaintiffs' recovery under RICO: $49,405,811.61.

Further, the Court considers whether it is appropriate to award prejudgment interest for damages on a RICO claim.  This Court and others in this Circuit have done so in the past, applying the state statutory rate in making the calculation.  *See Empire Servs., Inc. v. Kanza*, 1993 U.S. App. LEXIS 17645, *4-5 (6th Cir. 1993) (applying Tennessee's statutory rate in calculating prejudgment interest award); *Grange v. Mack*, Civil Action No. 02-110, Memorandum Opinion and Order (E.D. Ky. December 18, 2006).  The Court remains convinced that it is appropriate to award such prejudgment interest on the facts before it with respect to this RICO claim, for the damages are based upon specific sums and are "liquidated claims," susceptible to prejudgment interest under Kentucky law.  *See Estate of Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005); *McMahan & Co. V. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir. 2000) ("A claim is liquidated if the amount has been agreed to by the parties or is fixed by operation of law."); *Hale v. Life Ins. Co. of North America*, 795 F.2d 22, 24 (6th Cir. 1986) ("Under Kentucky law, if the claim is liquidated, interest follows as a matter of right, but if it is unliquidated, the allowance of interest is in the

discretion of the trial court.").[33]   The Court concludes, as well,

that it is appropriate to calculate this amount in the manner

proposed by Plaintiffs, meaning that prejudgment interest is

calculated from the time that investments were made on the money

paid until such time that funds were paid back to a plaintiff, at

which time prejudgment interest begins to run on the total of the

investment less the return.   Thus, the total award of prejudgment

interest will be $15,636,273.00.

The Court declines to treble Plaintiffs' prejudgment interest

award as requested by Plaintiffs since 18 U.S.C. § 1964

contemplates only the trebling of damages, not costs or attorneys

fees, and not, in this Court's mind, a trebling of prejudgment

interest.   This Court's errand in awarding damages is circumscribed

by the statute, and the Court will not deviate from the language

therein.   To the extent that this represents a deviation from the

---

[33]   The Court is cognizant of the case law cited by Defendants
in support of their position that the federal statutory interest
rate should apply in RICO situations, but each of those cases is
concerned with awards under ERISA, not RICO.  *See Snow v. Aetna
Ins. Co.*, 998 F. Supp. 852, 856 (W.D. Tenn. 1998) (post-judgment
rate stated in 28 U.S.C. § 1961 was made applicable to a
prejudgment interest award in an ERISA case); *Nelson v. EG&G Energy
Measurements Group*, 37 F.3d 1384 (9th Cir. 1994) (same); *Britton v.
Long Term Disability Ins. Plan of Lovelace Institutes*, 217
F.Supp.2d 1207 (D. N.M. 2002) (same).  In this regard, the Court
believes that it should proceed in a manner which is consistent
with its earlier decision, in *Grange v. Mack*, Civil Action No. 02-
110, as well as the decision of the Court of Appeals for the Sixth
Circuit in *Empire Servs., Inc. v. Kanza*, 1993 U.S. App. LEXIS
17645, *4-5 (6th Cir. 1993), and will apply the Kentucky state
statutory prejudgment interest rate of 8%.

decision this Court made in *Grange v. Mack*, Civil Action No. 02-110, and that the Court of Appeals for the Sixth Circuit reached in *Empire Servs., Inc. v. Kanza*, 1993 U.S. App. LEXIS 17645, *4-5 (6th Cir. 1993), the Court notes that there was neither argument with respect to the calculation of damages (and, thus, no holding) and the amount of the award in *Empire* and neither case included a reasoned analysis for why prejudgment interest was trebled in either of those cases. Frankly, having considered the matter anew, the Court concludes that, in this case, trebling a prejudgment interest award would be inconsistent with the statute and, in any event, an abuse of discretion.

Further, there can be no doubt that the damages available under RICO, even as articulated by the Court above, represent the largest amount recoverable on any of the causes of action addressed herein. With that in mind, the Court will not address the appropriate measure of damages for either Plaintiffs' common law fraud or breach of contract claims further at this juncture.

## IV. Conclusion

Plaintiffs have set forth a compelling and well-supported account of how Defendants misrepresented the reality of the Mare Lease Programs offered through ClassicStar and how, acting together, they took Plaintiff's money to use for their own ends, then worked to prevent the discovery the ruse and to perpetuate the cycle of investment. Whether that wrong is understood through the

lens of a civil RICO claim, common law fraud, or breach of contract, the gig is up. Plaintiffs' motion for summary judgment will be granted.

Accordingly, **IT IS ORDERED**:

(1) that Plaintiffs' Motion to Substitute Certain Exhibits in Support of their Summary Judgment Pleadings [DE 565] is **GRANTED** and that the Clerk shall **SUBSTITUTE** the tendered exhibits as necessary to effect this order.

(2) that Defendants ClassicStar 2004, LLC, ClassicStar Farms, Inc., Tony Ferguson, GeoStar Corporation, GeoStar Financial Services Corporation, and Thom Robinson's Motion for Leave to File Excess Pages [DE 515] is **GRANTED** and that the Clerk shall **FILE** the tendered document in the record of this matter.

(3) that the Motion of Plaintiffs Arbor Farms, LLC, Jaswinder Grover, Monica Grover, MacDonald Stables, LLC, Nelson Breeders, LLC, and West Hills Farms, LLC, for Leave to File Excess Pages [DE 535, 536, 555] is **GRANTED** and that the Clerk shall **FILE** the tendered documents in the record of this matter.

(4) that Defendants GeoStar Corporation, ClassicStar Farms, Inc., Tony Ferguson, Thom Robinson, First Source Wyoming, Inc., and GeoStar Financial Services Corporation's Motion for Briefing [DE 744] is **DENIED**.

(5) that the Motion for Summary Judgment of Plaintiffs Arbor Farms, LLC, Jaswinder Grover, Monica Grover, MacDonald Stables,

LLC, Nelson Breeders, LLC, and West Hills Farms, LLC [DE 482] is
**DENIED AS MOOT** as to Defendant James D. Lyon in his capacity as
Trustee for the Estate of ClassicStar, LLC.

(6) that the Motion for Summary Judgment of Plaintiffs Arbor
Farms, LLC, Jaswinder Grover, Monica Grover, MacDonald Stables,
LLC, Nelson Breeders, LLC, and West Hills Farms, LLC [DE 482] is
**GRANTED**.

This the 30th day of September, 2011.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge