```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF KENTUCKY
 2                   LEXINGTON DIVISION

 3  IN RE CLASSICSTAR MARE LEASE   . Docket No. MDL 1877
       LITIGATION,                 .
 4                                 .
     WEST HILLS FARMS, ET AL.,     .
 5                                 .
         Plaintiff,                . Master File No. 07-353
 6                                 .
                                   . Case Action No. 06-243
 7                                 .
                                   . Lexington, Kentucky
 8                                 . September 29, 2011
          v.                       . 10:40 a.m.
 9                                 .
    CLASSICSTAR, ET AL.,           . Hearing
10                                 .
         Defendants.               .
11  . . . . . . . . . . . . . . . .

12                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JOSEPH M. HOOD
13             UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For the Plaintiff:   Messrs. Barry D. Hunter, Robert
    West Hills Farms         C. Webb and Ms. Medrith Lee
16                           Norman
                         Frost Brown Todd LLC - Lexington
17                       250 W. Main Street
                         2800 Lexington Financial Center
18                       Lexington, KY 40507-1749

19  For the Defendants:  Mr. Brian M. Johnson
    Tony P. Ferguson     Greenebaum, Doll & McDonald,
20  Thomas E. Robinson       PLLC - Lexington
                         300 West Vine Street
21                       Suite 1100
                         Lexington, KY 40507
22
    Court Reporter:      K. Ann Banta, RPR, CRR
23                       101 Barr
                         Lexington, KY 40507
24                       (502) 545-1090

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.
```

2

```
 1                        Thursday morning session,

 2                        September 29, 2011, 10:40 a.m.

 3                        - - -

 4           THE COURT:  Good morning.

 5           MR. HUNTER:  Good morning, Judge.

 6           THE COURT:  Madam Clerk, call the matter on,

 7  please.

 8           THE CLERK:  Yes, Your Honor, Lexington Master

 9  File 07-353 and civil action no. 06-243, In Re:

10  ClassicStar Mare Lease Litigation, West Hills Farms,

11  et al., v. ClassicStar, et al., called for hearing.

12           THE COURT:  Let the record reflect -- well,

13  let the record -- tell me who is here, Mr. Hunter.

14           MR. HUNTER:  Barry Hunter, Bob Webb and Lee

15  Norman on behalf of the West Hills plaintiffs.

16           THE COURT:  Huh, Mr. Sullivan is not here

17  again?

18           MR. HUNTER:  Again he is not here sadly.

19           THE COURT:  I don't know about that.

20           MR. HUNTER:  But he's given me full authority

21  to speak.

22           THE COURT:  I am not for sure we are too sad

23  about that, are we?

24           Mr. Johnson?

25           MR. JOHNSON:  Good morning, Your Honor, Brian
```

1    Johnson for Geostar, Ferguson and Robinson.

2              THE COURT:  Is there anybody else here on

3    this matter or anybody else sitting around can't find

4    a place to hide have come?

5              MR. JOHNSON:  The latter I believe, Your

6    Honor.

7              THE COURT:  Okay.  Well, let me start out by

8    saying that I just -- I think I am on page 65 of the

9    final draft of probably what's going to be in the

10   neighborhood of about a 100-page opinion.

11             Hopefully we will get that out before I go to

12   Laredo next week.

13             But it's consistent with what I announced the

14   opinion would be.

15             Now, Mr. Hunter, you -- based on that, you

16   want to -- and Mr. Johnson wanted a hearing on the

17   matter of damages.  Would you like to talk about that?

18             MR. HUNTER:  Sure.

19             THE COURT:  I assume you disagree because you

20   haven't shaken hands and said, "This is -- we have

21   resolved this."

22             MR. HUNTER:  We -- we tried our might, yes,

23   sir, but like everything else in this case, our

24   clients got in the way.

25             THE COURT:  Those clients are trouble.

1          MR. HUNTER:  Yep.  Yep.

2          THE COURT:  Go ahead.

3          MR. HUNTER:  Okay, Your Honor, I handed a set

4  of charts -- let me also hand it to Mr. Johnson.

5          I have never referred to it.  I think it

6  would help set forth what -- what our position is.

7          But starting -- starting on the first page,

8  what that's intended to do, that chart is to actually

9  specify the damage amounts that we are seeking under

10  our out-of-pocket damages theory based on our

11  recisionary measure of damages in counts one, two and

12  four.

13          And as you can see, the principal amount of

14  the out of pocket is set forth for each plaintiff.

15          The prejudgment interest calculated at 8

16  percent is set forth, the total and the amount of the

17  trebling is set forth, and I just haven't --

18          THE COURT:  Have you made a motion yet for

19  treble damages?

20          MR. HUNTER:  It was in the summary judgment

21  motion, and it was in the motion.

22          THE COURT:  Okay, so Mr. Johnson then is

23  justified in fussing about your treble -- using the

24  treble damages.

25          MR. HUNTER:  And I think based on the fact

1 that you asked us to brief it, I think we sent you a

2 bunch of cases that say they are mandatory, those

3 attorneys fees.

4          I think Mr. Johnson was necessarily silent on

5 that point.

6          I don't think there is a serious issue but

7 that treble damages and attorneys fees are mandatory

8 under RICO.

9          THE COURT:  Mr. Johnson is seldom if ever

10 hardly silent, so we will let him get to that point

11 after -- when it becomes his turn.

12          MR. HUNTER:  Okay.  So the other thing that I

13 -- I wanted with regard to the prejudgment interest

14 calculation which was on page 2 of this chart, there

15 were some suggestion in the defendants' briefs that

16 the full benefit of the recoveries wasn't granted in

17 the prejudgment interest calculation.

18          That's manifestly not true, and I think it's

19 transparent on these documents.

20          And just -- just to be clear, the way that

21 our expert did the calculation was that every time

22 money went in, which is in that second column amount,

23 he calculated the balance, he calculated interest

24 based on that balance.

25          Where you get to the highlight portions,

1  that's where money starts going out, starts getting

2  recovered by our client.

3         And each time that happened, the expert,

4  Mr. Keeney, reduced the balance, you can say, and the

5  prejudgment interest was calculated based on the

6  reduced balance.

7         So I don't think there is any question, and I

8  think it's transparent in what's before the court in

9  our expert's calculation that prejudgment interest was

10  appropriately calculated.

11         Every time there was a recovery by the

12  plaintiffs, the balance upon which interest was

13  calculated was reduced.

14         THE COURT:  Go ahead.

15         MR. HUNTER:  Okay.  So there is -- there is a

16  question, and candidly the Circuits are split on

17  whether or not prejudgment interest ought to be

18  awarded in RICO cases.

19         We are in the Sixth Circuit, luckily for us,

20  and in the Sixth Circuit it appears to be the law.

21         And I have cited the Sixth Circuit case of

22  Empire Services v. Kanza as well as Your Honor's case

23  in Grange v. Mack which cites --

24         THE COURT:  Well, that would expect me to be

25  consistent in a decision.

1          MR. HUNTER:  Well, I am suggesting at least

2  in this case, Your Honor.

3          THE COURT:  Okay.

4          MR. HUNTER:  But where the Sixth Circuit and

5  Your Honor held that prejudgment interest was

6  appropriately added in a RICO case and that the

7  appropriate rate was the state rate in this case, 8

8  percent, the Kentucky rate.  And the courts were --

9  sorry.

10          THE COURT:  No, go ahead, I'm just thinking.

11          MR. HUNTER:  And the court rejected the

12  argument like Mr. Johnson is making here which is that

13  you should apply the federal rate which now if you

14  apply the federal rate you may as well forget

15  prejudgment interest because I think it's about .1

16  percent.

17          But the courts in the Sixth Circuit have said

18  that's not the rate to apply, they apply the state

19  rate which is 8 percent, and that's what our -- our

20  expert applied.

21          THE COURT:  Well, let me ask you, is -- you

22  talk about my Grange case and what I did in that

23  case.

24          I believe my brother Reeves had a -- also had

25  a Grange case.  It was Grange v. Mack, but it was a

1 different Mack; is that correct?

2         MR. HUNTER:  Honestly, Your Honor, I remember
3 there was another case.

4         I -- I don't know what it was about.  I don't
5 think it was about this issue.

6         THE COURT:  Well, it was about RICO.

7         MR. HUNTER:  Okay.

8         THE COURT:  It was a RICO case, and it was
9 about -- I had Mr. Mack; I believe he had Mrs. Mack,
10 if I am not mistaken.

11         So if you are not familiar with it, then
12 there is no sense in asking you any questions about
13 it.

14         MR. HUNTER:  Well, I can either explain that
15 to the fact that it didn't help me or that it was
16 irrelevant, I don't know which one.

17         THE COURT:  Well, okay.  Go ahead.

18         MR. HUNTER:  Okay.

19         THE COURT:  I was just wondering what he did
20 in that case.

21         MR. HUNTER:  Okay.  I -- I remember seeing it
22 because I think that my Louisville office was
23 involved, and I remember getting a case from them and
24 saying this has nothing to do with anything, and I
25 believe it was that.

```
 1              So it's my belief that it didn't discuss the
 2  issue.  But I can't --
 3              THE COURT:  Okay.
 4              MR. HUNTER:  I am not sure of that.
 5              THE COURT:  I don't know, I just posited that
 6  for discussion.
 7              MR. HUNTER:  Okay.
 8              THE COURT:  I was just wondering what he had
 9  done in his case.
10              MR. HUNTER:  The defendants claim that it
11  would be inequitable to grant prejudgment interest,
12  and that's one of the things that the courts look to.
13              Doesn't seem so to our clients who, for over
14  seven years, have been without the use of substantial
15  amounts of money and have had to spend millions of
16  dollars bringing these claims to collect the money.
17              As Your Honor knows, the purpose of
18  prejudgment interest is to compensate a plaintiff for
19  a delay in -- in not having the use of the money.
20              And we think prejudgment interest is
21  perfectly appropriate here.
22              THE COURT:  Well, do you warrant prejudgment
23  -- let me ask you this.
24              If you treble the damages, isn't that part of
25  the compensation claim for losing access to their
```

1 money?

2      MR. HUNTER:  That -- that will help,

3 Your Honor.

4      I -- the way that -- I think that the way

5 that we believe that the law looks at it, Sixth

6 Circuit, is that you determine what the appropriate

7 compensation is, which would be the principal plus the

8 prejudgment interest, and then under the RICO statute

9 for deterrent reasons you treble it.  So --

10      THE COURT:  You treble even the prejudgment

11 interest?

12      MR. HUNT:  Yes, sir, and both Empire Services

13 and, again, seeking your consistency here on Grange v.

14 Mack, does the same.

15      The -- the -- Mr. Johnson argues that that's

16 inequitable and that it leads to too high an amount of

17 damage.

18      And I just ask you to remember that the

19 recisionary damages measures that we seek based on the

20 notion that the plaintiffs would never have invested

21 in the first place but for the fraud, that those

22 measures were substantially lower than the benefit of

23 the bargain measures that Your Honor also awarded in

24 the summary judgment as an alternative that we

25 disclaimed in order to get a final judgment on counts

1 one, two and four.

2          And those out-of-pocket damages amounts are

3 substantially lower than the expectancy damages would

4 have been had we chosen to proceed on -- on those

5 damages.

6          I guess I need to briefly address

7 Mr. Johnson's claim that you ought to calculate

8 damages under his calculations rather than under the

9 calculations that we set forth in our summary judgment

10 papers which were part of the motion that Your Honor

11 granted.

12          Mr. Johnson's calculations, I think he is a

13 better lawyer than he is an economist, because what he

14 did was, they are kind of a hybrid set of

15 calculations.

16          When it lowers the amount of damage, when it

17 -- when it serves the purpose of lowering the damage,

18 he uses the out-of-pocket recisionary measure that we

19 are trying to espouse.

20          But then at the same time, when it helps him

21 further lower the damage, he uses a benefit of the

22 bargain measure by saying, "Okay, for purposes of the

23 offset, I am going to offset your recovery by the

24 contract value of the horses rather than by the money

25 that you actually received."

1           And as we said in our papers, that's flatly
2  inconsistent with the recisionary measure that we
3  proceeded on.
4           And what you get from his hybrid theory is
5  you get a hybrid measure of damages that's lower in
6  both than our recisionary measure of damages which was
7  one option in the summary judgment you granted, and
8  it's lower still than the expectancy measure of
9  damages alternative.
10          It's just -- it's not -- it's a -- it's a
11 hybrid of inconsistent measures, and it's not
12 appropriate.
13          And most importantly we set forth our damages
14 in our summary judgment.
15          Mr. Keeney, our expert's calculation was
16 right in the summary judgment that Your Honor granted
17 in its entirety.
18          And all the things that Mr. Johnson is
19 arguing with regard to how damages should be
20 calculated, that was not -- word one was not mentioned
21 about that anywhere in the summary judgment, and I
22 think that it's too late to start trying to change the
23 damages measures now.
24          Last point, Mr. Johnson argued, I think, in a
25 footnote that, again, even though this wasn't raised

1  in the summary judgment that he thinks an additional

2  offset should have been applied to our damages for

3  monies that my clients recovered in another case from

4  their lawyers.

5         They sued their lawyers for damages that they

6  didn't sue these MDL defendants for.

7         We didn't sue the MDL defendants for tax

8  losses like principal -- like penalties and interest.

9         We didn't sue the MDL defendants for the fact

10 that our lawyers got commissions and kickbacks.

11        That was not part of the damages we sought

12 against the defendants.

13        It was part of the damages that we sought

14 against our lawyers, and we recovered amounts based on

15 those claims against the lawyers.  So it's not

16 appropriate.

17        First of all, I think it's too late for them

18 to argue that those additional amounts should be

19 offset, because, again, they knew about these

20 recoveries --

21        THE COURT:  Well, what kind of -- what kind

22 of -- what was the theory that the damages were

23 awarded against the lawyers?

24        MR. HUNTER:  On the fact --

25        THE COURT:  Or the damages that were sought

1 against the lawyers.

2         MR. HUNTER:  A malpractice claim for not

3 properly advising on the taxes, number one, and a

4 recoupment claim for, "Give us back the commissions

5 that you got from these people that you shouldn't have

6 got, just an unjust enrichment claim that you got

7 dirty money that we ought to recover."

8         Those were not elements of damages against

9 these defendants, and if they had argued during the

10 case rather than after the case was over that we

11 should have offset our recovery by those type of

12 claims, then at least we would have been in a position

13 to protect ourselves and added those claims to

14 recovery against them.

15         What's not fair is to have a summary judgment

16 setting forth an out-of-pocket damages claim that

17 doesn't offset the recoveries against the lawyers that

18 they knew about, have them say nothing, have your

19 order -- have Your Honor then enter an award of

20 damages based on our measure, and then after it's all

21 done say, "Oh, by the way, you should have offset

22 additional amounts that they recovered against their

23 lawyers," and not give us the chance to have added

24 those claims against them so that we wouldn't get a --

25 kind of a double reduction in our amounts.

1          So I think the simple argument is it was in
2   the summary judgment, it wasn't raised by them in the
3   summary judgment.
4          Your Honor granted the summary judgment in
5   its entirety, and it's too late for that type of
6   argument.
7          So with that, Your Honor, I urge you to be
8   consistent with Grange v. Mack, and I'll let
9   Mr. Johnson talk.
10         THE COURT:  All right, thank you,
11  Mr. Hunter.
12         MR. HUNTER:  Thank you.
13         THE COURT:  Mr. Johnson?
14         MR. JOHNSON:  Thank you, Your Honor.  Judge,
15  before I get into the argument, I do have one thing I
16  need to correct --
17         THE COURT:  Yes, sir.
18         MR. JOHNSON:  -- what we filed, we made -- I
19  am still not sure how we did it, but we made a math
20  error with respect to one plaintiff in our Exhibit B,
21  and I have got a corrected page for that that I would
22  like to tender to the court.
23         THE COURT:  Okay.  All right, that would be
24  great.
25         MR. JOHNSON:  It actually increases the

1  damages.

2          THE COURT:  You gave me two copies?

3          MR. JOHNSON:  Yes, it's the same thing.

4          THE COURT:  One I will give to Mary to file

5  with the substitute --

6          MR. JOHNSON:  It actually raises the damages

7  at that point for the receivable.

8          THE COURT:  Okay.

9          MR. JOHNSON:  Judge, Mr. Hunter talks about

10 how we have taken a hybrid measure of damages, and he

11 is absolutely right.

12         We did take a hybrid measure of damages, and

13 the reason for that is because we believe that it's a

14 fair representation of how they should be awarded in

15 this case.

16         When you look at the case of Fleishhauer v.

17 Feltner, what it says in a RICO context the plaintiff

18 should set out a reasonable and principled basis of

19 recovery, and I am not sure how you do that if you

20 ignore the specific facts of one case and you apply

21 this type of one size fits all analysis for every

22 case.

23         Now, specifically, Judge, what I am talking

24 about is the representations -- and I know you have

25 read our briefs in the past on this -- but the

1   representations these plaintiffs made to the Internal

2   Revenue Service.

3          What they said to the IRS in order to take

4   these multi-million dollar tax deductions was that

5   they were in the horse business, more specifically

6   they were in the thoroughbred business.  So in order

7   to do that they --

8          THE COURT:  As opposed to the quarter horse

9   business?

10          MR. JOHNSON:  Correct, and I have not made

11   any adjustments, Your Honor, for quarter horses, for

12   stock, for other payments whatsoever.

13          The adjustments we have made to Mr. Keeney's

14   analysis are specific to thoroughbreds, and the reason

15   for that is all these plaintiffs testified they

16   thought they were getting in the thoroughbred

17   business.

18          There was some issue with that, but that's

19   what they said.

20          That's what they represented to the IRS, and

21   that's how they were able to take these multi-million-

22   dollar tax deductions.

23          Brian Nelson took a $28 million tax

24   deduction.

25          He was going to be the greatest horseman of

1 his time, apparently.

2          But he represented to the IRS in doing that

3 that he was active in the horse business.

4          If that is true and if these plaintiffs are

5 to be held to their word on their tax returns,

6 submitted under penalty of perjury, then what I think

7 we need to do is look at the Schedule A values because

8 they should certainly have known whether they were

9 fair or not, so that's why we made the adjustment.

10 With respect to the other --

11          THE COURT:  But -- that assumes that on RICO,

12 which has its base -- has its genesis in a wire and

13 tax -- mail fraud type statute, that the fact that you

14 made statements that were misleading prompted a

15 response from the plaintiff, the particular plaintiff

16 that you mentioned, I can't remember the name.

17          MR. JOHNSON:  Nelson, Your Honor.

18          THE COURT:  Nelson, okay, that Nelson said,

19 "I am now a thoroughbred breeder."

20          The mail and wire fraud takes a -- takes a

21 position, it makes no difference whether they relied

22 on it or not.

23          That's one of the instructions I know I give

24 a jury.

25          So Nelson says, "I am a horseman."  You know

1 there is the old saying, you know, how you become a

2 millionaire in the horse business, you start off with

3 ten million and pretty soon you are down to just a

4 million.

5        But -- and the fact of the matter is, so you

6 are saying they relied on it, they held themselves

7 out, they took a deduction based on what the plaintiff

8 said; and so they got the benefit of this tax

9 writeoff, is that --

10        MR. JOHNSON:  They attempted to, then they

11 were audited.

12        THE COURT:  Yes, and some of them the IRS

13 said, "No, that's not working."  Right?

14        MR. JOHNSON:  Correct, all of them, I

15 believe, Judge.

16        THE COURT:  So they are now looking at

17 penalties and things like that, aren't they?

18        MR. JOHNSON:  As far as I know, but I don't

19 know specifics about it.

20        THE COURT:  Yeah, okay, go ahead.

21        MR. JOHNSON:  And Judge, I fully recognize

22 that this is something that we raised in response to

23 the summary judgment motion, the idea that these

24 plaintiffs were in pari delicto; and you rejected that

25 argument by granting that motion.

1          But I think it is still relevant to
2 considering damages on this idea that it should be a
3 reasonable and principled measure of damages.
4           Now, with respect to the law firms, we do
5 believe an adjustment is appropriate, the settlements
6 they got from the law firms.
7          What they told you is that we weren't really
8 looking for the same kind of damages in those cases.
9          And really in footnote four of their surreply
10 they say those cases involve tax losses, and that's
11 what we are trying to get at.
12          But if you look at the complaints they filed
13 in the cases -- and Judge, I have those, I would like
14 to tender one for you -- it's not exactly what they
15 said when they filed their complaints.
16          And tax losses were certainly a part of those
17 cases and commission payments were part of those
18 cases.
19          But what you have there are two complaints.
20 The first one is the one filed by the MacDonald
21 plaintiffs against Handler, Thayer & Duggan in
22 Wisconsin.
23          And if you look at page 7 of that complaint,
24 and specifically under Section C, the plaintiffs go
25 into some detail talking about how Handler, Thayer &

1  Duggan actually were promoters of the mare lease

2  program.

3          They have talked throughout the MDL about how

4  these tax opinions that were provided were important

5  parts of the marketing of the program.

6          They have argued repeatedly and as recently

7  as their surreply that these lawyers were bribed and

8  that they were in on it.  This was part of the

9  scheme.

10         So when you look at what they say in

11 paragraph number 95 of that first complaint --

12         THE COURT:  Paragraph what?

13         MR. JOHNSON:  95, Your Honor.  It doesn't say

14 the plaintiffs were damaged by having tax losses.

15         What they were claiming in that case is

16 damages, all damages resulting from their

17 participation in the ClassicStar Mare Lease Program.

18         Now, how they characterized the payment for

19 purposes of settlement, I do not know; but that's what

20 the complaint says.

21         If you look at the second complaint, Your

22 Honor, this is the complaint of the Arbor Farms, West

23 Hills and Nelson plaintiffs against the Hanna Strader

24 Law Firm in state court in Portland, Oregon.

25         And they go through and they give some

1  history about how they retained Hanna Strader, how

2  Hanna Strader was representing the plaintiffs and also

3  providing opinions to ClassicStar itself.

4          And if you look at paragraph 50 of that

5  particular complaint, they talk about the damages that

6  they are seeking through that litigation.

7          What they do is they itemize their out-of-

8  pocket cash losses for participation in the mare lease

9  program.

10         They don't limit it to how much they lost or

11 how much the IRS is now assessing against them as a

12 result of their participation, it's all damages.

13         Again, Judge, Hanna Strader, like Handler,

14 Thayer & Duggan, is one of those firms that they said

15 was bribed by ClassicStar and was an important part of

16 the scheme that they have alleged in the MDL.

17         THE COURT:  Okay.

18         MR. JOHNSON:  So, Your Honor, we think that

19 it would be appropriate, especially if they are

20 looking for damages in connection with their business,

21 business losses resulting from participation in some

22 type of fraud scheme, those damages are part of it,

23 too.

24         And the fact that they chose to sue those law

25 firms separately, not within the MDL, probably so

1  there wouldn't be an issue of disclosing privileged

2  information, I don't think affects the analysis

3  because the money recovered was money they alleged

4  themselves in those complaints was part of the scheme.

5         With respect to prejudgment -- judgment

6  interest, excuse me, Your Honor, we have argued that

7  it shouldn't be awarded.

8         We have cited to the court some case law for

9  the fact that where you have statutory damages such as

10  you have in RICO where treble damages and attorneys

11  fees are permitted, then prejudgment interest is

12  within the discretion of the court.

13         And I know, Your Honor, that you have awarded

14  prejudgment -- prejudgment interest in past cases

15  including a RICO case.

16         THE COURT:  What did Judge Reeves do in his

17  RICO case, do you know?

18         MR. JOHNSON:  I have the same answer

19  Mr. Hunter had, unfortunately, Judge, I am not sure.

20         THE COURT:  Reminds me one time I was sitting

21  with the Sixth Circuit.

22         In the middle of the argument, one of the

23  judges asked the lawyer, said, "How does the Thibodaux

24  Abstention Doctrine apply in this case?"

25         Well, how does the Thibodaux Abstention

1 Doctrine apply in this case?

2          And the response from the lawyer that was

3 arguing the case went (holding hands out).

4          Eventually the judge said, "Well, it really

5 doesn't, so let's go on."

6          So I ask you the same question I asked

7 Mr. Hunter, and I don't know whether the Grange case

8 applies -- Judge Reeves's Grange v. Mack case applies

9 or not.

10          MR. JOHNSON:  My knowledge of it is the same

11 as his, I know it exists; and that's about the extent

12 of it.

13          MR. HUNTER:  Great minds think alike.

14          THE COURT:  Well, in this case great minds

15 are involved in doing the top hat and cane routine

16 with a little soft shoe.  Go ahead, I'm sorry.

17          MR. JOHNSON:  Judge, I think especially --

18 well, let me back up a little bit.

19          In the cases that have been provided to you

20 by the plaintiffs, I am not sure whether the issue of

21 the propriety and prejudgment interest was even

22 raised.

23          Now, it's clear, it's apparent from the

24 opinions themselves that prejudgment interest was

25 awarded.

1          I don't know that any of the defendants ever
2    raised the same argument we have raised here in the
3    cases they have cited.
4          And typically what you are looking at in
5    those cases are some pretty small dollar amounts.
6          So, for example, if you look at the Empire
7    Services case that Mr. Hunter has provided to you
8    again today, the plaintiff was out $50,000.
9          They applied prejudgment interest, it was
10   trebled and the total damages were about 187,
11   something like that.
12         If you look at the damages that they are
13   seeking, page one of what Mr. Hunter handed you today,
14   the interest more or less doubles the amount of their
15   out-of-pocket loss.
16         So when I went through and did some rough
17   calculations of total interest they are looking for,
18   it's about 15 and a half million dollars of
19   prejudgment interest at 8 percent.
20         And then they are asking you to treble that
21   so that we are looking at prejudgment interest of
22   almost 50 million dollars.
23         So I think what we have here is -- is
24   overreaching.
25         If the idea is to compensate the plaintiffs

1   while at the same time having a punitive measure under

2   RICO, I think you can certainly get there without

3   prejudgment interest at the already enormous numbers

4   we are looking at.

5          We are talking about -- well, seventeen,

6   eighteen million dollars of damages before you apply a

7   penny of interest.

8          THE COURT:  Is that treble -- that's the

9   trebled figure of damages or --

10         MR. JOHNSON:  The -- I believe the damages

11  are something like $18 million with no prejudgment

12  interest.

13         This is what they say we paid in, we didn't

14  get anything back from that, so that's what we are out

15  of pocket.

16         Now, add onto that another 15 and a half or

17  so million dollars of prejudgment interest, what you

18  are being asked to do is take all of those amounts and

19  then treble those.

20         THE COURT:  Well, what about the idea that

21  the damages -- the trebling is part of the penalty,

22  obviously it's a pretty serious penalty.

23         MR. JOHNSON:  Sure.

24         THE COURT:  But cannot the interest,

25  prejudgment interest, wouldn't that normally run on --

1  on the amount invested as opposed to the -- would that

2  be a suggested value of damages or can that be done?

3            MR. JOHNSON:  I think, Judge, and Mr. Hunter

4  is correct, that in the Empire Services case, the

5  prejudgment interest was added, and then that lump,

6  the loss plus the prejudgment interest was then

7  trebled, so you get it over again.

8            THE COURT:  What did I do in the Grange case?

9            MR. HUNTER:  Same thing, Your Honor.

10           MR. JOHNSON:  Same thing, that's true.

11           THE COURT:  Okay.

12           MR. JOHNSON:  Okay.  I do think it's

13  important to keep in mind the numbers we are talking

14  about because the numbers here are very high, and once

15  you treble them, even without adding a penny of

16  prejudgment interest these plaintiffs would be getting

17  a huge amount of money.  One thing Mr. Hunter has

18  said --

19           THE COURT:  Well, you have to say that the

20  fraud was pretty serious, too, the scheme, etc., was

21  pretty outrageous as well.

22           MR. JOHNSON:  I presume that's what you

23  found, Your Honor.

24           THE COURT:  Well, yeah, I think -- I think I

25  said that, didn't I?

1          MR. JOHNSON:  When you granted summary

2  judgment.

3          THE COURT:  Well, I just said I was going to

4  grant it.  I said I would set out my reasons why,

5  but --

6          MR. JOHNSON:  Right.

7          THE COURT:  But I mean, a hybrid --

8  Mr. Hunter was talking about the hybrid measure of

9  damages, and you did too.

10          That would be kind of the offspring between a

11  thoroughbred and a quarter horse if we had tried to

12  sell those types of shares, too.

13          MR. JOHNSON:  So in keeping with Mr. Hunter's

14  theme, I will just ask for consistency with the rest

15  of the cases, and we will have the hybrid all the way

16  through.

17          THE COURT:  All right.

18          MR. JOHNSON:  One thing that Mr. Hunter

19  pointed out, and I think we are just having a

20  miscommunication on this, he said that there is -- his

21  expert is not running prejudgment interest with

22  respect to the actual value of the horses received, so

23  if you look at I think it's the 2nd page.

24          THE COURT:  The second page, yeah, I think he

25  said.

1          MR. JOHNSON:  We have not questioned and I

2     agree with Mr. Hunter that it's plain from the

3     document that Mr. Keeney has reduced the damage

4     figures by the actual amount of proceeds received from

5     the sales of the horses.

6          The issue that we take with that is this is

7     what the plaintiffs got out of the program, and we are

8     simply arguing that interest should not run on those

9     amounts from day one.

10          That's something that they did get back.  So

11     that's the only distinction that we have.

12          So for example in Mr. Keeney's chart, you can

13     see under balance, the balance column, beginning with

14     the $575,000, that is reduced.

15          But there is no reduction in the interest

16     running on the value of that horse from day one at

17     which they put money in until 5-1-07 when they got

18     money out.

19          So that's the distinction that we tried to

20     draw in our papers.

21          THE COURT:  I am trying to understand that.

22     I could go through -- you are saying that you put --

23     they put in $7 million.

24          MR. JOHNSON:  Yes.

25          THE COURT:  That they got the interest then,

1 taking out the $575,000, where should -- what -- where

2 should you start the interest?

3       MR. JOHNSON:  I can tell you what we did, and

4 I think this -- this fixes it, at least the way we

5 believe its credibility.

6       What we did was we backed out the amount of

7 money that the plaintiff received.

8       THE COURT:  Right.

9       MR. JOHNSON:  This is Exhibit B to our

10 papers.

11       We backed out that total amount that they

12 received from the sales of the horses beginning on day

13 one here August 23rd, 2004.

14       THE COURT:  Yeah.

15       MR. JOHNSON:  Back it out again to the extent

16 that there is some left over on the October 15, 2004

17 payment in, and you have a net number.

18       You will essentially have what the plaintiffs

19 paid in at the beginning, net the horse value that

20 they got out and let prejudgment interest run on that

21 whole amount.

22       THE COURT:  Isn't that essentially what

23 Mr. Keeney did?

24       MR. JOHNSON:  The difference is, as I

25 understand it, that while he netted out the amount of

1  money that the plaintiffs got from the horses, he did

2  subtract that from the damages.

3          THE COURT:  Uh-huh.

4          MR. JOHNSON:  There is prejudgment interest

5  running from the day they sent the first check to

6  ClassicStar to the day that they got, you know, for

7  this example several hundred thousand dollars' worth

8  of horses out of the program.

9          THE COURT:  Oh, okay.  I see -- see the

10 difference, yeah.

11         MR. JOHNSON:  And then the final issue,

12 Judge, and it's a big one in this case, is which rate

13 to use.

14         We have argued that RICO, of course, is a

15 Federal statute, and I think that the Federal rate

16 should apply.  That has been done in the Circuit.

17         I know you have applied 8 percent in the past

18 in the Grange case.

19         From what I can tell, it doesn't appear that

20 the issue of which rate to use was argued by the

21 parties.

22         But it's an important issue here because the

23 Federal rate is extremely low whereas the 8 percent

24 more or less doubles the amount of damages they are

25 seeking.

1          THE COURT:  I -- I understand that.  The

2   cases, though, that you cite are not RICO cases.

3          MR. JOHNSON:  That's correct.

4          THE COURT:  They are -- they are ERISA cases,

5   as I understand it.

6          MR. JOHNSON:  Correct.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Deals with the same concept, I

9   think, because you are dealing with a federal statute

10  in those cases of what interest would be --

11         THE COURT:  Well, the argument there that you

12  make there is quite attractive.

13         I am not for sure though if I have got a

14  Sixth Circuit case telling me though that I need to

15  put a state law prejudgment interest on something,

16  what -- what choice do I have?

17         MR. JOHNSON:  I think, Judge, that the case

18  law says that the award of interest is in the

19  discretion of the trial court to begin with.

20         And I think what we have here is your Grange

21  case in which the rate was applied, again, as far as I

22  can tell without argument over which rate to apply.

23         And you have got the same situation in the

24  Empire Services case, I am not sure that the issue was

25  raised.

```
 1            THE COURT:  All right.  Anyway, there wasn't
 2  any substantial discussion of how they chose the state
 3  rate?  Or why -- why or how they chose the state rate?
 4            MR. JOHNSON:  That's correct.
 5            THE COURT:  Okay, anything else?
 6            MR. JOHNSON:  Not unless you have questions.
 7            THE COURT:  No, I don't.  Thank you.
 8            MR. JOHNSON:  Thank you.
 9            THE COURT:  Mr. Hunter?
10            MR. HUNTER:  Just real quick.
11            THE COURT:  I find that hard to believe,
12  but --
13            MR. HUNTER:  Just -- I want to just kind of
14  separate the two types of arguments that Mr. Johnson
15  is making.
16            When he is arguing about prejudgment
17  interest, I really think that is appropriate for today
18  because that's something that Your Honor said when you
19  announced the judgment was going to happen.
20            I got up and I said, "Judge, we want to do
21  some things.  We want to reduce the amount of out of
22  pocket for recoveries that we have made since, and we
23  want to tack on prejudgment interest."  So that's all
24  to be argued now.
25            What I don't think is fairly argued, and I
```

1  have said it before and I'll say it one more time, is

2  for him to try to change the measure of damages that

3  was set forth in the summary judgment that Your Honor

4  granted and make arguments that -- that should have

5  been made in the summary judgment, like this argument

6  about the lawyers and how that offset should have been

7  made as an additional offset in the principal damages.

8          We set forth exactly what our argument was on

9  that in the summary judgment in the papers that I have

10 shown Your Honor that we have disclosed the recoveries

11 from the lawyers long before the summary judgment was

12 briefed, and they didn't say one word about it

13 throughout that summary judgment process.

14         And -- and to argue it now, to argue for a

15 change in the damages based on these factual arguments

16 I don't think's appropriate.

17         Our position is what it was in the summary

18 judgment and I think that Your Honor accepted, which

19 is that but for the wire fraud and the lies, my

20 clients wouldn't have gotten anywhere near this entire

21 program.

22         It's not like they would have picked and

23 chose that.

24         If they knew the truth, they wouldn't have

25 gotten involved in it at all, and that was the

1 recisionary measure of damage that we presented in the

2 summary judgment and Your Honor accepted.

3          THE COURT:  You know, not besmirching your

4 clients, there are some people that can make money

5 losing money.

6          That assumes they have more money than they

7 know what to do with.

8          MR. HUNTER:  But I think if they would have

9 known this was a terrible fraud --

10          THE COURT:  Well, if you had sent out a

11 statement that said -- if the defendants would have

12 sent out a circular that says, "Your attention is

13 brought to the fact that this is just pure fraud" --

14          MR. HUNTER:  And it was.

15          THE COURT:  But -- well, it may have been,

16 but -- well, it was, there is just no question about

17 that.

18          But you know, sometimes people go along, and

19 they are saying, "Well, you know, I don't know."

20          Kind of like some of Bernie's people who were

21 just smiling and saying, "I am getting a whole bunch

22 of money here, and it's good."

23          MR. HUNTER:  Judge, I have had cases where

24 people have been defrauded by people before and they

25 invest again and you ask them, "How could you have

1 done this?"

2          And they say, "The returns were too good to

3 walk away from."  I know.

4          THE COURT:  I just -- you know, I mean, I am

5 sitting there, people saying, "You know, my friend

6 Bernie got me into this and, boy, my friend, I am

7 doing well and I like it."

8          And then the next thing you know, Bernie goes

9 off and they have lost money and Bernie is sitting

10 down there doing 159 years, but everybody was happy

11 until they found out that they didn't have anything.

12          MR. HUNTER:  I am just saying that if they

13 wanted to make an argument like that --

14          THE COURT:  They should have done it.

15          MR. HUNTER:  -- to further reduce our damages

16 which are way lower than you found on expectancy, they

17 should have done it then, not now.

18          THE COURT:  Yeah.

19          MR. HUNTER:  The last point about -- on

20 prejudgment interest, I understand the argument that

21 it is a big amount of money.

22          My clients lost a lot of money.  This was a

23 big fraud.

24          And RICO says by saying that you treble,

25 there is a policy there to deter this type of

1 behavior.

2          THE COURT:  Well, prejudgment interest is

3 usually awarded where you have a liquidated damage

4 amount, right?

5          MR. HUNTER:  And I believe it's clear we have

6 that.

7          THE COURT:  Well, I believe that's clear.

8          MR. HUNTER:  Yeah.

9          THE COURT:  But does the normal liquidated

10 damages include times three, that's what I am not

11 clear about.

12          And if I have -- if I have discretion, you

13 know, in determining what the damages are and to see

14 how to restore the plaintiffs to the best situation,

15 you know, fair, I mean, there is an element of

16 fairness to both sides here, in the element of

17 fairness.

18          And it seems like that the prejudgment

19 interest may be to the liquidated portion, as I see

20 it, and this may not be quite consistent with Mack.

21          But prejudgment interest times -- times the

22 first amount, the amount invested --

23          MR. HUNTER:  Uh-huh.

24          THE COURT:  -- as opposed to the amount

25 invested trebled and then interest, you are

1  essentially giving them treble and prejudgment

2  interest, too.

3            MR. HUNTER:  I understand.

4            THE COURT:  And I am -- that's a huge amount

5  topped on treble damages.

6            So I'll have to look and see what my

7  discretion is and how much I can do.  But I am --

8            MR. HUNTER:  I understand.

9            THE COURT:  I am kind of hesitant about

10 awarding damages -- prejudgment interest on -- on --

11           MR. HUNTER:  On the trebled amount.

12           THE COURT:  Yeah, because you wouldn't have

13 had that trebled money at the time you invested, and

14 that's the time that I think that the prejudgment

15 interest should run from.

16           MR. HUNTER:  I understand.

17           THE COURT:  But that's just -- and I haven't

18 looked, and I am just thinking loudly.

19           MR. HUNTER:  And if I could just real

20 quickly, the difference --

21           THE COURT:  You just can't give me the last

22 word, can you?

23           MR. HUNTER:  You will have it.

24           THE COURT:  I'll have it.

25           MR. HUNTER:  The difference between what

1 Brian and I are saying on when you calculate

2 prejudgment interest, I think that it's clear if you

3 apply a recisionary measure of damages, the way that

4 Keeney did it is right because you look to when the

5 money came in and you apply interest based on that

6 amount of money, and you don't reduce the balance for

7 calculating prejudgment interest until you recover the

8 money.

9          What he is trying to do is say, "Since you

10 recover the money seven years later, don't calculate

11 prejudgment interest for that entire seven years."

12          That's not consistent with the recisionary

13 measure of damages.

14          THE COURT:  Well, let me ask you the same

15 question I asked Mr. Johnson.

16          How does the Thibodaux Abstention Doctrine

17 apply in this case?

18          MR. HUNTER:  I think that it compels trebling

19 of prejudgment interest.

20          THE COURT:  Whatever.  All right.

21          MR. HUNTER:  In my first appellate argument,

22 the judge asked me, "How is this different than a

23 debenture?"

24          This was a securities case.  I had no idea

25 what a debenture was.

1          THE COURT:  Well, you know what?  And this is

2    just an aside, and I hate to take up the record but --

3    to go off on this.

4          But when the question was asked, I was

5    sitting there going I don't remember anything about

6    the Thibodaux Abstention Doctrine.

7          And I think Mary Ann, my clerk, was there at

8    the time, and I kind of looked over at her; and she

9    and the other law clerks were going (indicating).

10         So who knows, but that's just the way

11   somebody decided to ruin somebody's oral argument.

12         Court -- I'll have something hopefully out

13   before I leave for Laredo, so -- and then I'll have

14   something else out on this.  All right?  Court will

15   be --

16         MR. HUNTER:  And Your Honor, we would ask

17   that you reserve on attorneys fees because we haven't

18   agreed on a number, and I think the law says those are

19   mandatory.

20         THE COURT:  Okay.

21         MR. HUNTER:  Okay, thank you.

22         THE COURT:  I'll reserve on that.  Court will

23   be in recess until court in course.

24         MR. HUNTER:  Thank you.

25                              - - -

1        (The further hearing in this matter was

2  concluded at 11:25 a.m.)

3                          - - -

4                    CERTIFICATE

5        I certify that the foregoing is a correct

6  transcript from the record of proceedings in the

7  above-entitled matter.

8  s/  K. Ann Banta            10-26-11
    K. Ann Banta, RPR, CRR      Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25